No. 23-3016

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

―――――――――――

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

LYLE RIKIO CUMMINGS,

Defendant-Appellant.

―――――――――――

On Appeal From the United States District Court
for the District of Hawaii
Case No. 1:22-cr-00023-DKW

―――――――――――

**APPELLEE'S SUPPLEMENTAL EXCERPTS OF RECORD
VOLUME 2 of 2**

―――――――――――

CLARE E. CONNORS
*United States Attorney*
*District of Hawaii*

REBECCA A. PERLMUTTER
*Assistant U.S. Attorney*

1

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE DISTRICT OF HAWAII

3

UNITED STATES OF AMERICA,   )   CRIMINAL NO. 22-00023-DKW
4                            )
             Plaintiff,      )   Honolulu, Hawaii
5                            )
        vs.                  )   June 14, 2023
6                            )
LYLE RIKIO CUMMINGS,         )
7                            )
             Defendant.      )
8    _____ )

9

10              TRANSCRIPT OF JURY TRIAL (DAY 5)
            BEFORE THE HONORABLE DERRICK K. WATSON,
11          CHIEF UNITED STATES DISTRICT COURT JUDGE

12
     APPEARANCES:
13

14   For the Plaintiff:        REBECCA PERLMUTTER, ESQ.
                               CHRISTINE OLSON, ESQ.
15                             Office of the United States Attorney
                               PJKK Federal Building
16                             300 Ala Moana Boulevard, Suite 6100
                               Honolulu, Hawaii  96850
17

18   For the Defendant:        JOSEPH R. MOTTL, III, ESQ.
                               2009 Makiki Street #C
19                             Honolulu, HI 96822

20

21   Official Court Reporter:  Gloria T. Bediamol, RPR RMR CRR FCRR
                               United States District Court
22                             300 Ala Moana Boulevard
                               Honolulu, Hawaii 96850
23

24
     Proceedings recorded by machine shorthand, transcript produced
25   with computer-aided transcription (CAT).

2

1                          I N D E X

2    GOVERNMENT WITNESSES:                              PAGE NO.

3
     GREGG KATAYAMA (RESUMED TESTIMONY)
4
           CROSS-EXAMINATION BY MR. MOTTL                    5
5
     BRANDI KAONI
6
           DIRECT EXAMINATION BY MS. PERLMUTTER             7
7          CROSS-EXAMINATION BY MR. MOTTL                   30
           REDIRECT EXAMINATION BY MS. PERLMUTTER           35
8
     MURRAY ACOSTA
9
           DIRECT EXAMINATION BY MS. PERLMUTTER             38
10
     RYAN FAULKNER
11
           DIRECT EXAMINATION BY MS. PERLMUTTER             50
12         CROSS-EXAMINATION BY MR. MOTTL                   98
           REDIRECT EXAMINATION BY MS. PERLMUTTER          115
13
     LYLE CUMMINGS
14
           DIRECT EXAMINATION BY MR. MOTTL                 124
15         CROSS-EXAMINATION BY MS. OLSON                  139
           REDIRECT EXAMINATION BY MR. MOTTL              151
16
     VIANNA CUMMINGS
17
           DIRECT EXAMINATION BY MR. MOTTL                 154
18         CROSS-EXAMINATION BY MS. OLSON                  160
           REDIRECT EXAMINATION BY MR. MOTTL              162
19
     EVELYN CUMMINGS
20
           DIRECT EXAMINATION BY MR. MOTTL                 163
21         CROSS-EXAMINATION BY MS. OLSON                  166

22

23

24

25

3

```
 1                    I N D E X (CONTINUED)

 2   EXHIBITS:                                    PAGE NO.

 3     Government's Exhibits 12 and 12A were received in      49
       evidence
 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

4

|         |    |                                                            |
|---------|----|------------------------------------------------------------|
|         | 1  | June 14, 2023                                 8:42 a.m.     |
| 08:42AM | 2  | THE CLERK:  Criminal Number 22-00023-DKW, United           |
| 08:42AM | 3  | States of America versus Lyle R. Cummings.                 |
| 08:42AM | 4  | This matter has been set for jury trial, day five.         |
| 08:42AM | 5  | Counsel, please make your appearances for the record.      |
| 08:42AM | 6  | MS. OLSON:  Good morning.  AUSA Christine Olson and         |
| 08:42AM | 7  | AUSA Rebecca Perlmutter for the United States.  We also have at |
| 08:42AM | 8  | counsel table paralegal Rae Ann Unten and right behind us HSI |
| 08:42AM | 9  | Special Agent Murray Acosta.                               |
| 08:42AM | 10 | THE COURT:  Good morning.                                  |
| 08:42AM | 11 | MR. MOTTL:  Your Honor, good morning.  Joe Mottl           |
| 08:42AM | 12 | attorney for Lyle Cummings.  Mr. Cummings is present.      |
| 08:42AM | 13 | THE COURT:  Okay.  Good morning to both of you as          |
| 08:42AM | 14 | well.                                                      |
| 08:42AM | 15 | I've got to get used to the good morning, right?          |
| 08:42AM | 16 | We've -- we've been getting together in the afternoons up to |
| 08:42AM | 17 | this point.  So good morning -- you may be seated.  Good   |
| 08:42AM | 18 | morning to the 14 persons on our jury.  As we begin day five, I |
| 08:42AM | 19 | will reorient you to where we were at the end of our trial day |
| 08:42AM | 20 | yesterday.  Detective Katayama had just testified on direct |
| 08:43AM | 21 | examination and we were just about ready to begin Mr. Mottl's |
| 08:43AM | 22 | cross-examination when we ran out of time.  So let's do that |
| 08:43AM | 23 | now.                                                       |
| 08:43AM | 24 | Mr. Mottl?                                                 |
| 08:43AM | 25 | MR. MOTTL:  Yes.  Thank you, Your Honor.                   |

| | | |
|---|---|---|
| 08:43AM | 1 | GREGG KATAYAMA, |
| 08:43AM | 2 | (Resumed the stand.) |
| 08:43AM | 3 | CROSS-EXAMINATION |
| 08:43AM | 4 | BY MR. MOTTL: |
| 08:43AM | 5 | Q    Detective, good morning. |
| 08:43AM | 6 | A    Good morning. |
| 08:43AM | 7 | Q    I just have a few questions.  You carried out many |
| 08:43AM | 8 | searches as you described in this case? |
| 08:43AM | 9 | A    Yes. |
| 08:43AM | 10 | Q    Is there a method when you're working with someone else, |
| 08:43AM | 11 | someone was assisting you and photographs were being taken?  Is |
| 08:43AM | 12 | there any standard method used or is it -- do you just sort of |
| 08:43AM | 13 | look and feel and uncover things, disclose things and then |
| 08:43AM | 14 | photograph?  Or is someone photographing you as you do your |
| 08:43AM | 15 | investigation? |
| 08:43AM | 16 | A    Well, I like to do a systematic search.  So once somebody |
| 08:44AM | 17 | discovers something, I'll take pictures of it to -- in its |
| 08:44AM | 18 | natural state as how we found it then take additional pictures |
| 08:44AM | 19 | as needed. |
| 08:44AM | 20 | Q    It sounds as if you were taking -- did you also take |
| 08:44AM | 21 | pictures or were you the photographer? |
| 08:44AM | 22 | A    Yes.  So I was in charge of taking pictures and also was |
| 08:44AM | 23 | in charge of documenting the exhibit of what was found. |
| 08:44AM | 24 | Q    Now, the actual individual searching, was it just this -- |
| 08:44AM | 25 | your one helper there or were there two people searching the |

6

| | | |
|---|---|---|
| 08:44AM | 1 | car or the truck? |
| 08:44AM | 2 | A    The other two officers were conducting the search. |
| 08:44AM | 3 | Q    And if they discovered something, they'd notify you and |
| 08:44AM | 4 | you would come over and photograph it? |
| 08:44AM | 5 | A    Yes. |
| 08:44AM | 6 | Q    As they found it, okay.  All right.  If -- in terms of the |
| 08:44AM | 7 | standard procedures, if an item is found that is considered |
| 08:45AM | 8 | possible evidence, and something is on top of it, is -- you as |
| 08:45AM | 9 | photographer, would you photograph it in that order, that is as |
| 08:45AM | 10 | it was found, or might it be inverted to show what was |
| 08:45AM | 11 | underneath and then that item marked and removed?  Might it be |
| 08:45AM | 12 | other way -- either way? |
| 08:45AM | 13 | A    Generally, no.  Like in the instance of the black bag we |
| 08:45AM | 14 | found, we would document that first.  And then once that was |
| 08:45AM | 15 | properly documented, we'd continue to search and like the |
| 08:45AM | 16 | iPhone box is underneath then the search would continue. |
| 08:45AM | 17 | MR. MOTTL:  For that.  I see.  All right.  No further |
| 08:45AM | 18 | questions.  Thank you. |
| 08:45AM | 19 | THE COURT:  Redirect? |
| 08:45AM | 20 | MS. OLSON:  No redirect, thank you. |
| 08:45AM | 21 | THE COURT:  All right.  Detective, you may step down. |
| 08:45AM | 22 | Thank you. |
| 08:45AM | 23 | THE WITNESS:  Thank you. |
| 08:45AM | 24 | THE COURT:  Ms. Olson, your next witness, please. |
| 08:46AM | 25 | MS. PERLMUTTER:  Your Honor, the government calls |

| | | |
|---|---|---|
| 08:46AM | 1 | Brandi Kaoni. |
| 08:46AM | 2 | THE CLERK:  Please raise your right hand. |
| 08:46AM | 3 | BRANDI KAONI, |
| 08:46AM | 4 | called as a witness, having been first duly sworn, was examined |
| 08:46AM | 5 | and testified as follows: |
| 08:46AM | 6 | THE CLERK:  Please state your full name and spell your |
| 08:46AM | 7 | last name for the record. |
| 08:46AM | 8 | THE WITNESS:  Brandi Kaoni, K-A-O-N-I. |
| 08:47AM | 9 | DIRECT EXAMINATION |
| 08:47AM | 10 | BY MS. PERLMUTTER: |
| 08:47AM | 11 | Q    Good morning, Ms. Kaoni. |
| 08:47AM | 12 | A    Good morning. |
| 08:47AM | 13 | Q    Would you please introduce yourself to the jury by |
| 08:47AM | 14 | explaining where you're currently employed? |
| 08:47AM | 15 | A    I am a criminalist at the Maui Police Department. |
| 08:47AM | 16 | Q    And what's a criminalist? |
| 08:47AM | 17 | A    A criminalist is someone who uses scientific methods to |
| 08:47AM | 18 | analyze physical evidence for legal purposes. |
| 08:47AM | 19 | Q    Is part of your role to also provide testimony like you're |
| 08:47AM | 20 | doing today? |
| 08:47AM | 21 | A    Yes. |
| 08:47AM | 22 | Q    And where do you work in the Maui Police Department? |
| 08:47AM | 23 | A    So I work in the Maui Police Department crime laboratory |
| 08:47AM | 24 | also known as the drug analysis unit. |
| 08:47AM | 25 | Q    Who else works in that unit with you? |

8

| | | |
|---|---|---|
| 08:47AM | 1 | A    We have myself and one other criminalist. |
| 08:47AM | 2 | Q    How long have you been a criminalist with the Maui Police |
| 08:47AM | 3 | Department? |
| 08:47AM | 4 | A    For eight years. |
| 08:48AM | 5 | Q    Do you have other jobs before that? |
| 08:48AM | 6 | A    So I worked mostly as a graduate research assistant.  I |
| 08:48AM | 7 | had two positions as a graduate research assistant. |
| 08:48AM | 8 | Q    And you mentioned you were a graduate research assistant |
| 08:48AM | 9 | so that goes to my next question.  Could you explain a little |
| 08:48AM | 10 | bit about your education? |
| 08:48AM | 11 | A    Yes.  So I have a bachelor of science -- actually, a dual |
| 08:48AM | 12 | bachelor of science in biochemisty and molecular biology from |
| 08:48AM | 13 | the University of Denver, and I have a master of science in |
| 08:48AM | 14 | biomedical basic sciences from the University of Colorado |
| 08:48AM | 15 | Denver Anschutz Medical Campus. |
| 08:48AM | 16 | Q    As your role as the criminalist for the Maui Police |
| 08:48AM | 17 | Department, does that require specialized training? |
| 08:48AM | 18 | A    Yes. |
| 08:48AM | 19 | Q    Could you describe I guess from the beginning of when you |
| 08:48AM | 20 | first got the job what type of training that you've received? |
| 08:48AM | 21 | A    Yes.  So when I started in this position, I received |
| 08:49AM | 22 | formal training in drug analysis from the Honolulu Police |
| 08:49AM | 23 | Department scientific investigation section drug in-house unit. |
| 08:49AM | 24 | And since then or that was about seven months of formal |
| 08:49AM | 25 | training, structured like a college course you had written, |

08:49AM   1   practicals, oral exams, things like that.  So that was about

08:49AM   2   seven months.

08:49AM   3   Q    Was that seven months specifically focused on analyzing

08:49AM   4   drugs?

08:49AM   5   A    Yes.

08:49AM   6   Q    Is another word for that controlled substances?

08:49AM   7   A    Yes.

08:49AM   8   Q    What would you describe as a controlled substance?

08:49AM   9   A    So a controlled substance is something that has been

08:49AM   10  deemed illegal to possess by state or federal law.

08:49AM   11  Q    Since that seven months when you first started at MPD,

08:49AM   12  have you done other trainings?

08:49AM   13  A    Yes.  I participate in continuing education, so pretty

08:50AM   14  much every month since I finished training I've had some sort

08:50AM   15  of supplemental training either on techniques, on drug trends

08:50AM   16  or I've also had specialized training directly from

08:50AM   17  manufacturer of our instruments, so for about eight years now

08:50AM   18  I've had just continuing education.

08:50AM   19  Q    When you say that you had direct training regarding your

08:50AM   20  instruments, could you explain a bit what you mean by

08:50AM   21  instruments?

08:50AM   22  A    Yes.  So I mentioned we use scientific methods to analyze

08:50AM   23  evidence.  To analyze the evidence, we use highly sophisticated

08:50AM   24  scientific instruments or machines, if you will.  So the

08:50AM   25  manufacturer, the people who make all of the machines, we --

10

08:50AM   1    I've received training from all of them directly.

08:50AM   2    Q    Do you have certifications in the area of drug analysis?

08:51AM   3    A    Yes.  So I am a board certified drug analyst with the

08:51AM   4    American Board of Criminalistics.

08:51AM   5    Q    What did that mean?

08:51AM   6    A    So certification, it's a voluntary process and it

08:51AM   7    demonstrates that an analyst has the professional knowledge,

08:51AM   8    skills and abilities that are required to do the job.  So I

08:51AM   9    have the professional skills to be a drug analyst.  Excuse me.

08:51AM   10   Q    Do you have to do any sort of proficiency or competency

08:51AM   11   testing as part of your job?

08:51AM   12   A    Yes.  So each year we are required to complete proficiency

08:51AM   13   testing.  And that is when we received blind samples and we

08:51AM   14   have to analyze them according to our laboratory SOPs or

08:51AM   15   standard operating procedures, and we -- we test the unknown

08:52AM   16   samples, generate a report, and we upload that result to the

08:52AM   17   proficiency test provider.  And if our results are in consensus

08:52AM   18   with the nation or national consensus result, then we have

08:52AM   19   passed that proficiency test.

08:52AM   20   Q    Have you passed your proficiency tests?

08:52AM   21   A    Yes.

08:52AM   22   Q    Are there any other quality checks on the work that you do

08:52AM   23   in the drug analysis unit?

08:52AM   24   A    Yes.  So before we use any instrument for testing, we are

08:52AM   25   required to demonstrate that it is working properly.  So we

08:52AM   1   have daily checks of all the instruments that we use for case

08:52AM   2   work.

08:52AM   3   Q    When you come up with a final report, is that a fair way

08:52AM   4   to categorize it?

08:52AM   5   A    Yes.

08:52AM   6   Q    Does that report get checked by anyone?

08:52AM   7   A    Yes.  So our -- our official laboratory reports get

08:53AM   8   reviewed by another technically competent drug analyst and we

08:53AM   9   call this a technical case review.  So that's another quality

08:53AM   10  check that we -- that we perform before issuing our final

08:53AM   11  report.

08:53AM   12  Q    In your eight years at the Maui Police Department, can you

08:53AM   13  approximate how many analyses you've done of controlled

08:53AM   14  substances?

08:53AM   15  A    I've done about 3,500 analyses.

08:53AM   16  Q    And have you in that category tested substances that

08:53AM   17  contain cocaine?

08:53AM   18  A    Yes.

08:53AM   19  Q    What about cocaine base?

08:53AM   20  A    Yes.

08:53AM   21  Q    Do you have an approximate number of how many of those

08:53AM   22  tests that you've done?

08:53AM   23  A    I've identified cocaine about 115 times.

08:53AM   24  Q    What about cocaine base?

08:53AM   25  A    That 115 includes cocaine and cocaine base.

12

08:54AM  1    Q    Are you familiar with testing what's known as THC?

08:54AM  2    A    Yes.

08:54AM  3    Q    What does THC stand for?

08:54AM  4    A    THC is also or it stands for delta-9 tetrahydrocannabinol

08:54AM  5    and that is the psychoactive ingredient found in marijuana.

08:54AM  6    Q    And approximately how many analyses have you done for THC?

08:54AM  7    A    So I've identified THC 64 times and I've identified

08:54AM  8    marijuana over 300 times.

08:54AM  9    Q    Have you previously testified as an expert related to drug

08:54AM  10   analysis?

08:54AM  11   A    Yes.

08:54AM  12   Q    And how many times?

08:54AM  13   A    Seven times.

08:54AM  14   Q    And for what type of courts have you done that testimony

08:54AM  15   for?

08:54AM  16   A    I provided testimony in the courts in the State of Hawaii.

08:54AM  17        MS. PERLMUTTER:  Your Honor, at this time, I'd move to

08:55AM  18   offer Ms. Kaoni as an expert in drug analysis and

08:55AM  19   identification pursuant to the Federal Rules of Evidence

08:55AM  20   specifically Rule 702.

08:55AM  21        THE COURT:  Mr. Mottl, any objection?

08:55AM  22        MR. MOTTL:  No objection, Your Honor.

08:55AM  23        THE COURT:  All right.  Without objection, Ms. Kaoni

08:55AM  24   may testify as an expert within the meaning of Federal Rule of

08:55AM  25   Evidence 702 in the field of drug analysis and identification.

08:55AM    1            You may proceed.

08:55AM    2            MS. PERLMUTTER:  Thank you.

08:55AM    3    BY MS. PERLMUTTER:

08:55AM    4    Q    I'd like to turn to the purpose of your testimony here

08:55AM    5    today.  How were you involved in the investigation involving

08:55AM    6    Lyle Cummings?

08:55AM    7    A    I received a request to test suspected controlled

08:55AM    8    substances seized in -- in this particular case.

08:55AM    9    Q    After you received that request, what steps did you take

08:55AM    10   in order to start the process?

08:55AM    11   A    So the process starts by the laboratory receiving a work

08:55AM    12   request that details the case and item numbers that the

08:56AM    13   requester wants tested.  So I then take that request, I email

08:56AM    14   it to our evidence custodians who are in charge of I guess

08:56AM    15   organizing and maintaining all evidence items for the police

08:56AM    16   station.

08:56AM    17            So once they have the items ready, I go to the

08:56AM    18   evidence room.  I check that each item has the report number

08:56AM    19   and the item number listed on the work request that I receive.

08:56AM    20   And after I've confirmed all of those checks, I then check each

08:56AM    21   item for signs of tampering.  And when all of -- when the

08:56AM    22   evidence is -- I guess when all the checks are completed, I

08:56AM    23   then sign a chain of custody and that -- that details that I

08:56AM    24   have taken possession of those items.

08:56AM    25   Q    For the items that you tested in this case, were there any

| | | |
|---|---|---|
| 08:57AM | 1 | signs of tampering when you obtained them? |
| 08:57AM | 2 | A    No. |
| 08:57AM | 3 |        MS. PERLMUTTER:  All right.  Your Honor, at this time |
| 08:57AM | 4 | I'd like to publish Exhibit 14A, page two.  It's already in |
| 08:57AM | 5 | evidence. |
| 08:57AM | 6 |        THE COURT:  Yes, you may. |
| 08:57AM | 7 |        MR. MOTTL:  No objection, Your Honor. |
| 08:57AM | 8 |        MS. PERLMUTTER:  Thank you. |
| 08:57AM | 9 |        Page two, please. |
| 08:57AM | 10 | BY MS. PERLMUTTER: |
| 08:57AM | 11 | Q    Are you familiar with this form? |
| 08:57AM | 12 | A    Yes. |
| 08:57AM | 13 | Q    And do you see your signature on this form anywhere? |
| 08:57AM | 14 | A    Yes. |
| 08:57AM | 15 | Q    Okay.  Could you describe for the jury where your |
| 08:57AM | 16 | signature is and also the purpose? |
| 08:57AM | 17 | A    Okay.  So if you look towards the middle of -- of the |
| 08:57AM | 18 | form, it says item number, received from and received by |
| 08:57AM | 19 | signature.  So in that first line, I have received by and |
| 08:57AM | 20 | that's my signature.  And the date is June 25, 2021, at 11:51 I |
| 08:58AM | 21 | received this item. |
| 08:58AM | 22 | Q    Is your signature on there a second time? |
| 08:58AM | 23 | A    Yes.  On the line directly below, you can see my signature |
| 08:58AM | 24 | again under received from and that details when I returned the |
| 08:58AM | 25 | evidence back to the evidence room. |

| 08:58AM | 1  | Q | And on what date? |
|---------|----|---|---|

08:58AM  2  A    July 13, 2021, at 10:12.

08:58AM  3  Q    What happened with the items that you obtained custody of

08:58AM  4  during that period from June 25th to July 13th?

08:58AM  5  A    So those items that I received, they were taken back to

08:58AM  6  the crime laboratory where I stored them until I was ready to

08:58AM  7  test them.

08:58AM  8  Q    Are they kept secure in your crime lab?

08:58AM  9  A    Yes.

08:58AM  10  Q    How are they secured?

08:58AM  11  A    They are secured in personal evidence lockers in the crime

08:58AM  12  laboratory in which only me and another criminalist have access

08:59AM  13  to.  And those lockers are in our secure laboratory in which,

08:59AM  14  again, only me and another criminalist have access to.

08:59AM  15  Q    When you're finished testing the items, how do you

08:59AM  16  resecure them?

08:59AM  17  A    So when I finish my testing, I will return them to the

08:59AM  18  original packaging and then seal the packaging with green

08:59AM  19  evidence tape.  That -- that tape has my initials and date on

08:59AM  20  it as well.

08:59AM  21  Q    The exhibit in front of you 14A, page two, the property in

08:59AM  22  evidence voucher, do you see the evidence custodian that you

08:59AM  23  were referring to on this form?

08:59AM  24  A    Yes.

08:59AM  25  Q    And could you tell the jury where you see that person's

08:59AM   1   name?

08:59AM   2   A    So on that same line, received from, I received it from

08:59AM   3   Janice Aquino.  And on the next line below, I returned it to

09:00AM   4   Janice Aquino received by.  She sign under received by.

09:00AM   5   Q    Do you see her writing anywhere else on this form?

09:00AM   6   A    Yes.  If you look a little bit up, there's a table.  It

09:00AM   7   says property control number.  There is the property control

09:00AM   8   number and directly below that there is some handwritten

09:00AM   9   subitemization so that is a subitemization I designated for

09:00AM   10  each item in this particular package and those are my initials.

09:00AM   11  Q    If you could turn to page four, please.  This is another

09:00AM   12  property in evidence form.  Do you see your name here as well?

09:00AM   13  A    Yes.

09:00AM   14  Q    The procedures that you just discussed regarding obtaining

09:00AM   15  the evidence and securing it, is that similarly applied to the

09:00AM   16  items pertaining to this form?

09:00AM   17  A    Yes.

09:00AM   18  Q    And is that true for all of the items that you obtained

09:01AM   19  for purposes of your testing?

09:01AM   20  A    Yes.

09:01AM   21  Q    So does your signature appear on all the property in

09:01AM   22  evidence forms?

09:01AM   23  A    Yes.

09:01AM   24  Q    And again, just to point out in the property control

09:01AM   25  number, do you see your writing there?

09:01AM   1   A    Yes.  Again, you can see the subitemization with my

09:01AM   2   initials next to it.

09:01AM   3           MS. PERLMUTTER:  You can take this exhibit off.

09:01AM   4           At this time, Your Honor, I'd ask to -- permission to

09:01AM   5   approach the witness with Exhibit 12.

09:01AM   6           THE COURT:  Yes, you may.

09:01AM   7           MS. PERLMUTTER:  Thank you.

09:01AM   8   BY MS. PERLMUTTER:

09:01AM   9   Q    Please take a moment to inspect Exhibit 12, and you may

09:01AM   10  want to take it out of the outer packaging sleeve but it's

09:02AM   11  sealed in its inner packaging.  Do you recognize Exhibit 12?

09:02AM   12  A    Yes.

09:02AM   13  Q    What are the items inside there?

09:02AM   14  A    So in this exhibit, I see items that I have tested

09:02AM   15  regarding this particular case.  I see individual baggies with

09:02AM   16  my handwriting and initials.  And I also see two packages that

09:02AM   17  are sealed with green evidence tape that say MPD crime lab with

09:02AM   18  my initials on it as well.

09:02AM   19  Q    Are these same items related to the property in evidence

09:02AM   20  forms in Exhibit 14A that we just looked at?

09:03AM   21  A    Yes.

09:03AM   22  Q    Are these also the same items that you actually tested for

09:03AM   23  purposes of your drug analysis report?

09:03AM   24  A    Yes.

09:03AM   25  Q    Do you see the cocaine that you tested?

18

| | | | |
|---|---|---|---|
| 09:03AM | 1 | A | Yes. |
| 09:03AM | 2 | Q | Do you see the cocaine base that you tested? |
| 09:03AM | 3 | A | Yes. |
| 09:03AM | 4 | Q | How are you able to recognize that those were the items |
| 09:03AM | 5 | | that you tested? |
| 09:03AM | 6 | A | So again, each item that I test will have my handwriting |
| 09:03AM | 7 | | with the report number, the item number, if applicable a |
| 09:03AM | 8 | | weight, and my initials on it and I can see that on multiple |
| 09:03AM | 9 | | bags and on the evidence tape seal. |
| 09:03AM | 10 | Q | Why it is that you put your writing on there? |
| 09:03AM | 11 | A | So that helps us organize sometimes when you have multiple |
| 09:03AM | 12 | | bags related to one item number, you can't really tell them |
| 09:03AM | 13 | | apart so we subitemize. And to ensure that everything is |
| 09:04AM | 14 | | related to that specific item, we write it directly -- the |
| 09:04AM | 15 | | subitemization directly on the packaging. |
| 09:04AM | 16 | Q | Now, I don't -- I don't want to you get too close but -- |
| 09:04AM | 17 | | and I know the jury won't know this right from where you're |
| 09:04AM | 18 | | sitting but is there some type of odor emanating from that bag? |
| 09:04AM | 19 | A | There is -- there's an odor. It smells a little like |
| 09:04AM | 20 | | paint thinner. |
| 09:04AM | 21 | Q | Why? |
| 09:04AM | 22 | A | That's -- that's a smell that we commonly smell when we |
| 09:04AM | 23 | | have large amounts of cocaine. |
| 09:04AM | 24 | Q | If -- when you inspect those items today, are those items |
| 09:04AM | 25 | | in substantially the same condition as the crack, excuse me, |

2-SER-227

09:04AM   1    the cocaine base and the cocaine when you tested them in your

09:04AM   2    drug lab?

09:04AM   3    A    So the items in the larger heat seal with the green

09:04AM   4    evidence tape, those look intact, but I do see the outer manila

09:05AM   5    packaging.  There was an outer manila envelope that contained

09:05AM   6    some of these loose baggies.  I don't see that manila envelope.

09:05AM   7    That's the only thing I done see.

09:05AM   8    Q    So the outer packaging, that manila envelope, is not

09:05AM   9    included in there?

09:05AM   10   A    Yes.

09:05AM   11   Q    But the items themselves, the cocaine and the cocaine

09:05AM   12   base, are those in substantially the same condition?

09:05AM   13   A    Yes.  I see all of those within this bag here, yes.  So

09:05AM   14   all the contents in the manila envelope are present.

09:05AM   15        MS. PERLMUTTER:  Your Honor, permission to take the

09:05AM   16   exhibit from the witness at this time.

09:05AM   17        THE COURT:  Yes, please do so.

09:05AM   18   BY MS. PERLMUTTER:

09:05AM   19   Q    Now, we mentioned your findings here.  Did you make your

09:06AM   20   findings in a written report?

09:06AM   21   A    Yes.

09:06AM   22   Q    And is that written report something that you prepare with

09:06AM   23   every drug analysis that you do?

09:06AM   24   A    Yes.

09:06AM   25   Q    And does that report reliably indicate the conclusions

20

| | | |
|---|---|---|
| 09:06AM | 1 | that you came to after you did your analyses? |
| 09:06AM | 2 | A    Yes. |
| 09:06AM | 3 | Q    And did you do a report in this case? |
| 09:06AM | 4 | A    Yes. |
| 09:06AM | 5 | MS. PERLMUTTER:  Your Honor, at this time, I'd like to |
| 09:06AM | 6 | publish Exhibit 16 which I believe has already been admitted |
| 09:06AM | 7 | into evidence. |
| 09:06AM | 8 | THE COURT:  It has and you may. |
| 09:07AM | 9 | MS. PERLMUTTER:  Can you give us a minute?  I think we |
| 09:07AM | 10 | can publish it if the Court allows. |
| 09:07AM | 11 | BY MS. PERLMUTTER: |
| 09:07AM | 12 | Q    Okay.  So is this the report that you prepared for the |
| 09:07AM | 13 | items that you tested in this case? |
| 09:07AM | 14 | A    Yes. |
| 09:07AM | 15 | Q    Could you walk the jury through -- let's start with the |
| 09:07AM | 16 | upper portion of the report before you get into the specific |
| 09:07AM | 17 | items. |
| 09:07AM | 18 | MS. PERLMUTTER:  And, Ms. Unten, if you could blow |
| 09:07AM | 19 | that up, the upper portion, please. |
| 09:07AM | 20 | BY MS. PERLMUTTER: |
| 09:08AM | 21 | Q    What information do you put on the top of your report to |
| 09:08AM | 22 | identify it? |
| 09:08AM | 23 | A    Okay.  So first, oh, excuse me.  First off, this is the |
| 09:08AM | 24 | official laboratory report and it details the MPD case number, |
| 09:08AM | 25 | the offense, and the requester so the person requesting the |

09:08AM  1   drug analysis.  It also details who and when I received

09:08AM  2   evidence from.  So evidence custodian Janice Aquino, and then I

09:08AM  3   received it on June 25, 2021.  And below that it details the

09:08AM  4   date that analysis started and the date that it finished or it

09:08AM  5   was completed.

09:08AM  6   Q    And after the preliminary information in the top portion

09:08AM  7   of that report, there is a section call packaging.  Why do you

09:08AM  8   include that section?

09:08AM  9   A    So this helps us inventory all of our items and it helps

09:08AM  10  us document what each item or how they were packaging, the

09:09AM  11  conditions they were received.  And in this case, there were no

09:09AM  12  signs of tampering, so I've documented that all the seals I

09:09AM  13  received were intact.

09:09AM  14  Q    If you could walk the jury through -- actually, before

09:09AM  15  that we already have this pulled up.

09:09AM  16       After the packaging, you have a section called

09:09AM  17  evidence description and what's the significance of that?

09:09AM  18  A    So again, packaging is like the outer bag, and the

09:09AM  19  evidence description portion of this report details each item

09:09AM  20  that's within the packaging.  So each baggy is listed and a

09:09AM  21  description of -- of each item is listed in this section.

09:09AM  22  Q    So this is before you do any actual testing?

09:09AM  23  A    Yes.  So before we start any testing, we -- again, we

09:09AM  24  inventory.  We check the report number, the item number and

09:09AM  25  then we take it a step further by describing each item.

| | | |
|---|---|---|
| 09:10AM | 1 | MS. PERLMUTTER:  Okay.  If you can zoom back up. |
| 09:10AM | 2 | Thank you. |
| 09:10AM | 3 | BY MS. PERLMUTTER: |
| 09:10AM | 4 | Q    If you could walk the jury -- now, let's go to page two -- |
| 09:10AM | 5 | through your testing procedures in this case. |
| 09:10AM | 6 | A    Okay.  Okay.  So in this section, we have the results and |
| 09:10AM | 7 | conclusions.  So each item is listed and it has the final -- I |
| 09:10AM | 8 | guess the final conclusion about what the substance is, the |
| 09:10AM | 9 | weight that was obtained for that particular substance, and |
| 09:10AM | 10 | then the test and techniques.  So for each of these items, I |
| 09:10AM | 11 | performed a presumptive color test followed by -- |
| 09:10AM | 12 | Q    Let me stop you, Ms. Kaoni.  Let's go -- let's go back so |
| 09:10AM | 13 | that we take each in -- in part.  What was the first type of |
| 09:10AM | 14 | test that you did with the items? |
| 09:11AM | 15 | A    Okay.  So the first thing we do is we obtain a weight of |
| 09:11AM | 16 | the substance. |
| 09:11AM | 17 | Q    And why is it significant to weigh each item? |
| 09:11AM | 18 | A    So the weight of the substance helps the requester usually |
| 09:11AM | 19 | an officer, in this case detective, determine the charge so the |
| 09:11AM | 20 | charge for possession, if you will.  There are weight |
| 09:11AM | 21 | thresholds that we need to meet.  So it's important that we |
| 09:11AM | 22 | obtain an accurate weight of each substance so we know how much |
| 09:11AM | 23 | in total was in possession. |
| 09:11AM | 24 | Q    Is this weight -- I'm going to use these terms -- and I |
| 09:11AM | 25 | hope you can explain them to the jury -- a gross or a net |

09:11AM    1    weight?

09:11AM    2    A    So it's a net weight.  So it's the weight of the substance

09:11AM    3    without any other packaging.

09:11AM    4    Q    Okay.  So, for example, when you were looking at

09:12AM    5    Exhibit 12, the physical drugs, some of those drugs were in

09:12AM    6    plastic bags.  How would you have weighed that for the drugs

09:12AM    7    that were in those plastic bags?

09:12AM    8    A    Okay.  So to obtain a net weight, I'll take the bag and I

09:12AM    9    will scrape out all of the powder or substance into a weigh

09:12AM    10   boat and then I'll put that weigh boat onto our digital

09:12AM    11   balance.  And I will obtain the weight that is displayed and

09:12AM    12   record that in my notes and that is the net weight.  The weight

09:12AM    13   without any packaging.

09:12AM    14   Q    Okay.  So I want to talk a little bit about how you listed

09:12AM    15   the weight in your report so -- so the jury can understand.

09:12AM    16   Let's go to the first result and conclusion.

09:12AM    17        MS. PERLMUTTER:  If we can blow that up.

09:12AM    18   BY MS. PERLMUTTER:

09:12AM    19   Q    So for this item, the net -- what was net weight and why

09:12AM    20   is there something after that?

09:13AM    21   A    Okay.  So the weight I obtained was 0.861 grams and there

09:13AM    22   is a plus or minus .003 grams.  And that plus or minus .003,

09:13AM    23   it's called the uncertainty of measurement.  So it's a value

09:13AM    24   that we determine in the laboratory that accounts for all the

09:13AM    25   variability in our weighing process so it accounts for operator

24

09:13AM  1    error, the error -- or variability on the balance itself,

09:13AM  2    environmental conditions, so you can think of it also as a plus

09:13AM  3    or minus window in which the actual weight falls.

09:13AM  4    Q    If you can turn to page four, please.  And the bottom half

09:13AM  5    of the screen, please.

09:14AM  6         Did you determine a total weight of the various items

09:14AM  7    that you tested?

09:14AM  8    A    Yes.  So I obtained a total weight of all the cocaine and

09:14AM  9    all of the cocaine base including the total weight of all items

09:14AM  10   containing delta-9 tetrahydrocannabinol.

09:14AM  11   Q    Okay.  And is that included right above the measury --

09:14AM  12   measurement uncertainty statement?

09:14AM  13   A    Yes.

09:14AM  14         MS. PERLMUTTER:  If you can zoom out, please.

09:14AM  15   BY MS. PERLMUTTER:

09:14AM  16   Q    Now, as we move to the next portion of your testing,

09:14AM  17   perhaps it would be useful to just look at one item.

09:14AM  18   Specifically, let's take that first item that's included on

09:14AM  19   this page.  So we just talked about the weight.  What is your

09:14AM  20   next step?

09:14AM  21   A    Okay.  So we test one item at a time, so I'll take one

09:15AM  22   baggy, obtain the weight and then I'll proceed on performing a

09:15AM  23   presumptive test.  So the presumptive test gives us an

09:15AM  24   indication of what the substance could be.  So in this case for

09:15AM  25   this item, I utilized a color test.

25

| | | |
|---|---|---|
| 09:15AM | 1 | Q    And what does that mean? |
| 09:15AM | 2 | A    So a color test is performed on a ceramic spot plate so |
| 09:15AM | 3 | like a little rectangular plate with individual wells on it. |
| 09:15AM | 4 | So what I did was I took a little bit of the substance, put it |
| 09:15AM | 5 | in a well and then I added a color test reagent to that well |
| 09:15AM | 6 | and I observed color changes.  And in this case, I observed a |
| 09:15AM | 7 | blue precipitant, so you could think of it as blue dots that |
| 09:15AM | 8 | appeared.  And with this particular color test reagent, that |
| 09:15AM | 9 | indicates the presence of cocaine. |
| 09:16AM | 10 | Q    For the cocaine base separate and apart from the cocaine, |
| 09:16AM | 11 | did you perform the same type of presumptive test? |
| 09:16AM | 12 | A    Yes.  I performed the same color test and, again, I saw a |
| 09:16AM | 13 | blue precipitant which indicated the presence of cocaine. |
| 09:16AM | 14 | Q    And is there another step that you take in your testing? |
| 09:16AM | 15 | A    Yes.  So after the presumptive test, I then proceeded to |
| 09:16AM | 16 | perform a confirmatory test and those are tests that tell us |
| 09:16AM | 17 | the identity of the substance.  So for this particular item, I |
| 09:16AM | 18 | utilized the Fourier-Transform infrared spectrometer, also |
| 09:16AM | 19 | known as the FTIR. |
| 09:16AM | 20 | Q    And that's indicated in the test and techniques portion of |
| 09:16AM | 21 | your report? |
| 09:16AM | 22 | A    Yes. |
| 09:16AM | 23 | Q    And what does the FTIR do? |
| 09:16AM | 24 | A    So it's a bench top instrument that uses infrared light to |
| 09:17AM | 25 | give us information about a molecule structure.  So the |

09:17AM   1   infrared light will interact with the substance causing the

09:17AM   2   molecules to vibrate and so it creates like an energy

09:17AM   3   fingerprint of, if you will, of the substance.  And the

09:17AM   4   interesting thing about FTIR, this type of test, is that no two

09:17AM   5   molecules will have the same vibrational energy.  So we will be

09:17AM   6   able to tell two molecules or two substances apart from each

09:17AM   7   other using this technique.  Excuse me.

09:17AM   8        So again, the infrared light interacts with the

09:17AM   9   substance causing the bonds to vibrate.  Some of that infrared

09:17AM   10  light is absorbed.  Some of that goes through to the detector

09:17AM   11  in which it prints out a graph with peaks and valleys.  And so

09:17AM   12  again, those peaks and valleys are unique to each substance and

09:18AM   13  we can then take the graph that we obtained, compare it to a

09:18AM   14  known reference material, reference standard, and we can make

09:18AM   15  an -- we make the identification that way.

09:18AM   16  Q    Based on this type of testing, were you able to

09:18AM   17  differentiate between cocaine and cocaine base?

09:18AM   18  A    Yes.

09:18AM   19  Q    This particular item says cocaine hydrochloride.  What --

09:18AM   20  what is that?

09:18AM   21  A    So cocaine hydrochloride you can think of a cocaine

09:18AM   22  molecule with an additional hydrochloride entity attached to

09:18AM   23  it.  And so typically cocaine hydrochloride appears as a white

09:18AM   24  -- off white powdery substance.  And where am I going with

09:18AM   25  this --

| | | |
|---|---|---|
| 09:18AM | 1 | Q    In the physical exhibit that you looked at, Exhibit 12, |
| 09:18AM | 2 | was the cocaine hydrochloride the powdery bags in that? |
| 09:19AM | 3 | A    Yes, yes.  So physically, yes, it -- it appears as a white |
| 09:19AM | 4 | powdery substance. |
| 09:19AM | 5 | Q    The common name for cocaine hydrochloride something that |
| 09:19AM | 6 | we've been referring to? |
| 09:19AM | 7 | A    Typically we just call it cocaine. |
| 09:19AM | 8 | Q    And what about cocaine base? |
| 09:19AM | 9 | A    So cocaine base is, again, the cocaine molecule but it |
| 09:19AM | 10 | doesn't have that hydrochloride entity so it's just the cocaine |
| 09:19AM | 11 | molecule by itself.  Cocaine base, free base we call it.  And |
| 09:19AM | 12 | it's commonly referred to as crack, crack cocaine.  Typically |
| 09:19AM | 13 | it'll be a more waxy even rock-like substance.  So we don't see |
| 09:19AM | 14 | crack in the form of powder.  Normally, it's like a more rock |
| 09:19AM | 15 | or a waxy, solid substance. |
| 09:19AM | 16 | Q    And is that description in line with the physical exhibit |
| 09:20AM | 17 | of the items that you tested that were the cocaine base? |
| 09:20AM | 18 | A    Yes. |
| 09:20AM | 19 | Q    And so after completing these tests, were you able to come |
| 09:20AM | 20 | to a conclusion as to the identification of the items or |
| 09:20AM | 21 | substances that you tested? |
| 09:20AM | 22 | A    Yes. |
| 09:20AM | 23 | Q    Okay.  And those are in the report that we just looked at? |
| 09:20AM | 24 | A    Yes. |
| 09:20AM | 25 | Q    So for this example, it says substance from Ziploc bag |

| | | |
|---|---|---|
| 09:20AM | 1 | containing cocaine hydrochloride.  Is that your opinion as the |
| 09:20AM | 2 | actual makeup of the substance? |
| 09:20AM | 3 | A    Yes. |
| 09:20AM | 4 | Q    Did you also test items for THC? |
| 09:20AM | 5 | A    Yes. |
| 09:20AM | 6 | Q    And how does that relate to marijuana? |
| 09:20AM | 7 | A    So THC, again, is the psychoactive -- the main |
| 09:20AM | 8 | psychoactive component of marijuana.  And in this particular |
| 09:20AM | 9 | case, I identified THC not marijuana, so the difference there |
| 09:21AM | 10 | is that the THC was void of any plant material.  So when I |
| 09:21AM | 11 | observed it under the microscope, I didn't see any signs of |
| 09:21AM | 12 | vegetation, no characteristic traits of cannabis and that we |
| 09:21AM | 13 | refer to typically as a concentrate or an extract. |
| 09:21AM | 14 | Q    And that's just for the specific items that you actually |
| 09:21AM | 15 | tested? |
| 09:21AM | 16 | A    Yes.  In this case. |
| 09:21AM | 17 | Q    And if there were other items that were seized in the |
| 09:21AM | 18 | case, you may not have tested those.  It's only for the ones |
| 09:21AM | 19 | that are included in your report; is that right? |
| 09:21AM | 20 | A    Just for the items on the report. |
| 09:21AM | 21 |       MS. PERLMUTTER:  Okay.  And if we just zoom out back |
| 09:21AM | 22 | to page four. |
| 09:21AM | 23 | BY MS. PERLMUTTER: |
| 09:21AM | 24 | Q    Do you see the results of some of those THC tests on this |
| 09:21AM | 25 | page? |

29

| | | |
|---|---|---|
| 09:21AM | 1 | A    Yes.  So there are three items here smoking device, |
| 09:21AM | 2 | another substance, two other substances that were found to |
| 09:22AM | 3 | contain THC. |
| 09:22AM | 4 | Q    I'm not going to go into it but I just want you to point |
| 09:22AM | 5 | out for the jury if the tests were similar or different to the |
| 09:22AM | 6 | tests that you did for the cocaine and for the crack? |
| 09:22AM | 7 | A    They are a little bit different but the same concept |
| 09:22AM | 8 | presumptive and then a confirmatory test. |
| 09:22AM | 9 | Q    Would you turn to page five, please. |
| 09:22AM | 10 | This is the end of your official report, right? |
| 09:22AM | 11 | A    Yes. |
| 09:22AM | 12 | Q    And you signed and dated it? |
| 09:22AM | 13 | A    Yes. |
| 09:22AM | 14 | Q    Was this testing checked by someone other than yourself? |
| 09:22AM | 15 | A    Yes.  So this report did go through technical review.  It |
| 09:22AM | 16 | went to a third-party analyst for review. |
| 09:22AM | 17 | Q    And did the third-party analyst have any changes or |
| 09:22AM | 18 | corrections to your report? |
| 09:22AM | 19 | A    No. |
| 09:22AM | 20 | MS. PERLMUTTER:  Thank you.  At this time, Your Honor, |
| 09:22AM | 21 | no further questions. |
| 09:23AM | 22 | THE COURT:  Mr. Mottl, cross-examination when you're |
| 09:23AM | 23 | ready. |
| 09:23AM | 24 | MR. MOTTL:  Yes, Your Honor.  Thank you. |
| | 25 | |

| | | |
|---|---|---|
| 09:23AM | 1 | CROSS-EXAMINATION |
| 09:23AM | 2 | BY MR. MOTTL: |
| 09:23AM | 3 | Q    Good morning.  The -- I'll just ask you about the weighing |
| 09:23AM | 4 | of the substances and then the nature of the substance.  The |
| 09:23AM | 5 | scale used was a -- is that a -- a milligram scale, |
| 09:23AM | 6 | thousandths?  I know the -- the error indicator was a point and |
| 09:23AM | 7 | then three zeros.  Is that -- so that would indicate that you |
| 09:23AM | 8 | were using a -- a milligram scale or? |
| 09:23AM | 9 | A    Some milligram.  It's actually a four decimal place |
| 09:24AM | 10 | balance so we can read -- |
| 09:24AM | 11 | Q    Oh, four for an additional -- |
| 09:24AM | 12 | A    It's a 10th of a milligram, yes. |
| 09:24AM | 13 | Q    Okay.  I noticed there was a fair amount of variation in |
| 09:24AM | 14 | the amounts you weighed, net weight.  Just took the substance |
| 09:24AM | 15 | out of these multiple bags and weighed them and there was a |
| 09:24AM | 16 | variation that was well beyond the -- the error margin, plus or |
| 09:24AM | 17 | minus 003.  So there was a -- it's true that there were a |
| 09:24AM | 18 | significant variation in the amounts in the bags?  Some more -- |
| 09:24AM | 19 | or precise and some were not? |
| 09:24AM | 20 | A    I don't know how we could answer that because each bag is |
| 09:24AM | 21 | going to have its own weight.  So we don't know exactly how |
| 09:24AM | 22 | much is in a bag ever.  So if we're trying to say there's -- I |
| 09:24AM | 23 | didn't get the same amount every time.  I don't think that's |
| 09:24AM | 24 | a -- that's a reasonable thing to assume in -- in drug cases. |
| 09:25AM | 25 | Q    Well, I'm -- I'm referring to the net weight the in -- |

09:25AM    1    small packets.  And then there were some larger -- larger ones,

09:25AM    2    Ziplocs, primarily but the smaller ones, for example.

09:25AM    3    A    Yeah.

09:25AM    4    Q    Multiple.  You emptied the substances out and you weighed

09:25AM    5    them?

09:25AM    6    A    Yes.

09:25AM    7    Q    And then you replaced them back in -- back in the bag?

09:25AM    8    A    Yes.

09:25AM    9    Q    You put the substances back in the bag.  The amounts you

09:25AM    10   weighed, the net weight, varied from bag to bag, correct?  That

09:25AM    11   was my question.

09:25AM    12   A    Yes.

09:25AM    13   Q    Some were roughly around a gram, but some in excess of a

09:25AM    14   gram, some less than a gram, right?

09:25AM    15   A    It's -- it's whatever --

09:25AM    16   Q    And --

09:25AM    17   A    Whatever came out of the bag, yes.

09:25AM    18   Q    Correct.  And the variation in some cases, I don't know if

09:26AM    19   you recall it, sometimes was a 10th or more than a 10th so they

09:26AM    20   may be -- and I'm referring to -- with reference to one gram

09:26AM    21   sometimes, 8.5 and other times it was a one -- a full gram plus

09:26AM    22   additional two tenths or something like that so it was a

09:26AM    23   variation.  Certainly a lot greater than the -- the error that

09:26AM    24   you had in the scale you were using which was 003 which is

09:26AM    25   three thousandths, correct?

| | | |
|---|---|---|
| 09:26AM | 1 | A    If I'm understanding correctly or -- or I guess I don't |
| 09:26AM | 2 | really understand what -- what you're asking.  Are you asking |
| 09:26AM | 3 | why each bag was different in net weight? |
| 09:26AM | 4 | Q    No.  I'm just -- I'm asking you if that was one of your |
| 09:26AM | 5 | observations and you -- the amounts you entered in terms of the |
| 09:26AM | 6 | weights that was determined by the scale you were using, |
| 09:27AM | 7 | indicated that there was a -- a -- not an insignificant |
| 09:27AM | 8 | variation between the weights of one bag as opposed to another |
| 09:27AM | 9 | bag.  You had the three, one thousandths plus or minus and that |
| 09:27AM | 10 | was the error margin on the -- for the scale, but the -- the |
| 09:27AM | 11 | variation between the net weight of the contents of one bag |
| 09:27AM | 12 | versus another varied much more significantly than the error |
| 09:27AM | 13 | margin that you had; isn't that correct? |
| 09:27AM | 14 | A    They're -- they're different, yes, that's correct.  But I |
| 09:27AM | 15 | don't think we can attribute that to error on the part of the |
| 09:27AM | 16 | balance. |
| 09:27AM | 17 | Q    Oh, no.  Probably I -- I -- what I was thinking was an |
| 09:27AM | 18 | error in who placed the amounts in the bag assuming they were |
| 09:27AM | 19 | interested in placing a single gram in each bag? |
| 09:27AM | 20 |           MS. PERLMUTTER:  Objection, Your Honor.  Testifying. |
| 09:28AM | 21 |           MR. MOTTL:  Yeah. |
| 09:28AM | 22 |           THE COURT:  Ask a question, if you have one. |
| 09:28AM | 23 | BY MR. MOTTL: |
| 09:28AM | 24 | Q    Yeah.  I was not questioning the accuracy of the |
| 09:28AM | 25 | measurements you made. |

| 09:28AM | 1 | A | Okay. |
|---|---|---|---|

09:28AM   2   Q   I was just interested in the variation between one bag and

09:28AM   3   the next.  Thank you.

09:28AM   4       Now, the -- the molecule, cocaine molecule; is it

09:28AM   5   correct, yeah.  Is a three dimensional -- three-dimensional

09:28AM   6   molecule; is that correct?

09:28AM   7   A   If we're talking three-dimensional structure --

09:28AM   8   Q   Yes.

09:28AM   9   A   -- it's a small molecule.  Small molecules don't have

09:28AM   10  three-dimensional structure like larger things like proteins.

09:28AM   11  So it's a simple molecule you might say, but I -- I guess I'm

09:28AM   12  not too sure what you're asking.

09:28AM   13  Q   Okay.  Excuse my -- I'm possibly in -- in error in that

09:29AM   14  regard.  I did some reading myself.

09:29AM   15      I was interested in the spoilage of -- of cocaine.  In

09:29AM   16  time exposure to air, heat, water, moisture will change it,

09:29AM   17  correct, and it -- it may essentially become nonactive in terms

09:29AM   18  of its potency and its effect I guess you'd say psychoactively

09:29AM   19  and maybe physically.  So does it -- it spoils -- cocaine does

09:29AM   20  spoil?

09:29AM   21  A   I don't know that I have the expertise to talk about

09:29AM   22  cocaine spoilage, but I mean anything not properly preserved,

09:29AM   23  sure, could degrade.

09:29AM   24  Q   Okay.  Thank you.  Yeah.

09:29AM   25      So you're not an expert in the field.  That doesn't

09:29AM   1   fall within your expertise but you can say --

09:30AM   2   A     Not in terms of potency and how it affects that, no, I

09:30AM   3   can't speak to the potency.

09:30AM   4   Q     Now, you mentioned potency.  My next question relates to

09:30AM   5   the likelihood of other substances being mixed in with the

09:30AM   6   cocaine.  The presumptive tests that you made which are the --

09:30AM   7   during the -- the substance as you placed in it blue, that's

09:30AM   8   not affected by things that might be combined with the cocaine

09:30AM   9   and that certainly measured that there was a presence of

09:30AM  10   cocaine in the substance you were testing, correct?

09:30AM  11   A     I mean adulterants, cutting agents, they could have an

09:30AM  12   effect but that's why we follow that up with confirmatory

09:30AM  13   testing.

09:30AM  14   Q     That was my next question.  The vibrations you -- you

09:30AM  15   mentioned will take place irrespective -- vibrating molecules

09:31AM  16   with the ability to detect the vibration of the molecule that

09:31AM  17   you're seeking to identify which is cocaine is not affected by

09:31AM  18   other substances being mixed with it, correct?

09:31AM  19   A     So one of the limitations of this FTIR technique is that

09:31AM  20   the sample needs to be relatively pure in order to get a good

09:31AM  21   match to a reference standard.  And so for all of the items I

09:31AM  22   tested, all of the cocaine, all of the cocaine base, I got a

09:31AM  23   near -- or really, really good match for each of those items.

09:31AM  24   I did not have to chemically clean it up.  I did not have to

09:31AM  25   use other instrumentation, so as an analyst, I would say the

| | | |
|---|---|---|
| 09:31AM | 1 | samples were relatively pure. |
| 09:31AM | 2 | Q    Was there any way or did you actually determine the -- I'm |
| 09:32AM | 3 | probably not saying it correctly.  The -- the percentage of the |
| 09:32AM | 4 | purity that is how much was pure cocaine as opposed to |
| 09:32AM | 5 | something else that may have been mixed with it? |
| 09:32AM | 6 | A    No.  That's not a test that I performed. |
| 09:32AM | 7 | Q    Okay.  So it seemed relatively pure, but you didn't make a |
| 09:32AM | 8 | determination as to exactly how much or how pure it was? |
| 09:32AM | 9 | A    Correct. |
| 09:32AM | 10 |     MR. MOTTL:  Thank you.  All right.  I -- I have no |
| 09:32AM | 11 | further questions.  Thank you. |
| 09:32AM | 12 |     THE COURT:  Ms. Perlmutter, redirect? |
| 09:32AM | 13 |     MS. PERLMUTTER:  Just a couple of points of |
| 09:32AM | 14 | clarification, Your Honor. |
| 09:32AM | 15 |     THE COURT:  Go ahead. |
| 09:32AM | 16 |             REDIRECT EXAMINATION |
| 09:32AM | 17 | BY MS. PERLMUTTER: |
| 09:33AM | 18 | Q    Ms. Unten, if could you pull up Exhibit 16, page four, |
| 09:33AM | 19 | please.  Okay.  I'm circling -- |
| 09:33AM | 20 |     Permission to publish, Your Honor. |
| 09:33AM | 21 |     THE COURT:  Yes, go ahead. |
| 09:33AM | 22 | BY MS. PERLMUTTER: |
| 09:33AM | 23 | Q    I circled the top two here and I just want to clarify a |
| 09:33AM | 24 | couple points that you were asked on cross-examination.  So I'm |
| 09:33AM | 25 | going to put a -- that is terrible -- two little arrows there. |

09:33AM  1          Could you -- Mr. Mottl asked you about weight

09:33AM  2    variation between the items and also asked you about the error

09:33AM  3    on the balance.  Could you explain whether those concepts are

09:33AM  4    the same or different and how that relates to your report?

09:33AM  5    A    Okay.  So from item to item, we -- we don't ever know what

09:34AM  6    the weight actually is.  And that's what our job is.  It's to

09:34AM  7    determine what the net weight is.  So whether someone put a

09:34AM  8    gram, three grams, it's not my job to say they were this far

09:34AM  9    away from a gram.  It's just to say, this is the weight that --

09:34AM  10   that I obtained.  So to say there is an error between bags,

09:34AM  11   that's -- that -- I would say it's not applicable.  That's not

09:34AM  12   something we would ever be able to determine.  But -- and the

09:34AM  13   weight -- or that uncertainty value, that plus or minus .003,

09:34AM  14   that applies to every weighing that I make.  So every item

09:34AM  15   regardless what the weight is will have that uncertainty value.

09:34AM  16   And so two very different concepts that I can't really relate

09:35AM  17   to each other at all.

09:35AM  18   Q    Okay.  So when you dumped the contents of the first item

09:35AM  19   on page four that has the arrows to weigh that, was the net

09:35AM  20   weight of that contents 3.440 grams?

09:35AM  21   A    There was actually one other decimal after that.  It's a

09:35AM  22   four place balance, but the procedure in place at the time was

09:35AM  23   to truncate that last value.  So that's -- that's the reported

09:35AM  24   weight is the weight minus that last truncated decimal.

09:35AM  25   Q    Okay.  Then you went to the next item.

| | | |
|---|---|---|
| 09:35AM | 1 | A    Yes. |
| 09:35AM | 2 | Q    And it's the second item below the one where I have |
| 09:35AM | 3 | indicated with the arrows that's in the circle.  When you took |
| 09:35AM | 4 | that item and put it -- the powder, the cocaine hydrochloride |
| 09:35AM | 5 | on the scale, was that weight 1.786 grams? |
| 09:35AM | 6 | A    Yes. |
| 09:35AM | 7 | Q    So it's just the weight of that specific item; is that |
| 09:35AM | 8 | right? |
| 09:35AM | 9 | A    It's that one item, yes. |
| 09:36AM | 10 | Q    And despite the fact that you did not test for purity, are |
| 09:36AM | 11 | you -- you were able to determine nevertheless that the items |
| 09:36AM | 12 | that you tested had cocaine in them? |
| 09:36AM | 13 | A    Yes. |
| 09:36AM | 14 | Q    And cocaine base? |
| 09:36AM | 15 | A    Yes. |
| 09:36AM | 16 | MS. PERLMUTTER:  Thank you.  No further questions, |
| 09:36AM | 17 | Your Honor. |
| 09:36AM | 18 | THE COURT:  All right.  Ms. Kaoni, you may step down. |
| 09:36AM | 19 | MS. PERLMUTTER:  You can take the exhibit off the -- |
| 09:36AM | 20 | THE COURT:  Please call your next witness. |
| 09:36AM | 21 | MS. PERLMUTTER:  Your Honor, the government calls |
| 09:36AM | 22 | Special Agent Murray Acosta. |
| 09:37AM | 23 | THE CLERK:  Please raise your right hand. |
| 09:37AM | 24 | MURRAY ACOSTA, |
| 09:37AM | 25 | called as a witness, having been first duly sworn, was examined |

38

| | | |
|---|---|---|
| 09:37AM | 1 | and testified as follows: |
| 09:37AM | 2 | THE CLERK:  Please state your full name and spell your |
| 09:37AM | 3 | last name for the record. |
| 09:37AM | 4 | THE WITNESS:  My name is Murray Acosta.  Acosta is |
| 09:37AM | 5 | spelled, A-C-O-S-T-A. |
| 09:37AM | 6 | DIRECT EXAMINATION |
| 09:37AM | 7 | BY MS. PERLMUTTER: |
| 09:37AM | 8 | Q    Good morning, Special Agent Acosta. |
| 09:37AM | 9 | A    Good morning. |
| 09:37AM | 10 | Q    Could you please introduce yourself for the jury? |
| 09:37AM | 11 | A    Sure.  My name is Murray Acosta.  I'm a special agent with |
| 09:37AM | 12 | Homeland Security Investigations. |
| 09:37AM | 13 | Q    How long have you been with Homeland Security |
| 09:37AM | 14 | Investigations? |
| 09:37AM | 15 | A    Since 2006. |
| 09:37AM | 16 | Q    Were you in law enforcement prior to that? |
| 09:37AM | 17 | A    Yes. |
| 09:37AM | 18 | Q    And in what capacity? |
| 09:37AM | 19 | A    I was a police officer with the Honolulu Police Department |
| 09:37AM | 20 | for five and a half years and I was also a police officer in |
| 09:37AM | 21 | Portland, Oregon with the Port of Portland Police Department |
| 09:37AM | 22 | and also a few years with customs and border protection. |
| 09:38AM | 23 | Q    In your role at Homeland Security Investigations as a |
| 09:38AM | 24 | special agent, could you just describe generally the types of |
| 09:38AM | 25 | cases that you've investigated? |

| | | |
|---|---|---|
| 09:38AM | 1 | A    Sure.  Homeland -- special agents with Homeland Security |
| 09:38AM | 2 | Investigations have a wide range of authorities.  Including |
| 09:38AM | 3 | investigating that of illicit narcotics and child exploitation |
| 09:38AM | 4 | type investigations. |
| 09:38AM | 5 | Q    How are you involved in the investigation of Lyle |
| 09:38AM | 6 | Cummings? |
| 09:38AM | 7 | A    I am one of the case agents. |
| 09:38AM | 8 | Q    Okay.  And what does that mean? |
| 09:38AM | 9 | A    A case agent is you're in charge of investigating the |
| 09:38AM | 10 | case, assuring that the case is investigated to its utmost and |
| 09:38AM | 11 | to be sure that the elements for a charge is satisfied and |
| 09:38AM | 12 | acquired and the case is presented to the U.S. Attorney's |
| 09:38AM | 13 | office for review and -- and possibly for other steps |
| 09:39AM | 14 | thereafter. |
| 09:39AM | 15 | Q    Did you have a role in taking custody of the physical |
| 09:39AM | 16 | drugs in this case including the cocaine and the cocaine base? |
| 09:39AM | 17 | A    Yes, ma'am. |
| 09:39AM | 18 | Q    Okay.  And what did you do? |
| 09:39AM | 19 | A    I accepted the evidence in this case from |
| 09:39AM | 20 | Detective Matthew Bigoss of the Maui Police Department on |
| 09:39AM | 21 | April 1, 20 -- 2021. |
| 09:39AM | 22 | Q    Okay.  And are you sure it was 2021? |
| 09:39AM | 23 | A    2022. |
| 09:39AM | 24 | Q    And did you track or document the movement or custody of |
| 09:39AM | 25 | the drugs? |

| | | |
|---|---|---|
| 09:39AM | 1 | A    Yes, ma'am. |
| 09:39AM | 2 | Q    And how did you do that? |
| 09:39AM | 3 | A    We track that by -- I placed my signature on the Maui |
| 09:39AM | 4 | Police Department chain of custody form and also transferred |
| 09:39AM | 5 | that same chain of custody event on a separate more applicable |
| 09:39AM | 6 | Department of Homeland Security form which we call a 6051S. |
| 09:40AM | 7 | MS. PERLMUTTER:  Your Honor, permission to publish |
| 09:40AM | 8 | Exhibit 14A. |
| 09:40AM | 9 | THE COURT:  Yes, you may. |
| 09:40AM | 10 | MS. PERLMUTTER:  Please publish page one. |
| 09:40AM | 11 | BY MS. PERLMUTTER: |
| 09:40AM | 12 | Q    Could you describe for the jury what this particular form |
| 09:40AM | 13 | is? |
| 09:40AM | 14 | A    This is the Department of Homeland Security form 6051S. |
| 09:40AM | 15 | It's our custody receipt for seized property and evidence.  Our |
| 09:40AM | 16 | version of the chain of custody form. |
| 09:40AM | 17 | Q    And besides your signature on this, where -- well, where |
| 09:40AM | 18 | is your signature on this form? |
| 09:40AM | 19 | A    It's toward the lower part in the middle where it says |
| 09:40AM | 20 | seizing officer. |
| 09:40AM | 21 | Q    And is there another person's signature on this form? |
| 09:40AM | 22 | A    Yes.  Below my signature where it says assistant line 16, |
| 09:40AM | 23 | it's -- there's also another signature there and it's that of |
| 09:40AM | 24 | our seized property custodian and his name is Zev Aquin |
| 09:41AM | 25 | (phonetic). |

| | | | |
|---|---|---|---|
| 09:41AM | 1 | Q | And what's Mr. Aquin's role? |
| 09:41AM | 2 | A | He accepts -- he's in charge of safeguarding the evidence |
| 09:41AM | 3 | | that's placed in his -- in his custody. |
| 09:41AM | 4 | Q | And where does that evidence go when it's placed in |
| 09:41AM | 5 | | Mr. Aquin's custody? |
| 09:41AM | 6 | A | There are certain types of evidence that Mr. Aquin can |
| 09:41AM | 7 | | keep in his custody that's not deemed a high value type of -- |
| 09:41AM | 8 | | of evidence. Those that are not deemed high value evidence |
| 09:41AM | 9 | | will remain in his care. But for other types of evidence like |
| 09:41AM | 10 | | narcotics, it goes further and is given over to fines, |
| 09:41AM | 11 | | penalties and forfeitures with customs and border protection. |
| 09:41AM | 12 | Q | So what happened in this case? |
| 09:41AM | 13 | A | Exact -- and that's -- certain of the items in this case |
| 09:41AM | 14 | | remained in seized property custodian Zev Aquin's care and |
| 09:42AM | 15 | | also -- and the other types of evidence like the narcotics |
| 09:42AM | 16 | | evidence was handed over to customs and border protection |
| 09:42AM | 17 | | like -- like the narcotics evidence. |
| 09:42AM | 18 | Q | Okay. So we're looking specifically at this form. What |
| 09:42AM | 19 | | evidence is pertaining to this form? |
| 09:42AM | 20 | A | This form is cocaine with packing material. |
| 09:42AM | 21 | Q | So where was this evidence stored? |
| 09:42AM | 22 | A | Oh, this evidence was stored with seized property |
| 09:42AM | 23 | | custodian Zev Aquin. |
| 09:42AM | 24 | Q | And where -- where is that? |
| 09:42AM | 25 | A | We -- oh, at the -- at the federal building at 300 Ala |

| | | |
|---|---|---|
| 09:42AM | 1 | Moana Boulevard. |
| 09:42AM | 2 | Q    And is it stored in a secure location? |
| 09:42AM | 3 | A    Yes. |
| 09:42AM | 4 | Q    Okay.  And if you could turn to page two. |
| 09:42AM | 5 | Is your signature on this form as well? |
| 09:42AM | 6 | A    Yes. |
| 09:42AM | 7 | Q    And where is it indicated on this form? |
| 09:43AM | 8 | A    It's located in the received by signature section.  I'm |
| 09:43AM | 9 | the last signature on that -- in that form. |
| 09:43AM | 10 | Q    And for all of the items that you took custody of in |
| 09:43AM | 11 | Exhibit 14A and B, does your signature appear on those forms? |
| 09:43AM | 12 | A    Yes. |
| 09:43AM | 13 | Q    And if we were to turn to Exhibit 14B, are there similar |
| 09:43AM | 14 | forms that we just looked at for the marijuana and other items |
| 09:43AM | 15 | that were not cocaine or cocaine base? |
| 09:43AM | 16 | A    Yes, ma'am. |
| 09:43AM | 17 | Q    Thank you. |
| 09:43AM | 18 | When you received the items from Maui, how are they |
| 09:43AM | 19 | packaged? |
| 09:43AM | 20 | A    They were packaged in -- in evidence bags and signed and |
| 09:43AM | 21 | sealed. |
| 09:43AM | 22 | Q    Specifically I want to talk a bit about the cocaine and |
| 09:43AM | 23 | the cocaine base.  How were those packaged? |
| 09:44AM | 24 | A    Yeah, they were placed in sealed packages and further |
| 09:44AM | 25 | outer packages in manila envelopes. |

| | | | |
|---|---|---|---|
| 09:44AM | 1 | Q | Did you do anything with the packaging once you received |
| 09:44AM | 2 | | it from Detective Bigoss? |
| 09:44AM | 3 | A | Yes.  I verified the -- the type of evidence that was |
| 09:44AM | 4 | | listed on the evidence sheet and I also verified the quantity |
| 09:44AM | 5 | | of to be sure that everything was present. |
| 09:44AM | 6 | Q | Did you open the outer packaging? |
| 09:44AM | 7 | A | Yes, I did. |
| 09:44AM | 8 | Q | And why did you open the outer packaging? |
| 09:44AM | 9 | A | Just to verify that what was said on the evidence sheet is |
| 09:44AM | 10 | | exactly what was inside the -- the -- in the packaging. |
| 09:44AM | 11 | Q | And were you able to make that verification? |
| 09:44AM | 12 | A | Yes, ma'am. |
| 09:44AM | 13 | Q | And then how did you place the items into custody, did you |
| 09:44AM | 14 | | put them back in the outer manila envelope? |
| 09:44AM | 15 | A | No, I did not.  Actually, in accordance with -- with -- |
| 09:44AM | 16 | | with -- which is consistent with HSI's evidence, I actually |
| 09:44AM | 17 | | consolidated like evidence and then placed them all in one bag. |
| 09:45AM | 18 | Q | What do you mean by consolidated like evidence? |
| 09:45AM | 19 | A | We -- I placed the cocaine and the cocaine base evidence |
| 09:45AM | 20 | | which was within little baggies and placed them all in one bag. |
| 09:45AM | 21 | Q | Okay.  And did you seal that? |
| 09:45AM | 22 | A | Yes. |
| 09:45AM | 23 | Q | And how did you seal it? |
| 09:45AM | 24 | A | I sealed on -- within our evidence bag, there is a |
| 09:45AM | 25 | | evidence tape that's on the bag itself.  Taped it shut and I |

44

| | | |
|---|---|---|
| 09:45AM | 1 | placed my initials and the date that it was -- it was -- it was |
| 09:45AM | 2 | sealed. |
| 09:45AM | 3 | Q    And where did you do this verification and sealing? |
| 09:45AM | 4 | A    They were all made with witnesses around me and within the |
| 09:45AM | 5 | evidence room itself. |
| 09:45AM | 6 | Q    And is that the evidence room where they then went into |
| 09:45AM | 7 | secure location? |
| 09:45AM | 8 | A    Yes, ma'am. |
| 09:45AM | 9 |        MS. PERLMUTTER:  Your Honor, at this time, I'd ask |
| 09:45AM | 10 | permission to approach the witness with exhibits. |
| 09:45AM | 11 |        THE COURT:  Exhibit 12.  Is this Exhibit 12? |
| 09:46AM | 12 |        MS. PERLMUTTER:  Yes, Your Honor, it's Exhibit 12 and |
| 09:46AM | 13 | 12A which has been marked for identification purposes.  Before |
| 09:46AM | 14 | court this morning, defense attorney had an opportunity to |
| 09:46AM | 15 | inspect Exhibit 12A which is related to Exhibit 12. |
| 09:46AM | 16 |        THE COURT:  I don't have a 12A.  Is this a -- |
| 09:46AM | 17 |        MS. PERLMUTTER:  This is what we mentioned yesterday. |
| 09:46AM | 18 |        THE COURT:  Has it since been filed? |
| 09:46AM | 19 |        MS. PERLMUTTER:  There's not been a new filing yet |
| 09:46AM | 20 | because Your Honor said we should consult with defense counsel |
| 09:46AM | 21 | first. |
| 09:46AM | 22 |        THE COURT:  I'm not sure how I'm supposed to keep |
| 09:46AM | 23 | track of exhibits on an exhibit list that I don't have.  Is |
| 09:46AM | 24 | there an exhibit -- revised exhibit list? |
| 09:46AM | 25 |        MS. PERLMUTTER:  Not yet, Your Honor.  We intended to |

09:46AM   1   file it after court this morning, if it was indeed admitted.

09:46AM   2              THE COURT:  What other changes have been made to your

09:46AM   3   exhibit list that I'm not aware of?

09:46AM   4              MS. PERLMUTTER:  None.

09:46AM   5              THE COURT:  So 12 and 12A.  Is 12A part of 12?

09:46AM   6              MS. PERLMUTTER:  12A is separately packaged but it is

09:47AM   7   part of 12 in that it is -- relates to the outer packaging of

09:47AM   8   the drug materials.

09:47AM   9              THE COURT:  All right.  You may approach the witness

09:47AM  10   and I would appreciate some foundation for what 12A consists of

09:47AM  11   since I don't have it on my current list.

09:47AM  12              MS. PERLMUTTER:  Yes, Your Honor, the government

09:47AM  13   intends to do so.  Thank you.

09:47AM  14   BY MS. PERLMUTTER:

09:47AM  15   Q    Okay.  Let's start with Exhibit 12A.  If you could

09:47AM  16   describe for the jury what -- what it is and how -- how it came

09:47AM  17   into your possession?

09:47AM  18   A    Evidence 12A is an evidence -- Homeland Security

09:47AM  19   Investigations evidence bag which contains a manila -- a number

09:47AM  20   of manila envelopes to include also a red or magenta container

09:48AM  21   which is in -- in pieces.

09:48AM  22   Q    And what do those manila envelopes pertain to?

09:48AM  23   A    Those manila envelopes were received by me by -- these

09:48AM  24   manila envelopes had the actual cocaine baggies within them

09:48AM  25   when I received them from Lieutenant Bigoss.

| 09:48AM | 1 | Q | Okay. Did some of the manila envelopes also have |
| 09:48AM | 2 | marijuana and THC products in them? |
| 09:48AM | 3 | A | Yes, ma'am. |
| 09:48AM | 4 | Q | Okay. And what does that plastic container pertain to? |
| 09:48AM | 5 | A | It actually was -- it -- it actually contained at one |
| 09:48AM | 6 | point some -- some of the cocaine baggies also. |
| 09:48AM | 7 | Q | And why is that packaged in the HSI evidence bag separate |
| 09:48AM | 8 | from Exhibit 12? |
| 09:48AM | 9 | A | Because the -- these were like the outer packaging of |
| 09:48AM | 10 | the -- which contain the -- the cocaine that was placed in it. |
| 09:48AM | 11 | Q | Okay. If you can put that exhibit down, please. And take |
| 09:49AM | 12 | Exhibit 12 and see -- I see that you have it. Do you recognize |
| 09:49AM | 13 | Exhibit 12? |
| 09:49AM | 14 | A | Yes, ma'am. |
| 09:49AM | 15 | Q | And what is Exhibit 12? |
| 09:49AM | 16 | A | Exhibit 12 is the consolidation of the cocaine evidence |
| 09:49AM | 17 | in -- in this. The actual cocaine with the baggies which has |
| 09:49AM | 18 | the cocaine and cocaine base within them. |
| 09:49AM | 19 | Q | Okay. And besides the bag in Exhibit 12 and the manila |
| 09:49AM | 20 | envelopes and the plastic container in Exhibit 12A, do you have |
| 09:49AM | 21 | other sealed bags that you made for purposes of the items that |
| 09:49AM | 22 | you received? |
| 09:49AM | 23 | A | Yes. For other items like the -- the THC, and other items |
| 09:49AM | 24 | like that. |
| 09:49AM | 25 | Q | And where are those items today? |

| | | | |
|---|---|---|---|
| 09:49AM | 1 | A | Those are still kept in our evidence room. |
| 09:49AM | 2 | Q | And what was your role in getting both Exhibit 12 and |
| 09:49AM | 3 | | Exhibit 12A to court today? |
| 09:49AM | 4 | A | To present them for the -- for the court in this case. |
| 09:49AM | 5 | Q | And what steps did you take to get them out of the secure |
| 09:50AM | 6 | | location? |
| 09:50AM | 7 | A | There is a chain of custody sheet which is our 6051S form |
| 09:50AM | 8 | | which is located in a pocket in the back of each of the bags. |
| 09:50AM | 9 | | And every time the -- that I would -- would pick up the -- the |
| 09:50AM | 10 | | evidence bags, I would actually have an escort with me to |
| 09:50AM | 11 | | assure its safety and -- so they would be escorted to court |
| 09:50AM | 12 | | together. I would actually sign the form showing that it was |
| 09:50AM | 13 | | signed out by myself and with an escort I would actually bring |
| 09:50AM | 14 | | the evidence bags to court today. |
| 09:50AM | 15 | Q | So Exhibit 12 you mentioned there is a form in that bag |
| 09:50AM | 16 | | itself, could you hold it up and show -- show us what that is? |
| 09:50AM | 17 | A | Sure. This is actually one form. This is the first page |
| 09:50AM | 18 | | of the 6051S form. And this is just a continuing -- |
| 09:51AM | 19 | | continuation page so in this form the signatures are all filled |
| 09:51AM | 20 | | out. We just -- we just continue on to a continuation page |
| 09:51AM | 21 | | here. |
| 09:51AM | 22 | Q | And what's the purpose of keeping this form with the |
| 09:51AM | 23 | | actual custody bag? |
| 09:51AM | 24 | A | To assure that there's proper chain of custody for that |
| 09:51AM | 25 | | evidence bag itself. |

| | | | |
|---|---|---|---|
| 09:51AM | 1 | Q | Is there a similar form with Exhibit 12A? |
| 09:51AM | 2 | A | Yes, ma'am. |
| 09:51AM | 3 | Q | And did you receive the items in both Exhibit 12, bless |
| 09:51AM | 4 | | you, Exhibit 12 and Exhibit 12A at the same time from |
| 09:51AM | 5 | | Detective Bigoss? |
| 09:51AM | 6 | A | Yes. |
| 09:51AM | 7 | Q | And in the sealed bags themselves in both Exhibit 12 and |
| 09:51AM | 8 | | Exhibit 12A, is your signature on that seal? |
| 09:51AM | 9 | A | Yes, it's my initials. |
| 09:51AM | 10 | Q | What's the purpose of that? |
| 09:51AM | 11 | A | To show that it was me that was -- that I was the one that |
| 09:52AM | 12 | | sealed the bag. |
| 09:52AM | 13 | Q | Are the items in Exhibit 12 in substantially the same |
| 09:52AM | 14 | | condition of when you received them from Detective Bigoss? |
| 09:52AM | 15 | A | Yes, ma'am. |
| 09:52AM | 16 | Q | Are the items in Exhibit 12A in substantially the same |
| 09:52AM | 17 | | condition of when you received them from Detective Bigoss? |
| 09:52AM | 18 | A | Yes, ma'am. |
| 09:52AM | 19 | | MS. PERLMUTTER:  Your Honor, at this time I'd move to |
| 09:52AM | 20 | | admit Exhibit 12. |
| 09:52AM | 21 | | THE COURT:  Any objection, Mr. Mottl? |
| 09:52AM | 22 | | MR. MOTTL:  No, Your Honor. |
| 09:52AM | 23 | | MS. PERLMUTTER:  I'd also move to admit Exhibit 12A. |
| 09:52AM | 24 | | THE COURT:  Any objection to that, Mr. Mottl? |
| 09:52AM | 25 | | MR. MOTTL:  No, Your Honor. |

09:52AM  1        THE COURT:  All right.  Without objection,

09:52AM  2    Government's Exhibits 12 and 12 alpha are both admitted.

09:52AM  3    (Government's Exhibits 12 and 12A were received in evidence.)

09:52AM  4        MS. PERLMUTTER:  No further questions for this

09:52AM  5    witness, Your Honor.

09:52AM  6        THE COURT:  Cross-examination, Mr. Mottl?

09:52AM  7        MS. PERLMUTTER:  Your Honor, should I remove Exhibits

09:52AM  8    12 and 12A from --

09:52AM  9        THE COURT:  You can.  I don't know if Mr. Mottl

09:52AM  10   intends to use it, but we can retrieve it if he -- if he does.

09:52AM  11       MS. PERLMUTTER:  Would you like me to keep them up

09:52AM  12   there, Mr. Mottl?

09:52AM  13       MR. MOTTL:  No, thank you.

09:53AM  14       Your Honor, I have no questions for Mr. Acosta.

09:53AM  15       THE COURT:  No questions?

09:53AM  16       MR. MOTTL:  Thank you.

09:53AM  17       THE COURT:  You may step down, sir.  Thank you.

09:53AM  18       All right.  Ms. Perlmutter or Ms. Olson, your next

09:53AM  19   witness.

09:53AM  20       MS. PERLMUTTER:  Yes, Your Honor.  At this time, the

09:53AM  21   government would call Ryan Faulkner.

09:53AM  22       THE CLERK:  Please raise your right hand.

09:53AM  23               RYAN FAULKNER,

09:53AM  24   called as a witness, having been first duly sworn, was examined

09:53AM  25   and testified as follows:

50

```
09:53AM   1              THE CLERK:  Please state your full name and spell your
09:54AM   2    last name for the record.
09:54AM   3              THE WITNESS:  My name is Ryan Faulkner.  Last name
09:54AM   4    spelled, F-A-U-L-K-N-E-R.
09:54AM   5                        DIRECT EXAMINATION
09:54AM   6    BY MS. PERLMUTTER:
09:54AM   7    Q    Good afternoon, Special Agent -- or good morning.  I have
09:54AM   8    to change, recalibrate my time as well.  Good morning, Special
09:54AM   9    Agent Faulkner.
09:54AM   10   A    Good morning, ma'am.
09:54AM   11   Q    Would you please introduce yourself to the jury by
09:54AM   12   explaining to them who you work for?
09:54AM   13   A    My name is Ryan Faulkner and I work for Homeland Security
09:54AM   14   Investigations.
09:54AM   15   Q    And what specific job titles do you hold at Homeland
09:54AM   16   Security?
09:54AM   17   A    I'm currently the resident agent in charge for an area
09:54AM   18   that includes Kauai, Maui and Hawaii island so I cover HSI
09:54AM   19   operation and things that our agency does on those three
09:54AM   20   islands.
09:54AM   21   Q    And what does it mean to be a resident agent in charge
09:54AM   22   versus a special agent?
09:54AM   23   A    The special agents generally conduct the investigations
09:55AM   24   that HSI does.  And the resident agent in charge is a
09:55AM   25   supervisory position that manages the investigations and agents
```

09:55AM    1    and task force officers on the various islands.

09:55AM    2    Q    How long have you been the resident agent in charge?

09:55AM    3    A    For approximately eight months.

09:55AM    4    Q    And prior to that, what were you doing at Homeland

09:55AM    5    Security?

09:55AM    6    A    Prior to that I was a special agent assigned to the

09:55AM    7    Honolulu office and I was a resident agent on the Big Island so

09:55AM    8    I conducted investigations for our agency on that particular

09:55AM    9    island.

09:55AM    10   Q    While you were a special agent that was on the Big Island,

09:55AM    11   did you also conduct investigations on other neighboring

09:55AM    12   islands?

09:55AM    13   A    I did.

09:55AM    14   Q    And did those investigations include the island of Maui?

09:55AM    15   A    Yes, ma'am.

09:55AM    16   Q    And how long have you been at Homeland Security?

09:55AM    17   A    I've been with the agency for a little over 16 years.

09:55AM    18   Q    And when you started, were you a special agent?

09:55AM    19   A    Yes, ma'am.

09:55AM    20   Q    So is it fair to say that for almost 15 years you were a

09:56AM    21   special agent?

09:56AM    22   A    Yes, ma'am.

09:56AM    23   Q    And then since that time, you've been the resident agent

09:56AM    24   in charge?

09:56AM    25   A    That's correct.

09:56AM  1   Q    Okay.  And what other type of law enforcement experience
09:56AM  2   do you have?
09:56AM  3   A    Prior to that for ten years from 1997 through 2007, I was
09:56AM  4   a police officer here with the Honolulu Police Department.  And
09:56AM  5   within those times and before that for approximately 30 years,
09:56AM  6   I have been a military police officer with the U.S. Army
09:56AM  7   Reserves.
09:56AM  8   Q    Are you still in the army reserves?
09:56AM  9   A    I am.
09:56AM  10  Q    Could you describe -- let's focus on your special agent
09:56AM  11  role, your duties and responsibilities at Homeland Security.
09:56AM  12  A    So as a special agent with Homeland Security
09:56AM  13  Investigations, I was tasked with investigating various types
09:56AM  14  of crimes or whatever is in our agency's investigative
09:56AM  15  portfolio, but specifically I was tasked with who was involved
09:56AM  16  in primarily for the majority of my career narcotics and
09:57AM  17  firearms types of investigations.
09:57AM  18  Q    And when you were in law enforcement with the Honolulu
09:57AM  19  Police Department, what was your focus there?
09:57AM  20  A    Of the ten years I was there over eight years I spent
09:57AM  21  doing plain clothes narcotics investigations as well.
09:57AM  22  Q    As a law enforcement officer, I know it's been a while,
09:57AM  23  are you able to ballpark approximately how many narcotics or
09:57AM  24  drug investigations you've been a part of?
09:57AM  25  A    Yes, ma'am, conservatively I've been involved in well over

| | | |
|---|---|---|
| 09:57AM | 1 | 400 narcotics investigations. |
| 09:57AM | 2 | Q    Could you explain your involvement in various roles in |
| 09:57AM | 3 | those investigations? |
| 09:57AM | 4 | A    Yes.  They range -- it was a wide range so at times I |
| 09:57AM | 5 | would be the case agent which is basically the investigative |
| 09:57AM | 6 | leader in charge of every aspect of the investigation, and |
| 09:57AM | 7 | there were times I would play a supporting role which would |
| 09:57AM | 8 | include either assisting with a search warrant, processing |
| 09:57AM | 9 | evidence, a crime scene, interviewing suspects and/or witnesses |
| 09:58AM | 10 | and compiling evidence, conducting surveillance, and I also |
| 09:58AM | 11 | worked in -- in undercover capacity on several occasions as |
| 09:58AM | 12 | well. |
| 09:58AM | 13 | Q    Could you describe that undercover capacity work that you |
| 09:58AM | 14 | did? |
| 09:58AM | 15 | A    Yes.  When I was with the Honolulu Police Department, I |
| 09:58AM | 16 | served in an undercover capacity and -- and in -- that involved |
| 09:58AM | 17 | basically posing as a -- a buyer of narcotics and purchasing |
| 09:58AM | 18 | various amounts of cocaine, MDMA and rock cocaine. |
| 09:58AM | 19 | Q    And we didn't talk about this specific nature of your drug |
| 09:58AM | 20 | investigations, have some of those investigations included |
| 09:58AM | 21 | cocaine? |
| 09:58AM | 22 | A    They have. |
| 09:58AM | 23 | Q    And have some also included cocaine base? |
| 09:58AM | 24 | A    Yes, ma'am. |
| 09:58AM | 25 | Q    Is it fair to refer to cocaine base as crack? |

54

| | | | |
|---|---|---|---|
| 09:58AM | 1 | A | It is. |
| 09:58AM | 2 | Q | So can I use those words interchangeably here? |
| 09:58AM | 3 | A | Yes, ma'am. |
| 09:58AM | 4 | Q | And approximately how many investigations have you done |
| 09:58AM | 5 | | involving cocaine or crack? |
| 09:58AM | 6 | A | I would estimate that well over 50 of my narcotics |
| 09:59AM | 7 | | investigations involved cocaine which is more common, and of |
| 09:59AM | 8 | | those investigations, at least a dozen involved rock or crack |
| 09:59AM | 9 | | cocaine. |
| 09:59AM | 10 | Q | And how many search warrants involving drugs have you been |
| 09:59AM | 11 | | involved with? |
| 09:59AM | 12 | A | At least 150 to 200 conservatively. |
| 09:59AM | 13 | Q | And what are the location generally that you've been |
| 09:59AM | 14 | | involved with in the searches? |
| 09:59AM | 15 | A | I've been involved in residential search warrants, vehicle |
| 09:59AM | 16 | | search warrants, boats and other vessels, search warrants of |
| 09:59AM | 17 | | luggage, and people internally body carrying drugs from one |
| 09:59AM | 18 | | city to another. |
| 09:59AM | 19 | Q | What jurisdictions have you participated search warrants |
| 09:59AM | 20 | | in? |
| 09:59AM | 21 | A | Primarily, they have been the islands of Hawaii and I've |
| 09:59AM | 22 | | also participated in search warrants in California, Arizona, |
| 09:59AM | 23 | | Texas that I can recall right now. |
| 09:59AM | 24 | Q | You participated in State of Hawaii search warrants? |
| 10:00AM | 25 | A | I have. |

| 10:00AM | 1 | Q | And also federal search warrants? |

10:00AM    1    Q    And also federal search warrants?

10:00AM    2    A    That's correct.

10:00AM    3    Q    And if you could describe a little bit more detail about

10:00AM    4    your drug investigations.  What's the nature of the different

10:00AM    5    types of investigations that you've -- you've been a part of?

10:00AM    6    A    They're wide ranging.  Typically, the investigations

10:00AM    7    especially at the federal level target drug trafficking

10:00AM    8    organizations.  So we typically look at the structure of the

10:00AM    9    organization and attempt to disrupt or dismantle that

10:00AM    10   organization in any way we can.  So they involve undercover

10:00AM    11   purchases, informant purchases, surveillance, telephone

10:00AM    12   analysis, wiretap investigations and other types of

10:00AM    13   interdiction.

10:00AM    14   Q    Have you been involved in investigations that just

10:00AM    15   involved individual drug dealers?

10:00AM    16   A    That's correct.

10:00AM    17   Q    Have you also been involved in investigations that

10:00AM    18   involved things like a car stop?

10:00AM    19   A    Yes, many times.

10:01AM    20   Q    What's -- what's a car stop?

10:01AM    21   A    A car stop is when law enforcement for a specific reason

10:01AM    22   attempts to and hopefully successfully stops a moving vehicle

10:01AM    23   for the purpose of furthering an investigation.  And there

10:01AM    24   could be a number of reasons that predicate or trigger that

10:01AM    25   type of a -- of a car stop.

56

10:01AM   1   Q    You've been involved in prosecutions that involved

10:01AM   2   narcotics found only in a car?

10:01AM   3   A    Yes, ma'am.

10:01AM   4   Q    And have you been involved in investigations involving

10:01AM   5   only one type of narcotics such as cocaine?

10:01AM   6   A    Yes.

10:01AM   7   Q    And have you been involved in investigations involving

10:01AM   8   multiple types of drugs?

10:01AM   9   A    Yes.

10:01AM   10   Q    You also have been involved in investigations specifically

10:01AM   11   involving possession with the intent to distribute?

10:01AM   12   A    Yes, I have.

10:01AM   13   Q    From this experience are you familiar with the

10:01AM   14   distribution and the circumstances involving a narcotics

10:01AM   15   distribution in Hawaii?

10:01AM   16   A    Yes.

10:01AM   17   Q    You also received training involving narcotics?

10:02AM   18   A    Yes, I have.

10:02AM   19   Q    Okay.  Could you describe some of that training?

10:02AM   20   A    Yes.  From a formal perspective, I have criminal justice

10:02AM   21   training as it pertains to education.  That would be a

10:02AM   22   bachelor's degree in criminal justice.  I hold a master's

10:02AM   23   degree in forensic science with an emphasize on crime scene

10:02AM   24   investigations, and I'm moving on to periodic training whether

10:02AM   25   it be through the military or through various organizations.

| | | |
|---|---|---|
| 10:02AM | 1 | I've -- I attend training conferences on a regular basis that |
| 10:02AM | 2 | cover specific topics like drug interdiction investigations, |
| 10:02AM | 3 | interviewing techniques, drug recognition and the like. |
| 10:02AM | 4 | Q    And does your work at Homeland Security Investigations |
| 10:02AM | 5 | involve other law enforcement officers involved in narcotics |
| 10:02AM | 6 | investigations on Maui? |
| 10:02AM | 7 | A    Yes.  It routinely does. |
| 10:02AM | 8 | Q    Were you involved in the investigation of this case? |
| 10:03AM | 9 | A    I was not. |
| 10:03AM | 10 | Q    What's your purpose for your testimony today? |
| 10:03AM | 11 | A    I was asked to evaluate some of the evidence that was |
| 10:03AM | 12 | provided to me and made specific determinations as to drug |
| 10:03AM | 13 | types, amounts, prices, what the market values are for drugs, |
| 10:03AM | 14 | and distribution quantities as it pertains to distribution |
| 10:03AM | 15 | versus possession. |
| 10:03AM | 16 | MS. PERLMUTTER:  Your Honor, at this time, I move to |
| 10:03AM | 17 | qualify -- |
| 10:03AM | 18 | Is it fair to call you Special Agent still or should I |
| 10:03AM | 19 | call you resident agent in charge? |
| 10:03AM | 20 | THE WITNESS:  Special agent is fine. |
| 10:03AM | 21 | MS. PERLMUTTER:  Okay.  This time I'd move to qualify |
| 10:03AM | 22 | Special Agent Faulkner as an expert in drug distribution and |
| 10:03AM | 23 | trafficking in Hawaii. |
| 10:03AM | 24 | MR. MOTTL:  No objection, Your Honor. |
| 10:03AM | 25 | THE COURT:  Without objection, the witness Special |

| | | |
|---|---|---|
| 10:03AM | 1 | Agent Faulkner may testify within the meaning of Federal Rule |
| 10:03AM | 2 | of Evidence 702 in the field of drug distribution and |
| 10:03AM | 3 | trafficking in Hawaii. |
| 10:04AM | 4 | You may proceed. |
| 10:04AM | 5 | BY MS. PERLMUTTER: |
| 10:04AM | 6 | Q    What's the evidence or the information that you've |
| 10:04AM | 7 | reviewed in this case for preparing for your testimony today? |
| 10:04AM | 8 | A    In this case I reviewed photographs that were taken during |
| 10:04AM | 9 | the execution of a search warrant.  I also reviewed crime |
| 10:04AM | 10 | laboratory reports that were generated as a result of what was |
| 10:04AM | 11 | found during that search warrant execution. |
| 10:04AM | 12 | Q    Did you also inspect the physical drugs that were seized? |
| 10:04AM | 13 | A    I did have that opportunity, yes. |
| 10:04AM | 14 | Q    And have you spoken to the investigators involved in this |
| 10:04AM | 15 | case regarding the circumstances of the seizure? |
| 10:04AM | 16 | A    I did not speak to them directly. |
| 10:04AM | 17 | Q    Have you done other preparation in order to prepare and -- |
| 10:04AM | 18 | your testimony today? |
| 10:04AM | 19 | A    Yes.  I spoke -- I reviewed prior reports as they pertain |
| 10:04AM | 20 | to prior investigations I was involved in just to get an idea |
| 10:04AM | 21 | of what drug prices may have been ballpark back then when this |
| 10:04AM | 22 | case occurred.  And I also spoke with law enforcement |
| 10:05AM | 23 | professionals, other colleagues to solidify some of the |
| 10:05AM | 24 | theories as they pertain to distribution and prices. |
| 10:05AM | 25 | Q    And did you speak to law enforcement colleagues in Maui? |

59

| | | | |
|---|---|---|---|
| 10:05AM | 1 | A | I did. |
| 10:05AM | 2 | Q | And did you review any law enforcement databases? |
| 10:05AM | 3 | A | I did. |
| 10:05AM | 4 | Q | And what was the purpose of that? |
| 10:05AM | 5 | A | It was to pull narrative reports to look at what prices |

10:05AM    6    were available over certain periods of time.  And to confirm

10:05AM    7    the prices basically from back -- back when that happened.

10:05AM    8    Q    Based on all the evidence that you've reviewed and the

10:05AM    9    other independent research you did like the law enforcement

10:05AM    10    database, have you formed an opinion as to the cocaine and

10:05AM    11    cocaine base that were seized in this case?

10:05AM    12    A    Yes.

10:05AM    13    Q    Okay.  Is that opinion based on your experience and

10:05AM    14    training?

10:05AM    15    A    Yes, ma'am.

10:05AM    16    Q    And what's the bottom line opinion that you formed in this

10:06AM    17    case?

10:06AM    18    A    The bottom line opinion is that the items that I viewed

10:06AM    19    that were specifically the cocaine as well as -- as well as the

10:06AM    20    cocaine base were amounts that were packaged and -- and the

10:06AM    21    quantities were that of distribution not just simple

10:06AM    22    possession.

10:06AM    23    Q    Okay.  Let's discuss the various pieces of evidence and

10:06AM    24    the circumstances that led you to this opinion.

10:06AM    25            MS. PERLMUTTER:  If we could, please, publish

60

| | | |
|---|---|---|
| 10:06AM | 1 | Exhibit 11 at page 23. |
| 10:06AM | 2 | THE COURT: Yes, you may. |
| 10:06AM | 3 | MS. PERLMUTTER: Thank you. |
| 10:06AM | 4 | BY MS. PERLMUTTER: |
| 10:06AM | 5 | Q    So there is a series of photos taken from the search |
| 10:06AM | 6 | warrant of the vehicle. Did you review all of those photos in |
| 10:06AM | 7 | preparation for your testimony today? |
| 10:06AM | 8 | A    Yes, I did. |
| 10:06AM | 9 | Q    And is this page, page 23, one of those photos that you |
| 10:07AM | 10 | reviewed? |
| 10:07AM | 11 | A    Yes, it was. |
| 10:07AM | 12 | Q    Do you recognize just by looking at this photo based on |
| 10:07AM | 13 | your training and experience what these drugs purport to be? |
| 10:07AM | 14 | A    Yes. |
| 10:07AM | 15 | Q    And what -- what based on their appearance do these look |
| 10:07AM | 16 | like? |
| 10:07AM | 17 | A    So I was viewing the photo, to the left of the photo, |
| 10:07AM | 18 | there are four separate Ziploc baggies. They appear to contain |
| 10:07AM | 19 | an off-white colored rock-like substance and they resemble |
| 10:07AM | 20 | visually what appear to be macadamia nuts. Those in my opinion |
| 10:07AM | 21 | are crack cocaine also referred to as cocaine base. To the |
| 10:07AM | 22 | right of the same photo, the other packets that are of similar |
| 10:07AM | 23 | size that contain a white, powdery substance appear to be |
| 10:07AM | 24 | various quantities of cocaine, powder cocaine. |
| 10:07AM | 25 | Q    What's the difference between cocaine and crack? |

| | | |
|---|---|---|
| 10:07AM | 1 | A    So cocaine is in its -- in its pure form, cocaine |
| 10:07AM | 2 | hydrochloride is basically what you refer to -- what -- what is |
| 10:07AM | 3 | commonly referred to as cocaine after it's been processed |
| 10:08AM | 4 | and -- and placed into like a brick or brick.  Is what they |
| 10:08AM | 5 | call it, and you cut pieces off of the brick of cocaine powder |
| 10:08AM | 6 | and -- and those can be broken down to smaller quantities. |
| 10:08AM | 7 | Now, the process in converting powder cocaine to crack |
| 10:08AM | 8 | cocaine is commonly referred to as what they call rocking it up |
| 10:08AM | 9 | which is basically a process in which an additive is introduced |
| 10:08AM | 10 | into the cocaine powder through a -- through a heating process |
| 10:08AM | 11 | and -- and water and a -- and a secondary process.  The final |
| 10:08AM | 12 | result is it will turn into like a cookie and that's basically |
| 10:08AM | 13 | the crack cocaine.  And then the cookie is then chipped off |
| 10:08AM | 14 | into smaller rock like or macadamia nut like pieces and brought |
| 10:08AM | 15 | in -- broken into smaller quantities that could then be sold or |
| 10:08AM | 16 | distributed. |
| 10:08AM | 17 | Q    If you could describe for the jury the difference between |
| 10:08AM | 18 | cocaine and crack, to the average user.  So I guess we could |
| 10:09AM | 19 | start, how is it ingested into the body? |
| 10:09AM | 20 | A    So the main way that powder cocaine is ingested or |
| 10:09AM | 21 | introduced into the body is basically through -- it goes |
| 10:09AM | 22 | through the nostril.  That's the main way.  There are a couple |
| 10:09AM | 23 | of less common ways but the main predominant way that it's |
| 10:09AM | 24 | introduced is where a user would open a baggy of powder |
| 10:09AM | 25 | cocaine, pour it on to a -- a clean surface usually a class |

| | | |
|---|---|---|
| 10:09AM | 1 | surface or some people like to use their cell phones because |
| 10:09AM | 2 | it's a nice clean surface.  And then they'll use an object to |
| 10:09AM | 3 | make it into a line and they will snort the line through either |
| 10:09AM | 4 | a rolled up dollar bill or a straw and those are two of the |
| 10:09AM | 5 | common ways to snort the cocaine and it will get introduced |
| 10:09AM | 6 | into the body through the nasal passage which will give that |
| 10:09AM | 7 | person the desired effect. |
| 10:09AM | 8 | Q    And what about crack? |
| 10:09AM | 9 | A    So crack cocaine is a little bit different in that the |
| 10:10AM | 10 | typical most common and popular way to use crack cocaine is |
| 10:10AM | 11 | use -- is to smoke it through a pipe and what that basically is |
| 10:10AM | 12 | it's a straight tubular glass pipe.  And stuffed on one end of |
| 10:10AM | 13 | the pipe, it will be typically either a piece of Brillo pad or |
| 10:10AM | 14 | a copper pad which basically is used because that heats quicker |
| 10:10AM | 15 | or can hold heat better.  And the user will hold the -- the |
| 10:10AM | 16 | pipe and put a portion of the rock into the end of the pipe and |
| 10:10AM | 17 | use a -- and use a heating element like a butane lighter or a |
| 10:10AM | 18 | high heat lighter in order to cause that rock cocaine to |
| 10:10AM | 19 | vaporize and then smoke it through the glass pipe into the |
| 10:10AM | 20 | mouth and that's how it's introduced into the body. |
| 10:10AM | 21 | Q    Based on your review of the photographs of the seized |
| 10:10AM | 22 | evidence, was there a crack pipe found with the crack? |
| 10:10AM | 23 | A    Not that I observed. |
| 10:10AM | 24 | Q    What about the difference in cost, just generally.  Is one |
| 10:11AM | 25 | more expensive than the other? |

| | | |
|---|---|---|
| 10:11AM | 1 | A    Yes.  Typically, cocaine in its powder form can -- can get |
| 10:11AM | 2 | a better price than rock cocaine in its -- in its crack cocaine |
| 10:11AM | 3 | form. |
| 10:11AM | 4 | Q    And in one type of session or high, typically how much |
| 10:11AM | 5 | would a user use for one session? |
| 10:11AM | 6 | A    In -- in powder cocaine, a gram, a half gram to a gram |
| 10:11AM | 7 | is -- is the most common dosage unit or -- or line that someone |
| 10:11AM | 8 | would typically use.  It could be a little bit more, a little |
| 10:11AM | 9 | bit less depending on the quality.  So if someone had put -- |
| 10:11AM | 10 | had done a line of cocaine and they didn't like the desired |
| 10:11AM | 11 | effect because it had too many cutting agents or it was -- it |
| 10:11AM | 12 | was what they call stepped on which means too many additives |
| 10:11AM | 13 | were introduced into the pure cocaine, then they might do a |
| 10:11AM | 14 | second line or a second gram to then enhance their high or get |
| 10:11AM | 15 | a better effect. |
| 10:11AM | 16 | Q    What about crack? |
| 10:11AM | 17 | A    Crack is -- gives you a much more intense and -- and |
| 10:12AM | 18 | the -- the high from -- generated from crack cocaine is a |
| 10:12AM | 19 | shorter high but it -- it -- it is more intense and it's -- and |
| 10:12AM | 20 | it lasts -- I'm sorry.  It starts quicker from when it gets |
| 10:12AM | 21 | into the -- into the body because partly because of the -- it |
| 10:12AM | 22 | comes in as a vapor or through -- it -- it gets smoked. |
| 10:12AM | 23 | Q    And in looking at this particular picture in front of you, |
| 10:12AM | 24 | I see a photo of at least two individual crack rocks.  Is that |
| 10:12AM | 25 | fair and accurate based on the photo? |

64

| | | |
|---|---|---|
| 10:12AM | 1 | A    Yes, ma'am. |
| 10:12AM | 2 | Q    Okay.  And would that represent what you just described as |
| 10:12AM | 3 | one session? |
| 10:12AM | 4 | A    It could, but visually these -- these rocks appear a |
| 10:12AM | 5 | little bit larger than what one would want to put a crack pipe. |
| 10:12AM | 6 | So a typical crack user because they want to preserve and |
| 10:12AM | 7 | prolong the amount of hits that they are allowed to have per |
| 10:12AM | 8 | rock, they may break it in half or in thirds so it will fit |
| 10:12AM | 9 | into in the crack pipe appropriately. |
| 10:12AM | 10 | Q    Do you see photos of a rock broken in half in this |
| 10:13AM | 11 | picture? |
| 10:13AM | 12 | A    Yes, ma'am. |
| 10:13AM | 13 | Q    And could you describe for the jury where you see that? |
| 10:13AM | 14 | A    I see -- at least the top two pictures where you could see |
| 10:13AM | 15 | where the -- it -- it break -- there's like a breaking point in |
| 10:13AM | 16 | the -- in the item itself or the -- or the rock where it |
| 10:13AM | 17 | appears to have been cut in half or broken in half or something |
| 10:13AM | 18 | was done to it where it was halved. |
| 10:13AM | 19 | Q    Did you have an opportunity to review the actual physical |
| 10:13AM | 20 | evidence of the cocaine and crack in this case? |
| 10:13AM | 21 | A    Yes, I have. |
| 10:13AM | 22 | Q    Okay.  And were you able to confirm that what you just |
| 10:13AM | 23 | described is what the actual physical evidence looks like as |
| 10:13AM | 24 | well? |
| 10:13AM | 25 | A    Yes. |

65

| 10:13AM | 1 | MS. PERLMUTTER: Okay. You can take that picture off |
|---------|---|---|

10:13AM   1              MS. PERLMUTTER:  Okay.  You can take that picture off

10:13AM   2    right now.

10:13AM   3    BY MS. PERLMUTTER:

10:13AM   4    Q    Generally, I'd like to focus on cocaine first.  If you

10:13AM   5    could describe the weights or amounts that cocaine is typically

10:13AM   6    divided into for distribution or sale?

10:14AM   7    A    Sure.  In my experience, I've seen it broken down to as

10:14AM   8    small as a quarter of a gram, but the typical amount that is

10:14AM   9    purchased would be a gram and it could also be purchased as

10:14AM  10    what people call a teen, which is street slang for half of

10:14AM  11    or -- or a 16th of an ounce or an eight ball which is doubled

10:14AM  12    that which is an 8th of an ounce, and in larger quantities,

10:14AM  13    they could also be purchased.

10:14AM  14    Q    How many gram are in an ounce?

10:14AM  15    A    28, just over 28.

10:14AM  16    Q    And when you said the 16th of an ounce, did you say teen

10:14AM  17    with an N or team with an M, as in Mary?

10:14AM  18    A    With an N as in Nancy.

10:14AM  19    Q    Why these different amounts?

10:14AM  20    A    Some of it's based on what the user can afford, some of

10:14AM  21    the users that have a bigger budget can purchase it in a larger

10:14AM  22    quantity and some people just can only afford so much at a

10:15AM  23    time.  It depends if they're daily users versus recreational

10:15AM  24    users.  And it -- and another factor could also be if they

10:15AM  25    purchased from a certain customer, or I'm sorry, a certain

10:15AM   1    seller multiple times, they may buy a larger quantity

10:15AM   2    because -- because they're already familiar -- familiar with

10:15AM   3    the quality of the product.  Whereas if they're purchasing

10:15AM   4    from -- the first or second time from a particular person, they

10:15AM   5    may be a little skeptical of the quality so they want to buy a

10:15AM   6    smaller amount to test it first.

10:15AM   7    Q    Specifically with reference to a one ounce or a half ounce

10:15AM   8    quantity, what type of person might purchase these larger

10:15AM   9    quantities?

10:15AM   10   A    Typically, someone who purchases a half ounce and more

10:15AM   11   commonly an ounce of cocaine is also in their own right a

10:15AM   12   distributor.  So if -- if a main distributor is selling an

10:15AM   13   ounce of powder cocaine to an individual, it's highly likely

10:15AM   14   that that person will then break it down to smaller quantities

10:16AM   15   to sell as a subdistributor to their own customer base in order

10:16AM   16   to turn a profit.

10:16AM   17   Q    For the crack we talked about a crack rock.  Are you able

10:16AM   18   to kind of give the jury an -- either a metaphor, an estimate

10:16AM   19   of what size that might be, a visual queue perhaps?

10:16AM   20   A    Yes.  A crack rock is typically going to be a little

10:16AM   21   smaller than your pinky fingernail.  A person could purchase

10:16AM   22   like a big rock and then break it down on their own into

10:16AM   23   smaller quantities depending on the diameter of the pipe so

10:16AM   24   they could fit it into their pipe.

10:16AM   25   Q    And does that translate into kind of a general weight

10:16AM   1   range?

10:16AM   2   A    Yes.  A gram would kind of be on the high end for a rock

10:16AM   3   and I've -- in my experience, I've seen a lot of people

10:16AM   4   purchasing crack rocks in the quarter to third to even half

10:16AM   5   gram range.

10:16AM   6   Q    Based on your review of the drug report -- drug analysis

10:17AM   7   report in this case, were the rocks and half rocks within that

10:17AM   8   weight range that you just described?

10:17AM   9   A    They were.

10:17AM   10  Q    Okay.  I'd like to talk specifically about the weights

10:17AM   11  that were seized in this case.

10:17AM   12         MS. PERLMUTTER:  If we could, let's see, turn to

10:17AM   13  Exhibit 16, page two.  Permission to publish, Your Honor.

10:17AM   14         THE COURT:  Yes, go ahead.

10:17AM   15  BY MS. PERLMUTTER:

10:17AM   16  Q    So on page two, I want to focus just on the cocaine, the

10:17AM   17  cocaine hydrochloride as it's listed.  Could you describe

10:17AM   18  generally the amount that was weighed from these Ziploc bags?

10:17AM   19  A    Yes.  Did you -- did you say the cocaine hydrochloride

10:18AM   20  was --

10:18AM   21  Q    Yes, the cocaine hydrochloride, please.

10:18AM   22  A    So these amounts that are listed on this particular

10:18AM   23  portion of the report are generally within the range of what a

10:18AM   24  gram customer would purchase.  In other words, it's not exactly

10:18AM   25  to the thousandth of a gram, an actual full gram, but because

10:18AM   1   of the bag weight and visually they all appear to be within the

10:18AM   2   range of what someone would look at and say, oh, this is a

10:18AM   3   gram.

10:18AM   4   Q    If we could turn to page 3, and I want to direct your

10:18AM   5   attention to the analysis of the cocaine hydrochloride on this

10:18AM   6   page.  Let's start with the first one.  Let me see if I can

10:18AM   7   write on this for you to direct your attention.  Okay.  So

10:18AM   8   let's start with this one.  How much does this particular bag

10:18AM   9   contain?

10:18AM   10  A    It says it contains 27.006 grams of actual product.  So

10:19AM   11  it's definitely within a range of what a customer would expect

10:19AM   12  when they're purchasing an ounce because an ounce is 28.35 but

10:19AM   13  when you factor in the weight the bag, the weight listed on the

10:19AM   14  report is without the bag.

10:19AM   15  Q    And does that relate to the potential subdistributor that

10:19AM   16  you discussed?

10:19AM   17  A    It is.

10:19AM   18  Q    Okay.  And what amount -- these next three items,

10:19AM   19  what's -- what's significant about the amounts related to these

10:19AM   20  items?

10:19AM   21  A    These are indicative of amounts that are packaged for --

10:19AM   22  for sale at the half-ounce level.  So a typical buyer would

10:19AM   23  visually look at that bag and expect that they're purchasing a

10:19AM   24  half ounce of cocaine.

10:19AM   25  Q    Okay.  And if we could turn to, let's see, page four,

```
10:19AM    1   please.  Oh, am I on page four?  Or excuse me, let me clear
10:20AM    2   this.  I don't see the clear button.  Oh, there we go.  Okay.
10:20AM    3          So specifically on page four, the first item and the
10:20AM    4   second item and the third item.  What's significant about the
10:20AM    5   weights with these three items?
10:20AM    6   A    These are weights that I referenced earlier in my
10:20AM    7   testimony.  The first item that says 3.440 grams is very close
10:20AM    8   in weight to what's referred to as an eight ball or an 8th of
10:20AM    9   an ounce of cocaine.  An eight ball would -- if it was in
10:20AM   10   exact, it would be about 3.54 but this visually would be the
          11   expectation of someone's -- I'm sorry.
          12          THE COURT REPORTER:  Excuse me, I need you to slow
          13   down.
          14          THE WITNESS:  Yes, ma'am.
          15          THE COURT REPORTER:  Okay.  So an eight ball, if
          16   it's -- if it was an exact something, something 3 point
          17   something.  Do you want to say that again?
          18          THE WITNESS:  Yes, ma'am.
10:21AM   19          If it was an exact eight ball, it would be
10:21AM   20   approximately 3.54 grams, and this being 3.440 grams is what
10:21AM   21   one would expect when they're purchasing an eight ball of
10:21AM   22   powder cocaine.
10:21AM   23   BY MS. PERLMUTTER:
10:21AM   24   Q    And at the bottom here, you see the total net weight?
10:21AM   25   A    Yes.
```

10:21AM  1   Q    Related to -- let's start with cocaine.  Approximately how

10:21AM  2   many ounces is 83.686 grams?

10:21AM  3   A    Approximately three ounces.

10:21AM  4   Q    And based on your training and experience, is the -- is

10:22AM  5   someone when has three ounces of cocaine is that consistent

10:22AM  6   with distribution or is it consistent with user quantities?

10:22AM  7   A    That quantity of cocaine is definitely consistent with

10:22AM  8   distribution.

10:22AM  9   Q    In your experience in the cocaine investigations and

10:22AM  10  prosecutions that you've done, have you ever determined that

10:22AM  11  someone who has three ounces of cocaine is not a distributor?

10:22AM  12  A    I have not.

10:22AM  13  Q    Are these amounts that we looked at exact measurements?

10:22AM  14  A    They appear to be based off of laboratory reports so...

10:22AM  15  Q    Okay.  Let me -- let me clarify that question.  Let's take

10:22AM  16  a look, for example, at these two items that I've characterized

10:22AM  17  here.  The 1.786 grams and the 1.74 grams.  Was that what you

10:22AM  18  referred to as the teen?

10:23AM  19  A    That's correct.

10:23AM  20  Q    Okay.  Or the 16th of an ounce?

10:23AM  21  A    Yes, ma'am.

10:23AM  22  Q    Is that also referred to as an half an eight ball?

10:23AM  23  A    Yes.

10:23AM  24  Q    And are the two teens exact measurements between each

10:23AM  25  other?

10:23AM  1   A    They're not -- they were not exact.

10:23AM  2   Q    Okay.  And based on your training and experience, how were

10:23AM  3   these amounts determined?

10:23AM  4   A    Based on my training and experience, these amounts were

10:23AM  5   based on what the person who was weighing or breaking down the

10:23AM  6   larger amounts into smaller amounts, when they placed it from

10:23AM  7   the larger bag or source to the smaller bag that was recovered.

10:23AM  8   It's typical that someone who's used to visually seeing certain

10:23AM  9   amounts for distribution or for sale would not use a scale, and

10:23AM  10  one of the explanations for the weights not being exact for the

10:24AM  11  quantities provided or projected is because they can eyeball it

10:24AM  12  or visually confirm that it's close enough.  And not use a

10:24AM  13  scale for breaking them down into smaller amounts.

10:24AM  14  Q    Okay.  Based on your review of the evidence seized in the

10:24AM  15  warrant, was there a scale found?

10:24AM  16  A    Not that I've seen.

10:24AM  17  Q    Okay.  Is there a term for not using a scale that you're

10:24AM  18  familiar with?

10:24AM  19  A    Just eyeballing it.

10:24AM  20       MS. PERLMUTTER:  Okay.  We can take this exhibit off,

10:24AM  21  please.

10:24AM  22  BY MS. PERLMUTTER:

10:24AM  23  Q    And the total net weight of the cocaine at 86 --

10:24AM  24  83.686 grams, approximately how many sessions would that be?

10:24AM  25  A    If the average user, for example, was to do a gram per use

| | | |
|---|---|---|
| 10:25AM | 1 | or per session, that could equate or amount to 83 separate |
| 10:25AM | 2 | sessions, give or take. |
| 10:25AM | 3 | Q    So a gram per session about? |
| 10:25AM | 4 | A    Yes. |
| 10:25AM | 5 | Q    Approximately.  And for the crack, there were |
| 10:25AM | 6 | approximately four rocks total?  Two rocks and two broken into |
| 10:25AM | 7 | half rocks? |
| 10:25AM | 8 | A    Yes. |
| 10:25AM | 9 | Q    Okay.  And would that in your training and experience |
| 10:25AM | 10 | involve multiple sessions as well? |
| 10:25AM | 11 | A    Yes.  I would say that most crack pipes that I've seen in |
| 10:25AM | 12 | my years of experience are not wide enough to take that size of |
| 10:25AM | 13 | a rock and so those rocks that we view in the photograph would |
| 10:25AM | 14 | be broken down into even smaller amounts or smaller increments |
| 10:25AM | 15 | prior to them being smoked. |
| 10:25AM | 16 | Q    Does the fact that multiple different quantities were |
| 10:25AM | 17 | found together in the seizure tell you anything about the |
| 10:25AM | 18 | person who possessed them? |
| 10:25AM | 19 | A    Yes.  That's indicative of someone who has certain |
| 10:26AM | 20 | customers that want certain amounts.  So it wouldn't be that |
| 10:26AM | 21 | one person is dealing with one particular customer.  They have |
| 10:26AM | 22 | different customers who seek different amounts for their own |
| 10:26AM | 23 | specific reasons. |
| 10:26AM | 24 | Q    I'd like to turn to packaging.  Is the drug packaging here |
| 10:26AM | 25 | significant? |

| | | |
|---|---|---|
| 10:26AM | 1 | A    Yes. |
| 10:26AM | 2 | Q    And is it consistent with distribution or with user -- a |
| 10:26AM | 3 | single user? |
| 10:26AM | 4 | A    Definitely with distribution. |
| 10:26AM | 5 | Q    And why? |
| 10:26AM | 6 | A    Because the packets were broken down into several one-gram |
| 10:26AM | 7 | sizes and then there were multiple teen or 16th sizes, and then |
| 10:26AM | 8 | there was an eight ball, there were half-ounce quantities and |
| 10:26AM | 9 | ounce quantities, so there was a large range of different sizes |
| 10:26AM | 10 | and quantities already broken down into various size bags for |
| 10:27AM | 11 | that purpose. |
| 10:27AM | 12 | Q    Do you know the total number of bags that were ceased as |
| 10:27AM | 13 | part of the search of the car of the cocaine and cocaine base? |
| 10:27AM | 14 | A    Of the cocaine base, I believe there were four bags. |
| 10:27AM | 15 | Q    Okay.  And for the cocaine, do you recall the total number |
| 10:27AM | 16 | of bags that were seized? |
| 10:27AM | 17 | A    I believe it was in excess of ten. |
| 10:27AM | 18 | Q    Okay.  And if it were 14, for example, does that suggest |
| 10:27AM | 19 | anything to you about distribution or personal use based on |
| 10:27AM | 20 | your training and experience? |
| 10:27AM | 21 | A    Yes.  It's very inconsistent with personal use for the |
| 10:27AM | 22 | reasons stated.  It's more consistent with distribution for |
| 10:27AM | 23 | sure. |
| 10:27AM | 24 | Q    Okay.  Let's turn to cost and money.  You spent some time |
| 10:27AM | 25 | researching at the law enforcement databases a cost of cocaine |

| | | |
|---|---|---|
| 10:28AM | 1 | and cocaine base in Maui; is that fair to say? |
| 10:28AM | 2 | A    It is. |
| 10:28AM | 3 | Q    Okay.  And did you also talk to law enforcement on Maui |
| 10:28AM | 4 | related to cost of cocaine and cocaine base? |
| 10:28AM | 5 | A    Yes, ma'am. |
| 10:28AM | 6 | Q    Do you also have experience personally in your role as a |
| 10:28AM | 7 | special agent regarding the cost of cocaine and cocaine base? |
| 10:28AM | 8 | A    I do. |
| 10:28AM | 9 | Q    Okay.  And specifically did you look at cost related to |
| 10:28AM | 10 | Maui? |
| 10:28AM | 11 | A    I did. |
| 10:28AM | 12 | Q    Okay.  And did you also narrow the time frame? |
| 10:28AM | 13 | A    Yes.  In my conversations with law enforcement colleagues, |
| 10:28AM | 14 | it was narrowed down for the specific time frame and location. |
| 10:28AM | 15 | Q    And why is it important to narrow that time frame? |
| 10:28AM | 16 | A    One example would be during the COVID pandemic because of |
| 10:28AM | 17 | supply chain issues, certain types of drugs fluctuated in price |
| 10:28AM | 18 | because of where -- things were warehoused coming over the |
| 10:28AM | 19 | Mexico border and how it was able to get to Hawaii and the |
| 10:28AM | 20 | limitations involved.  And also because certain islands have |
| 10:29AM | 21 | differences in price, although they're fairly close, there are |
| 10:29AM | 22 | differences just because of the availability and other -- other |
| 10:29AM | 23 | less important factors. |
| 10:29AM | 24 | Q    Is that why it was significant to focus on Maui? |
| 10:29AM | 25 | A    Yes, ma'am. |

75

10:29AM    1    Q    Okay.  And what was the time frame that you actually

10:29AM    2    narrowed down in on?

10:29AM    3    A    It was in the year 2020 right at the beginning of the --

10:29AM    4    in the first half of 2020.

10:29AM    5           MS. PERLMUTTER:  If we could turn to Exhibit 11, page

10:29AM    6    23.  Permission to publish, Your Honor.

10:29AM    7           THE COURT:  Yes, go ahead.

10:29AM    8    BY MS. PERLMUTTER:

10:29AM    9    Q    Okay.  This is the same picture we looked at just for

10:29AM    10   purposes of reference.  If we could start with the cocaine

10:29AM    11   prices.  For a gram of cocaine, approximately how much would

10:29AM    12   that range be in March of 2020 on Maui?

10:30AM    13   A    There were some fluctuations but generally it was in the

10:30AM    14   hundred to $150, maybe $160 range.

10:30AM    15   Q    Okay.  And although we're not looking at it in this

10:30AM    16   picture, what about the one-ounce quantities?  What would be

10:30AM    17   the range of price be for that?

10:30AM    18   A    Around that time frame, the general price range was

10:30AM    19   approximately 1,500 to possibly $2,000 for an ounce.

10:30AM    20   Q    And then what about the half-ounce quantities?

10:30AM    21   A    The half-ounce quantity would go for approximately 800 to

10:30AM    22   a thousand and maybe a little bit more depending on the

10:30AM    23   availability.

10:30AM    24   Q    And are these wholesale or retail-type prices?

10:30AM    25   A    At the half ounce to ounce level, those can be considered

2-SER-284

10:31AM  1   wholesale prices because they could be broken down even further

10:31AM  2   for a final end user or the retail person.

10:31AM  3   Q    Okay.  When I say wholesale versus retail, could you

10:31AM  4   describe to the jury in your words what -- what you mean by

10:31AM  5   that description?

10:31AM  6   A    I define retail as broken down to the lowest amount that a

10:31AM  7   person would use or purchase to consume themselves, and the

10:31AM  8   wholesale level would be the intent for selling a larger amount

10:31AM  9   with the expectation that it would be broken down into even

10:31AM  10  smaller amounts for additional sale or distribution.

10:31AM  11  Q    How does the cost of cocaine compare to other illegal

10:31AM  12  drugs sold in Hawaii?

10:31AM  13  A    Cocaine is higher on the spectrum.  Whereas

10:31AM  14  methamphetamine currently is on the low end the of drug

10:31AM  15  spectrum.  Cocaine and heroin would be on the higher end of the

10:31AM  16  wholesale and retail spectrum as far as illegal drugs here.

10:31AM  17  Q    Okay.  Also in this picture is the cocaine base or the

10:32AM  18  crack.  Could you describe what the prices generally looked

10:32AM  19  like in March of 2020 in Maui for crack?

10:32AM  20  A    Yes.  Because there is a smaller consumer market for this

10:32AM  21  form of cocaine, crack cocaine, there wasn't a lot of research

10:32AM  22  that could be done.  But in speaking with colleagues and -- and

10:32AM  23  based on my experience with similar islands and what it looked

10:32AM  24  like, the price for the rock cocaine would land at about 60 to

10:32AM  25  $120 a gram and depending on the purity or the time frame and a

| | | |
|---|---|---|
| 10:32AM | 1 | full gram was purchased versus a smaller amount. |
| 10:32AM | 2 | Q    In looking at this picture, these appear to be packaged in |
| 10:33AM | 3 | clear plastic baggies.  Is there anything significant about |
| 10:33AM | 4 | that plastic baggy in your training and experience for the |
| 10:33AM | 5 | distribution of drugs? |
| 10:33AM | 6 | A    Yes.  They are readily available, very commonly used and |
| 10:33AM | 7 | the customer has a very easy way of visually seeing what |
| 10:33AM | 8 | they're buying. |
| 10:33AM | 9 | Q    If we could turn to Exhibit 16, page -- |
| 10:33AM | 10 | THE COURT:  How much more do you have, Counsel, on |
| 10:33AM | 11 | direct? |
| 10:33AM | 12 | MS. PERLMUTTER:  I'm sorry, Your Honor. |
| 10:33AM | 13 | THE COURT:  How much more do you have on direct? |
| 10:33AM | 14 | MS. PERLMUTTER:  I would say about ten to 15 minutes. |
| 10:33AM | 15 | THE COURT:  All right.  Then let's go ahead and take |
| 10:33AM | 16 | our first morning break at this point.  As we go to break, I'll |
| 10:33AM | 17 | remind our jury to please refrain from discussing the substance |
| 10:33AM | 18 | of this case with anyone including each other until I advise |
| 10:33AM | 19 | you otherwise; refrain from accessing any media or other |
| 10:33AM | 20 | accounts of this case that may be out there; and finally do not |
| 10:33AM | 21 | conduct any independent investigation into the facts, |
| 10:34AM | 22 | circumstances or persons involved.  Let's take about a |
| 10:34AM | 23 | 15-minute recess.  And we will resume at about 10:50 if the |
| 10:34AM | 24 | lawyers would please remain. |
| 10:34AM | 25 | (At 10:34 a.m., the jury was excused, and the |

10:34AM  1   following proceedings were held:)

10:35AM  2           THE COURT:  Okay.  The record should reflect the

10:35AM  3   departure of our jury and -- you may step down, sir, if you

10:35AM  4   wish.

10:35AM  5           I want to give the lawyers and others in the court the

10:35AM  6   chance to take the break -- a break as well.  But I'd like to

10:35AM  7   resume without the jury once you have a chance to do that to

10:35AM  8   discuss jury instructions and the verdict form that the court

10:35AM  9   circulated last week.  We have received two short responses by

10:35AM 10   the defense side.  One yesterday filed last evening and then

10:35AM 11   one this morning.  I don't know if counsel for the government

10:35AM 12   has seen both of those submissions.

10:35AM 13           MS. PERLMUTTER:  We printed them out just before we

10:35AM 14   arrived in court this morning and I did have a chance to

10:35AM 15   briefly review them and I am prepared to discuss them.

10:35AM 16           THE COURT:  All right.  So I'll give you a chance to

10:35AM 17   take a break and then I'll ask Ms. Elkington to get us back

10:36AM 18   together just a few minutes before the jury comes back.

10:36AM 19           (Proceedings were recessed at 10:36 a.m. to 10:48

10:36AM 20   a.m.)

10:48AM 21           (Open court out of the presence of the jury.)

10:48AM 22           THE COURT:  All right.  So the jury has not yet

10:48AM 23   reentered back from our first morning break but the lawyers are

10:48AM 24   here as is their client and client representatives.  So we are

10:48AM 25   getting close to the end.  From my list of exhibit -- excuse

10:48AM   1    me, witnesses Special Agent Faulkner is, in fact, the

10:48AM   2    government's last witness.  Is there anyone that the government

10:48AM   3    intends to call thereafter?

10:48AM   4          MS. PERLMUTTER:  No.  Special Agent Faulkner, we will

10:48AM   5    rest after his testimony completes.

10:48AM   6          THE COURT:  All right.  Mr. Mottl, does the defense

10:48AM   7    intend to call anyone in its case in chief.

10:48AM   8          MR. MOTTL:  Yes.  Yes.  We have three witnesses and

10:48AM   9    they'll be moderate duration.  I don't know what

10:49AM  10    cross-examination will be, but they're not going to be as long.

10:49AM  11          THE COURT:  Okay.  In light of that, well, we will see

10:49AM  12    how long the defense case takes.  I have some idea from what

10:49AM  13    Ms. Perlmutter already said with respect to how long

10:49AM  14    Mr. Faulkner is expected to take but it very well could be the

10:49AM  15    case that we find ourselves at -- at the point of closing.

10:49AM  16          Are both sides ready to do that today?

10:49AM  17          MS. OLSON:  Yes, Your Honor.

10:49AM  18          THE COURT:  Mr. Mottl?

10:49AM  19          MR. MOTTL:  I could, Your Honor, yes.

10:49AM  20          THE COURT:  All right.  All right.  Well, we'll see

10:49AM  21    where that take us.  We'll need I'm guessing at least an hour

10:49AM  22    or so for closings to allow both sides a reasonable amount

10:49AM  23    of -- of time.  So we'll see where we are in the evidence come

10:49AM  24    12:30ish.  We are scheduled only to continue until 1:30 today.

10:49AM  25    So if we do not have sufficient time to close, we can wrap

| | | |
|---|---|---|
| 10:49AM | 1 | today with the evidence and if possibly the instructions as |
| 10:50AM | 2 | well and then we can close first thing tomorrow.  We'll see |
| 10:50AM | 3 | where we are with that. |
| 10:50AM | 4 | In preparation for instructing the jury, I'd ask you |
| 10:50AM | 5 | all to be prepared to discuss the jury instructions and verdict |
| 10:50AM | 6 | form.  I would say that the version of the verdict form and |
| 10:50AM | 7 | jury instructions that the Court proposed in its filings last |
| 10:50AM | 8 | Friday were very similar to the joint proposed set that the |
| 10:50AM | 9 | government filed under its caption prior to trial. |
| 10:50AM | 10 | And the reason for that is well, one, I think more or |
| 10:50AM | 11 | less it contains an accurate statement of the law and presents |
| 10:50AM | 12 | the issues that the jury is required to -- to address.  But in |
| 10:50AM | 13 | addition to that, there was no competing version of anything |
| 10:50AM | 14 | that I had received from the defense and that is until last |
| 10:51AM | 15 | night.  Last night the defense filed input into three issues |
| 10:51AM | 16 | and then modified that in its filing this morning before the |
| 10:51AM | 17 | start of trial. |
| 10:51AM | 18 | In last night's version, the defense proposed |
| 10:51AM | 19 | different instructions for Count 1, different instructions for |
| 10:51AM | 20 | entrapment and then suggested a lesser included offense of |
| 10:51AM | 21 | possession, simple possession of cocaine in addition to the |
| 10:51AM | 22 | instruction on Count 2 that was proposed by the -- by the |
| 10:51AM | 23 | government. |
| 10:51AM | 24 | In this morning's filing, the lesser included |
| 10:51AM | 25 | suggestion from the defense was omitted and what to make of |

| | | |
|---|---|---|
| 10:51AM | 1 | that I'm not -- not certain.  So that's -- let's just start |
| 10:51AM | 2 | with that. |
| 10:51AM | 3 | Mr. Mottl, the defense is suggesting including the |
| 10:52AM | 4 | lesser included offense instruction that you proposed in your |
| 10:52AM | 5 | filing last evening, or has it had a change of heart in light |
| 10:52AM | 6 | of the filing this morning that did not include such an |
| 10:52AM | 7 | instruction? |
| 10:52AM | 8 | MR. MOTTL:  I intend the statement this morning to set |
| 10:52AM | 9 | out the -- the law on the basis for the -- the suggested |
| 10:52AM | 10 | instructions for Count 1 and Count 2.  I -- I didn't -- I |
| 10:52AM | 11 | thought the lesser included was pretty straightforward.  I |
| 10:52AM | 12 | cited federal law and essentially it was simple possession.  So |
| 10:52AM | 13 | my omission there wasn't indicated that we were abandoning |
| 10:52AM | 14 | that.  We believe it's still appropriate and we would request |
| 10:52AM | 15 | that. |
| 10:52AM | 16 | THE COURT:  Okay.  So let's -- since we're on that |
| 10:52AM | 17 | subject, did the government have a response to including the -- |
| 10:53AM | 18 | I think it's 844? |
| 10:53AM | 19 | MS. PERLMUTTER:  Yes, Your Honor.  First of all, I do |
| 10:53AM | 20 | want to point out that Mr. Mottl in -- sometime in May sent the |
| 10:53AM | 21 | government an email after we filed our jury instructions |
| 10:53AM | 22 | regarding his potential proposition of a lesser included |
| 10:53AM | 23 | offense.  I responded to that email on May 22nd and included a |
| 10:53AM | 24 | proposal for a lesser included instruction.  If he were so |
| 10:53AM | 25 | inclined to want to elect that and that he could file it and |

10:53AM  1    never responded to me.  I did not have time this morning to

10:53AM  2    file anything in response to the 10 p.m. submission; however, I

10:53AM  3    have printed out the government's proposal and it tracks the

10:53AM  4    Ninth Circuit model jury instruction 3.14 which is the lesser

10:53AM  5    included offense and also cites to Ninth Circuit case law

10:53AM  6    specifically United States versus Pineda-Doval 614 F.3D 1019

10:54AM  7    from 2010.  That says, "When a lesser included offense

10:54AM  8    instruction is appropriate, a defendant has the right to elect

10:54AM  9    whether all or only some of the jurors must not be convinced

10:54AM  10   beyond a reasonable doubt of guilt of the greater offense."

10:54AM  11        I take that to mean that it is the defendant's right

10:54AM  12   to elect if it does apply that it be given.  The government

10:54AM  13   would not oppose giving the lesser included offense instruction

10:54AM  14   under those circumstances but does not agree to the defendant's

10:54AM  15   proposal and would like to follow the model jury instruction

10:54AM  16   related to 21 U.S.C. 844(a) that is simple possession of a

10:54AM  17   controlled substance.

10:54AM  18        THE COURT:  I want to know why a lesser included

10:54AM  19   offense needs to be given whether you agree with it or not.

10:54AM  20   Why it triggered here?

10:54AM  21        MS. PERLMUTTER:  My understanding and quite frankly,

10:54AM  22   Your Honor, I haven't been able to do more investigation or

10:55AM  23   research on it is only that based on what I have in my proposal

10:55AM  24   which is only a cite to one case and I haven't been able to

10:55AM  25   reread that is that if a lesser included offense meets the

| | | |
|---|---|---|
| 10:55AM | 1 | test.  There's a test that's set forth that the elements are |
| 10:55AM | 2 | included in there, then it is the defendant's option under the |
| 10:55AM | 3 | Ninth Circuit case law to either strategically ask for that |
| 10:55AM | 4 | inclusion or not ask for that inclusion in there.  I -- I mean, |
| 10:55AM | 5 | I could imagine reasons why Mr. Mottl would or would not seek a |
| 10:55AM | 6 | lesser included offense under the possession with intent to |
| 10:55AM | 7 | distribute here.  But I can't say that I've done further |
| 10:55AM | 8 | research and I can't say conclusively whether that's correct or |
| 10:55AM | 9 | not.  I'm solely just looking at my instruction here. |
| 10:55AM | 10 | THE COURT:  In the defense proposal with regard to |
| 10:55AM | 11 | simple possession, there is offered an instruction on what |
| 10:55AM | 12 | simple possession requires the jury to find.  But it has -- |
| 10:56AM | 13 | says nothing.  The defense submission says nothing about when |
| 10:56AM | 14 | the instruction ought to be given.  Just what the instruction |
| 10:56AM | 15 | should say, if it were to be given. |
| 10:56AM | 16 | My understanding is not the defendant simply gets to |
| 10:56AM | 17 | choose and dictate that the lesser included ought to be given |
| 10:56AM | 18 | whenever -- whenever they decide it out to be given.  That's |
| 10:56AM | 19 | not the defense election to make.  The -- I don't think there |
| 10:56AM | 20 | is any issue and I don't quarrel with simple possession under |
| 10:56AM | 21 | 844 being a lesser included offense of 841, the possession with |
| 10:56AM | 22 | the intent to distribute.  It sure seems like it -- it would |
| 10:56AM | 23 | be, but what I think triggers the issuance of a lesser included |
| 10:57AM | 24 | offense instruction in the first place is whether a rational |
| 10:57AM | 25 | jury could only find for simple possession.  And not for the |

| | | |
|---|---|---|
| 10:57AM | 1 | crime that Mr. Cummings has been charged with in Count 2 of the |
| 10:57AM | 2 | indictment.  And based on the evidence that I've heard thus |
| 10:57AM | 3 | far, particularly Special Agent Faulkner's testimony that we |
| 10:57AM | 4 | heard just before the break, I don't see how a rational jury |
| 10:57AM | 5 | could do that. |
| 10:57AM | 6 | Now, I know there's cross-examination to come and |
| 10:57AM | 7 | Special Agent Faulkner has not stepped down from the stand, but |
| 10:57AM | 8 | unless something changes drastically in his testimony or in one |
| 10:57AM | 9 | of the three witnesses that Mr. Mottl says he intends to call |
| 10:57AM | 10 | in the defense case, the identities of which I am unaware, I |
| 10:58AM | 11 | don't see how a jury could do that. |
| 10:58AM | 12 | MS. PERLMUTTER:  I agree, Your Honor.  I do believe |
| 10:58AM | 13 | the case law says if a rational jury could not find -- if there |
| 10:58AM | 14 | is evidence in the record that a rational jury could not find |
| 10:58AM | 15 | beyond a reasonable doubt the greater offense which is |
| 10:58AM | 16 | possession with the intent to distribute, then the simple |
| 10:58AM | 17 | possession of the lesser offense might be appropriate.  But if |
| 10:58AM | 18 | that's not -- if there is no evidence that a rational jury |
| 10:58AM | 19 | could not fine then -- then it's at the discretion of Your |
| 10:58AM | 20 | Honor but also then it is not necessarily appropriate.  I -- I |
| 10:58AM | 21 | would agree with that summation of the law. |
| 10:58AM | 22 | THE COURT:  Mr. Mottl, thoughts. |
| 10:58AM | 23 | MR. MOTTL:  I was -- I was thinking that the -- I |
| 10:58AM | 24 | recall reviewing the proposed instruction that the -- that |
| 10:58AM | 25 | was -- that was I guess submitted in earlier, and I would |

| | | |
|---|---|---|
| 10:59AM | 1 | concur.  That was a Ninth Circuit.  I originally considered |
| 10:59AM | 2 | that.  But -- but I think the Court -- I can understand the |
| 10:59AM | 3 | Court's position but request that it just wait to see what |
| 10:59AM | 4 | comes out on cross-examination and make the decision based on |
| 10:59AM | 5 | that.  I -- if -- yeah, I -- I think. |
| 10:59AM | 6 | THE COURT:  All right.  Well, my -- my -- my decision |
| 10:59AM | 7 | as it stands with the evidence right now is not to give the |
| 10:59AM | 8 | lesser included offense requested by the defense in whatever |
| 10:59AM | 9 | form because I do not think it's warranted in light of my |
| 10:59AM | 10 | understanding of what triggers giving a lesser included offense |
| 10:59AM | 11 | in the first place.  If you wish to renew the request for |
| 10:59AM | 12 | simple possession instruction, you may do so after the close of |
| 11:00AM | 13 | the evidence.  But that's where it is now.  If you do not renew |
| 11:00AM | 14 | the request, then the court's ruling will stand. |
| 11:00AM | 15 | With respect to the other two issues, the language of |
| 11:00AM | 16 | the Count 1 instruction and the instruction that the defendant |
| 11:00AM | 17 | has proposed with respect to entrapment.  Let me take the |
| 11:00AM | 18 | entrapment issue first. |
| 11:00AM | 19 | The defense urges an entrapment instruction based on |
| 11:00AM | 20 | Hawaii state law and not the federal standard with respect to |
| 11:00AM | 21 | entrapment.  It seems like the federal standard is in some ways |
| 11:00AM | 22 | beneficial to the defendant in the sense that the burden of |
| 11:00AM | 23 | proof is different, at least in terms of what has been proposed |
| 11:00AM | 24 | probative to me.  The defense State of Hawaii instruction |
| 11:00AM | 25 | places the burden of entrapment on the defendant.  Whereas, the |

| | | |
|---|---|---|
| 11:01AM | 1 | government's entrapment instruction places the burden beyond a |
| 11:01AM | 2 | reasonable doubt on the government to prove that it wasn't |
| 11:01AM | 3 | entrapment. |
| 11:01AM | 4 | Notwithstanding, that perceived benefit to the |
| 11:01AM | 5 | defendant, the defendant has proposed the Hawaii instruction. |
| 11:01AM | 6 | I'm not certain why that is, perhaps it's because it's |
| 11:01AM | 7 | available on demand as opposed to the federal instruction which |
| 11:01AM | 8 | is available only upon an initial prima facie showing. |
| 11:01AM | 9 | My inclination is to give the entrapment instruction |
| 11:01AM | 10 | using the language proposed by the government so that is my |
| 11:02AM | 11 | tentative inclination. If anyone wants to try to change my |
| 11:02AM | 12 | mind, feel free. Now is your chance. |
| 11:02AM | 13 | MS. PERLMUTTER: Your Honor, the government -- if -- |
| 11:02AM | 14 | if the Court in its discretion determines that the evidence has |
| 11:02AM | 15 | been sufficient to make a prima facie showing on both |
| 11:02AM | 16 | predisposition and inducement that's required for the |
| 11:02AM | 17 | instruction for entrapment, the government will not then object |
| 11:02AM | 18 | to that court's determination. However, the government does |
| 11:02AM | 19 | agree that the model instruction in the Ninth Circuit's model |
| 11:02AM | 20 | which the court has incorporated is the appropriate instruction |
| 11:02AM | 21 | and the federal law should be followed. |
| 11:02AM | 22 | THE COURT: So my inclination is to give it and the |
| 11:02AM | 23 | reason is although the defense has not presented any evidence |
| 11:02AM | 24 | in its case in chief, I think a fair reading of the text |
| 11:03AM | 25 | message exchange between Kiana or Officer Surina on one hand |

| | | |
|---|---|---|
| 11:03AM | 1 | and Mr. Cummings on the other, you could -- a reasonable jury |
| 11:03AM | 2 | could find the requisite elements of entrapment to be present |
| 11:03AM | 3 | based solely on that, and I think it's justifiable then to give |
| 11:03AM | 4 | the entrapment instruction.  I -- I have been given no |
| 11:03AM | 5 | authority for why that instruction ought to take the form of |
| 11:03AM | 6 | the Hawaii state version just like the lesser included offense, |
| 11:03AM | 7 | the language of the proposed instruction on entrapment was |
| 11:03AM | 8 | simply presented by the defense with -- without much in terms |
| 11:03AM | 9 | of why Hawaii and not federal standards should apply. |
| 11:03AM | 10 | There was a case blurb that was quoted from by the |
| 11:04AM | 11 | defense and we've taken a look at that case blurb.  It does not |
| 11:04AM | 12 | hold that Hawaii state law trumps federal law with respect to |
| 11:04AM | 13 | giving the entrapment instruction in that form.  And so I |
| 11:04AM | 14 | decline to do that. |
| 11:04AM | 15 | Mr. Mottl, do you wish to be heard any further on |
| 11:04AM | 16 | that? |
| 11:04AM | 17 | MR. MOTTL:  No, Your Honor.  It's clear and -- and we |
| 11:04AM | 18 | just stand by what we submitted.  So nothing further. |
| 11:04AM | 19 | THE COURT:  All right.  So that's where I stand.  I |
| 11:04AM | 20 | will give the entrapment instruction in the form that was |
| 11:04AM | 21 | proposed by the government which is also the form that was set |
| 11:04AM | 22 | forth in the government's proposed set of jury instructions |
| 11:04AM | 23 | filed last week. |
| 11:04AM | 24 | And then finally with respect to Count 1, there is |
| 11:04AM | 25 | some verbiage that the defense has proposed regarding the |

| | | |
|---|---|---|
| 11:04AM | 1 | enticement charge. Some of it, I'd say half of it, is actually |
| 11:05AM | 2 | verbatim or substantively verbatim of the proposal that the |
| 11:05AM | 3 | Court submitted which is from the parties or the government's |
| 11:05AM | 4 | filing. And in particular the latter two items, elements three |
| 11:05AM | 5 | and four I believe are virtually identical. There is some |
| 11:05AM | 6 | language in the first element of the defense proposal that's |
| 11:05AM | 7 | simply not -- not correct. Whether Mr. Cummings knowingly |
| 11:05AM | 8 | attempted to use a facility or means of interstate commerce is |
| 11:05AM | 9 | not the issue. It's not whether he attempted to use a facility |
| 11:05AM | 10 | or means. It's he used a facility or means to attempt to |
| 11:05AM | 11 | coerce. I think the word attempt is in the wrong place in -- |
| 11:05AM | 12 | in item number -- number one. |
| 11:06AM | 13 | I don't know. Any other thoughts from the |
| 11:06AM | 14 | government's side of things in terms of the propriety of what |
| 11:06AM | 15 | defendant has proposed versus what the government and the Court |
| 11:06AM | 16 | proposed? |
| 11:06AM | 17 | MS. PERLMUTTER: The government would concur with all |
| 11:06AM | 18 | of your sentiments, Your Honor. I'd also point out that there |
| 11:06AM | 19 | is an error in the date range. The defendant's proposed |
| 11:06AM | 20 | March 14th to 16th and the date range that's charged is 13th to |
| 11:06AM | 21 | 15th, and it also point out that the proposal that the |
| 11:06AM | 22 | government put forth in front of Your Honor which had case |
| 11:06AM | 23 | cites and has been the same type of instruction that was used |
| 11:06AM | 24 | in two other enticement cases in this jurisdiction which went |
| 11:06AM | 25 | up on the Ninth Circuit and were litigated, United States |

| | | |
|---|---|---|
| 11:06AM | 1 | versus Macapagal and United States versus Nishida is in accord |
| 11:06AM | 2 | with that.  In both those jury instructions and those cases |
| 11:06AM | 3 | involved the same Hawaii Revised Statutes which the Hawaii |
| 11:06AM | 4 | Revised Statutes which was cited in the government's proposed |
| 11:07AM | 5 | instruction is based not only on the statute itself but based |
| 11:07AM | 6 | on the Hawaii proposed jury instructions.  And so the |
| 11:07AM | 7 | government would submit that the defendant not only is |
| 11:07AM | 8 | factually and somewhat legally incorrect, although accurate in |
| 11:07AM | 9 | some other ways, is not the best instruction or the most |
| 11:07AM | 10 | accurate instruction to give in this case. |
| 11:07AM | 11 | THE COURT:  And -- and we did look at Macapagal, I'm |
| 11:07AM | 12 | not sure I'm pronouncing it correctly, but Macapagal, although |
| 11:07AM | 13 | tried by Judge Kobayashi, was my case until trial.  And so I'm |
| 11:07AM | 14 | familiar with the development of the law in that case.  I know |
| 11:07AM | 15 | it went up on appeal and I think it was only very recently |
| 11:07AM | 16 | ruled on by the Ninth Circuit.  I don't have the -- a date but |
| 11:07AM | 17 | I -- my recollection is the advance sheet came out within the |
| 11:07AM | 18 | last 45 days, something like that. |
| 11:07AM | 19 | MS. PERLMUTTER:  At the oral arguments -- I -- I |
| 11:07AM | 20 | actually did the oral arguments in that case.  They were last |
| 11:07AM | 21 | October.  The decision came out in early 2023, and the jury |
| 11:08AM | 22 | instructions have been revised, in fact, in the Ninth Circuit |
| 11:08AM | 23 | in March 2023 based on the published decision in Macapagal. |
| 11:08AM | 24 | THE COURT:  Okay.  Thank you for the clarification. |
| 11:08AM | 25 | The -- the passage of time is something that escapes me many |

11:08AM  1   times.  My inclination is I think the -- the -- the proof is in
11:08AM  2   the pudding so to speak that the instruction that the
11:08AM  3   government has proposed is something that this Court me
11:08AM  4   personally but this Court generally has used in the past and is
11:08AM  5   consistent with what it appears the Ninth Circuit is satisfied
11:08AM  6   with when -- when this type of -- of crime has been charged.
11:08AM  7   Specifically in the Hawaii context even.  So it's even more
11:08AM  8   drilled down than -- than a reference to the USC provision
11:08AM  9   might indicate.
11:08AM  10          And so I -- I do think that the appropriate course
11:08AM  11  here is to give the instruction that the circuit has
11:08AM  12  essentially put its stamp of imprimatur on rather than trying
11:09AM  13  to get creative in a -- on a version that the circuit hasn't
11:09AM  14  spoken on in the past.  So my inclination is not to make any
11:09AM  15  changes to -- to the Count 1 instruction.
11:09AM  16          There was only one knit in the Count 1 instruction
11:09AM  17  that we noticed in doing further review during the break and
11:09AM  18  that is with respect to the reference to internet or cellular
11:09AM  19  phones.  This is element two in the Court's proposed
11:09AM  20  instruction number 18.  It reads, "Second, the defendant used a
11:09AM  21  means or facility of interstate or foreign commerce, that is,
11:09AM  22  the internet or a cellular phone to do so."
11:09AM  23          It's redundant because at the very end of this very
11:09AM  24  same instruction it says, "The internet and a cellular phone
11:09AM  25  are facilities of interstate commerce."

11:10AM  1          So we have made just so you all know and I'm not --

11:10AM  2      it's no surprise to anyone.  We're removing the reference to

11:10AM  3      internet or cellular phone in item -- element two as redundant

11:10AM  4      of -- of that provision on the last sentence.  Other than that

11:10AM  5      we're keeping it the way -- the way it is.

11:10AM  6          So we'll go into production then on the final verdict

11:10AM  7      form, the final set of jury instructions so we will do that

11:10AM  8      while we continue the examination of Special Agent Faulkner.

11:10AM  9      And if it is the case that our time permits the court to

11:10AM  10     instruct today, then we will -- we will get there.  We will be

11:10AM  11     ready to do that.

11:10AM  12         All right.  Any other issues before we -- before we

11:10AM  13     call the jury back in?

11:10AM  14         MS. PERLMUTTER:  No other issues, Your Honor.

11:10AM  15         THE COURT:  All right.  Mr. Mottl, anything from the

11:10AM  16     defense?

11:10AM  17         MR. MOTTL:  No, Your Honor.

11:10AM  18         THE COURT:  All right.  Then let's get the jury in,

11:10AM  19     please.

11:10AM  20         (The following proceedings were held in open court in

11:10AM  21     the presence of the jury:)

11:12AM  22         Our 14-member jury has returned, and when we were last

11:12AM  23     together a few minutes ago, Special Agent Faulkner was on the

11:12AM  24     stand and Ms. Perlmutter was in the midst of her direct

11:12AM  25     examination.

| 11:12AM | 1 | You may continue with that now. |
|---|---|---|

11:12AM  2          MS. PERLMUTTER:  Thank you, Your Honor.

11:12AM  3   BY MS. PERLMUTTER:

11:12AM  4   Q    Special Agent Faulkner, I'm going to just direct you back

11:12AM  5   to the topic that we were discussing when we took the break.

11:12AM  6   We were talking about the value of the cocaine and the cocaine

11:12AM  7   base otherwise known as crack.

11:12AM  8          MS. PERLMUTTER:  And I had just asked Ms. Unten if you

11:12AM  9   could please pull up Exhibit 16, page four.

11:12AM  10         And, Your Honor, permission to publish.

11:12AM  11         THE COURT:  Yes, you may.

11:12AM  12         MS. PERLMUTTER:  Thank you.

11:13AM  13         And please if you could highlight or blow up the last

11:13AM  14  third of that exhibit.  Thank you.

11:13AM  15  BY MS. PERLMUTTER:

11:13AM  16  Q    Okay.  Special Agent Faulkner, you had prior to the break

11:13AM  17  discussed the different values around March 2020 in Maui of

11:13AM  18  both cocaine and cocaine base in varying amounts.  Now, I want

11:13AM  19  to direct your attention to the total net weight that was

11:13AM  20  seized from the Toyota Tacoma truck in March of 2020.

11:13AM  21         If you could look at this exhibit, you'll see that the

11:13AM  22  cocaine hydrochloride is 83.686 grams in total.  And you had

11:13AM  23  explained I believe earlier to the jury how many ounces that

11:13AM  24  was approximately?

11:13AM  25  A    Yes.  It was approximately three.

| | | |
|---|---|---|
| 11:13AM | 1 | Q    And essentially do you just divide 83.686 by 28 to get |
| 11:14AM | 2 | that amount? |
| 11:14AM | 3 | A    I just multiplied the 28.35 by three and then it would -- |
| 11:14AM | 4 | it was very close to this amount here. |
| 11:14AM | 5 | Q    Okay.  Are you able to ballpark based on the three ounces |
| 11:14AM | 6 | approximately of cocaine that was seized from the Toyota Tacoma |
| 11:14AM | 7 | how much in value that was worth around that time? |
| 11:14AM | 8 | A    Yes.  At the wholesale level if someone was to purchase |
| 11:14AM | 9 | this amount, the value would be as much as $2,000 times three |
| 11:14AM | 10 | which would be about $6,000 at the retail end of things.  The |
| 11:14AM | 11 | value if the gram breakdown was the amount purchased by a |
| 11:14AM | 12 | consumer at the $120 range it would be in the ballpark of in |
| 11:15AM | 13 | excess of $8,500. |
| 11:15AM | 14 | Q    What about the next line there, the cocaine base |
| 11:15AM | 15 | approximately the 3.488 grams?  Can you approximate what that |
| 11:15AM | 16 | value might be as well? |
| 11:15AM | 17 | A    Yes.  Approximating that the purchased amount would be |
| 11:15AM | 18 | broken down to the gram level, the value could be -- could be |
| 11:15AM | 19 | in the neighborhood of $400. |
| 11:15AM | 20 | MS. PERLMUTTER:  All right.  If you can clear this |
| 11:15AM | 21 | exhibit, please. |
| 11:15AM | 22 | BY MS. PERLMUTTER: |
| 11:15AM | 23 | Q    Okay.  I'd like to move to the last topic that we're going |
| 11:15AM | 24 | to -- I'll address today about organization of the items that |
| 11:15AM | 25 | were seized in Toyota Tacoma.  Is the -- based on your review |

| | | |
|---|---|---|
| 11:15AM | 1 | of the evidence, are you aware that the cocaine and the cocaine |
| 11:15AM | 2 | base were seized inside the truck? |
| 11:16AM | 3 | A    Yes, I am. |
| 11:16AM | 4 | Q    Okay.  Is there anything significant about the location in |
| 11:16AM | 5 | a vehicle that's -- that strikes you pursuant to a -- to |
| 11:16AM | 6 | forming your opinion on distribution? |
| 11:16AM | 7 | A    Yes.  Two things strike me.  The fact that the vehicle was |
| 11:16AM | 8 | used makes the drug distribution easier because it's a more |
| 11:16AM | 9 | mobile way of getting drugs to their desired locations.  But |
| 11:16AM | 10 | even more important than that within the vehicle based on the |
| 11:16AM | 11 | photos I examined, the drugs were concealed within items that |
| 11:16AM | 12 | were in or around the center console area.  And as somebody |
| 11:16AM | 13 | drives a vehicle and distributes, it's -- it's common or normal |
| 11:16AM | 14 | that they like to have their items very close to where they can |
| 11:16AM | 15 | reach them as they're transacting with people and at the same |
| 11:16AM | 16 | time in a concealed location.  So if they're pulled over by law |
| 11:16AM | 17 | enforcement, it's not something that the police officer could |
| 11:16AM | 18 | see visibly at that time. |
| 11:16AM | 19 |     MS. PERLMUTTER:  If you could pull up Exhibit 11.  I |
| 11:17AM | 20 | believe page 11. |
| 11:17AM | 21 |     And Permission to publish, Your Honor. |
| 11:17AM | 22 |     THE COURT:  Yes, you may. |
| 11:17AM | 23 | BY MS. PERLMUTTER: |
| 11:17AM | 24 | Q    Okay.  So you just talked about the significance of the |
| 11:17AM | 25 | center console itself.  Is there anything significant about the |

11:17AM   1    items, the cocaine and the cocaine base, that were actually

11:17AM   2    found in that black bag?

11:17AM   3    A    Yes.  A black bag is a -- or a bag.  It doesn't really

11:17AM   4    matter what the color is but a bag like that is very mobile and

11:17AM   5    when someone gets out of their vehicle if they're carrying a

11:17AM   6    fanny bag or a purse or a satchel, it's something that is a

11:17AM   7    preferred method where someone could leave the vehicle with

11:17AM   8    product, interact with someone or sell something or receive

11:17AM   9    something, and then go back to their vehicle.  It's just a

11:17AM   10   small bag with multiple compartments that have -- it -- it's

11:17AM   11   just a very popular item.

11:17AM   12   Q    If you could turn to the next page, please.  What about

11:17AM   13   the fact that there was money contained in the same black bag

11:17AM   14   where the cocaine and the cocaine base were found?

11:18AM   15   A    That's indicative that a separate compartment was used to

11:18AM   16   hold the money after selling.  If money is owed to a buyer,

11:18AM   17   oftentimes they'll keep it in the same spot as the product.  So

11:18AM   18   they have control over everything that is with them so

11:18AM   19   everything is kind of easy to access and keep track of.

11:18AM   20   Q    If you could turn to page 21, please.  Okay.  Take a look

11:18AM   21   at this exhibit.  This is -- in the black bag, you see the

11:18AM   22   black bag in the upper right-hand corner, yes, and the metal

11:18AM   23   tin on the left-hand side.  There are four bags of cocaine.  Is

11:18AM   24   that what you observed as well?

11:18AM   25   A    Yes, it is.

| | | |
|---|---|---|
| 11:18AM | 1 | Q   And now let's turn to page 22.  And you see that this is a |
| 11:18AM | 2 | separate container in the black bag? |
| 11:18AM | 3 | A   It is. |
| 11:19AM | 4 | Q   Okay.  And page 23.  And the items contained in that |
| 11:19AM | 5 | separate container, you see the container on the become |
| 11:19AM | 6 | left-hand corner? |
| 11:19AM | 7 | A   I do. |
| 11:19AM | 8 | Q   And do you observe the crack rocks in that container? |
| 11:19AM | 9 | A   In page 23, I observed the crack rocks on the seat next to |
| 11:19AM | 10 | the portion of the container that I just saw on page 22. |
| 11:19AM | 11 | Q   And we talked about amounts earlier, do you observe that |
| 11:19AM | 12 | the bags of cocaine on the right side are the approximate |
| 11:19AM | 13 | one-gram amounts? |
| 11:19AM | 14 | A   Yes. |
| 11:19AM | 15 | Q   Okay.  Let's go back to page 22 and 21.  Are these the |
| 11:19AM | 16 | one-gram amounts or are they bigger amounts than that? |
| 11:19AM | 17 | A   They are slightly bigger. |
| 11:19AM | 18 | Q   And is this the eight ball and teen amounts you referred |
| 11:19AM | 19 | to before? |
| 11:19AM | 20 | A   Yes, they do appear to be that. |
| 11:19AM | 21 | Q   Is there anything significant to you why the eight ball |
| 11:19AM | 22 | and teen amounts would be separated in a different container |
| 11:20AM | 23 | than the gram amounts? |
| 11:20AM | 24 | A   Yes.  Some -- a lot of times drug distributors like to |
| 11:20AM | 25 | have their amounts segregated so that when they pull up to meet |

11:20AM  1   with a customer, the goal is to have a -- a quick transaction

11:20AM  2   so they're not fumbling around and trying to figure out what

11:20AM  3   amounts are in what area of the -- of the bag or the center

11:20AM  4   console or what have you.  So this would be a -- a fair example

11:20AM  5   of this demonstrating that the larger amounts that were still

11:20AM  6   meant for customers were separate and apart from the smaller

11:20AM  7   gram amounts.  And that also is consistent with the absence of

11:20AM  8   a scale.

11:20AM  9   Q    If we could turn to page 27, please.  Now, in reviewing

11:20AM  10  the evidence, are you aware that in the center console besides

11:20AM  11  the black bag there was also cocaine found in an iPhone box?

11:20AM  12  A    Yes, I am.

11:20AM  13  Q    Okay.  And is this a picture you've reviewed of the

11:21AM  14  cocaine in the iPhone box?

11:21AM  15  A    It is.

11:21AM  16  Q    You also reviewed the physical drug exhibit of the cocaine

11:21AM  17  found in the iPhone box?

11:21AM  18  A    I have.

11:21AM  19  Q    And are the amounts in the iPhone box greater than the

11:21AM  20  amounts that were found in the black bag?

11:21AM  21  A    Yes, they are.

11:21AM  22  Q    Okay.  Are these the one ounce and half-ounce amounts?

11:21AM  23  A    Yes, ma'am.

11:21AM  24  Q    If you could turn to maybe page 28.  Let's see what that

11:21AM  25  is.  And are these the four bags laid out?

98

| 11:21AM | 1 | A | Yes. |

11:21AM  1   A    Yes.

11:21AM  2   Q    And is there anything significant about distribution about

11:21AM  3   the separation between the black bag drugs and the iPhone box

11:21AM  4   drugs that stands out to you?

11:21AM  5   A    Yes.  So these, obviously as I explained earlier, are the

11:21AM  6   larger quantities and these are based on my opinion quantities

11:21AM  7   that would have likely been given or sold to someone who was

11:21AM  8   going to further break them down and distribute -- distribute

11:21AM  9   them to other customers.

11:21AM  10       Moving it -- taking it a step further, the larger bags

11:22AM  11   that were in an iPhone box separate from the black fanny bag is

11:22AM  12   also indicative of a drug trafficker's desire or a drug

11:22AM  13   dealer's desire to keep certain quantities separated from the

11:22AM  14   stuff that they want to immediately walk around with, say, in

11:22AM  15   a -- in a purse or a bag.

11:22AM  16       MS. PERLMUTTER:  At this time, no further questions,

11:22AM  17   Your Honor.

11:22AM  18       Thank you, Special Agent Faulkner.

11:22AM  19       THE COURT:  Mr. Mottl?

11:22AM  20       MR. MOTTL:  Thank you, Your Honor.

11:22AM  21                    CROSS-EXAMINATION

11:22AM  22   BY MR. MOTTL:

11:22AM  23   Q    Agent Faulkner, good morning.  Let's see.  You last

11:22AM  24   testified concerning the placement of -- of the drugs in the

11:23AM  25   car -- in the truck and your placement of that fact in the

| | | |
|---|---|---|
| 11:23AM | 1 | context of what a trafficker may have done in a similar |
| 11:23AM | 2 | circumstances.  For example, you -- you referred to the -- the |
| 11:23AM | 3 | black purse.  And it looked like -- it may have been a waist |
| 11:23AM | 4 | pack and that how items were placed in there and how that is |
| 11:23AM | 5 | some -- a type of place where traffickers in your experience |
| 11:23AM | 6 | would use to place certain amounts of drugs.  Were an |
| 11:23AM | 7 | individual who was a user of cocaine, probably an addict of |
| 11:23AM | 8 | some sort, where might they keep it as opposed to a drug |
| 11:24AM | 9 | dealer? |
| 11:24AM | 10 | A    An addict or a user depending on where they're going to |
| 11:24AM | 11 | use the drug could potentially keep it in a bag or a purse. |
| 11:24AM | 12 | Q    Like the one in -- in -- in Mr. Cummings' truck? |
| 11:24AM | 13 | A    Yes, sir.  The -- at a -- yes, sir.  So the location being |
| 11:24AM | 14 | much less important than the quantity is what -- yes. |
| 11:24AM | 15 | Q    And in terms of the -- the quantity, it is a case that -- |
| 11:24AM | 16 | that cocaine being a chemical degrades in some ways; isn't that |
| 11:24AM | 17 | the case?  In other words, over time it will lose its potency? |
| 11:24AM | 18 | A    I am aware that cocaine can lose its potency.  I'm not |
| 11:24AM | 19 | sure the degrading is a result of time versus things that are |
| 11:25AM | 20 | added to the cocaine by a person to lose its potency. |
| 11:25AM | 21 | Q    It also is -- is all those, excuse me, also the case that |
| 11:25AM | 22 | exposure of cocaine to humidity or moisture, to heat that will |
| 11:25AM | 23 | affect the duration of the potency, correct? |
| 11:25AM | 24 | A    I'm not extremely familiar with the -- the type of affect |
| 11:25AM | 25 | that sunlight or moisture would have on the actual cocaine |

11:25AM  1   itself.  That's not something I'm very familiar with.

11:25AM  2   Q    You mentioned sunlight and I omitted sunlight.  So it's

11:25AM  3   not to your knowledge that sunlight will affect the potency of

11:25AM  4   cocaine over a period of time?

11:25AM  5   A    Yes, sir.  So my answer is I'm not sure what impact, if

11:25AM  6   any, sunlight or other environmental factors would have on the

11:25AM  7   potency of cocaine.

11:26AM  8   Q    So there would be no reason to try and seal a -- an amount

11:26AM  9   of cocaine up from the -- essentially its environmental

11:26AM 10   atmosphere, sunlight, etcetera, in order to try to preserve its

11:26AM 11   utility for consumption?  That's not the case?

11:26AM 12   A    I'm sorry, sir, if you don't mind just repeating your

11:26AM 13   question so I can best answer it.

11:26AM 14   Q    It's not to your knowledge based on your experience that

11:26AM 15   placement and/or keeping of cocaine essentially outside of a

11:26AM 16   container will not reduce the duration of its potency?  Is

11:26AM 17   that -- I -- I just want to clarify.  If that what your

11:26AM 18   response was.

11:26AM 19        MS. PERLMUTTER:  Objection, asked and answered.

11:26AM 20        THE COURT:  Overruled.  You may answer, if you

11:27AM 21   understand the question.

11:27AM 22        THE WITNESS:  If I understand your question, sir.  The

11:27AM 23   environmental factors that you mentioned or the lack of sealing

11:27AM 24   the product, I don't specifically know the exact impact it

11:27AM 25   would have on the duration of the potency.  I'm aware based on

11:27AM 1   talking to hundreds of people in varying roles in drug
11:27AM 2   trafficking organizations that people do things in packaging
11:27AM 3   and concealment because they feel certain things may or may not
11:27AM 4   happen as a result.  But that's just what they perceive and it
11:27AM 5   may not be a scientific answer.
11:27AM 6   Q    And those -- more specifically then you referred to things
11:27AM 7   that individuals may think will happen.  What are -- do you
11:27AM 8   have any idea what those things are in your education or
11:27AM 9   experience?
11:27AM 10  A    People conceal cocaine in various ways if they're
11:28AM 11  transporting it sometimes for the limited purpose of evading
11:28AM 12  law enforcement detection or a narcotics detection dog.  But in
11:28AM 13  this particular case the way it was packaged is very consistent
11:28AM 14  with it just being ready for immediate distribution.
11:28AM 15  Q    In the clear plastic bags?
11:28AM 16  A    Absolutely.
11:28AM 17  Q    Now, the -- in terms of the sales price of cocaine, it's
11:28AM 18  true like any other merchandise the -- the larger the amount
11:28AM 19  often the cheaper the price.  So if you're willing and you're
11:28AM 20  able to buy a larger amount, it would cost you less than
11:28AM 21  buying -- buying it in the smaller packets and -- isn't that
11:28AM 22  the case?
11:28AM 23  A    That is fair, yes.
11:28AM 24  Q    So if an individual is a -- a relatively steady consumer
11:28AM 25  of cocaine, and is -- cocaine is stimulant; is it not?

| | | |
|---|---|---|
| 11:29AM | 1 | A    Yes. |
| 11:29AM | 2 | Q    Supposedly they use it for some reason to -- many of them |
| 11:29AM | 3 | to function a certain way at work or in another context, they |
| 11:29AM | 4 | may want a larger amount in which case they would be wise in |
| 11:29AM | 5 | order to save money, funds, to buy a larger amount and to |
| 11:29AM | 6 | preserve it and use it over a longer period of time assuming |
| 11:29AM | 7 | they're able to afford it.  Isn't that the case? |
| 11:29AM | 8 | A    One can speculate that someone would buy a larger amount |
| 11:29AM | 9 | for prolonged use or to share with others I guess would be a |
| 11:29AM | 10 | scenario.  That -- that could be the case.  In -- in this |
| 11:29AM | 11 | particular case though the way it was packaged to smaller |
| 11:30AM | 12 | quantities and then even smaller quantities and finally the |
| 11:30AM | 13 | smallest quantities is inconsistent with what you're |
| 11:30AM | 14 | describing. |
| 11:30AM | 15 | Q    Although in this case with your uncertainty about |
| 11:30AM | 16 | environmental factors and how it affects cocaine, you testified |
| 11:30AM | 17 | that you didn't have any knowledge of how it might affect it. |
| 11:30AM | 18 | If someone were concerned for whatever reason that a very |
| 11:30AM | 19 | relatively -- it's certainly not a cheap product, expensive |
| 11:30AM | 20 | product, cocaine, it's something that they would want to |
| 11:30AM | 21 | preserve as best as possible during the period of their use; |
| 11:30AM | 22 | isn't that correct?  Assuming you said you didn't know one way |
| 11:30AM | 23 | or the other how sunlight, moisture, air, oxygen -- oxidation |
| 11:30AM | 24 | would affect it.  If they wanted to preserve it, that would be |
| 11:30AM | 25 | the way to do it, correct, sealing it up? |

| 11:31AM | 1  | A    In many interviews I've conducted, I've -- it's never been |
|---------|----|
| 11:31AM | 2  | brought to my attention that the person that was the |
| 11:31AM | 3  | interviewee or the person that was involved in the cocaine use |
| 11:31AM | 4  | and distribution had those particular concerns you're |
| 11:31AM | 5  | describing because they typically want to get it from their |
| 11:31AM | 6  | purchase to their body as quickly as possible so the prolonged |
| 11:31AM | 7  | preservation hasn't come up as an issue, sir. |
| 11:31AM | 8  | Q    Well, if someone were working or some were just rich, and |
| 11:31AM | 9  | no doubt there are people with money who engage in -- in drugs |
| 11:31AM | 10 | like that, illegal drugs.  They would -- they would certainly |
| 11:31AM | 11 | take the larger amount that they purchased and I would imagine |
| 11:32AM | 12 | break it down into amounts that they could transport easily and |
| 11:32AM | 13 | take to places where they might consume it hence placing it in |
| 11:32AM | 14 | smaller packets to preserve the integrity of the -- the drug |
| 11:32AM | 15 | over a period of time and putting the larger amount, whatever |
| 11:32AM | 16 | they were able to afford, whether it's an ounce or two ounces |
| 11:32AM | 17 | or if someone was rich maybe buying a brick a thousand grams or |
| 11:32AM | 18 | something like that, place it some place where they could go to |
| 11:32AM | 19 | it and take as much as they need for purposes that they were |
| 11:32AM | 20 | using -- |
| 11:32AM | 21 |         MS. PERLMUTTER:  Objection, Your Honor, is there a |
| 11:32AM | 22 | question? |
| 11:32AM | 23 |         MR. MOTTL:  Yep.  I'm sorry.  What was the objection? |
| 11:32AM | 24 |         THE COURT:  The -- the objection is you're speaking |
| 11:32AM | 25 | and not asking questions, Mr. Mottl, so if you do have a |

| 11:32AM | 1 | question for this witness, please ask it. |
| 11:32AM | 2 | BY MR. MOTTL: |
| 11:32AM | 3 | Q    So your response is that you see no reason why someone |
| 11:33AM | 4 | would want to reduce a larger quantity whether it's a -- an |
| 11:33AM | 5 | ounce to a gram-size packets for their own use and that |
| 11:33AM | 6 | breaking it down like that is done solely for the purposes of |
| 11:33AM | 7 | engaging in a transaction of selling or transferring.  Is that |
| 11:33AM | 8 | your position? |
| 11:33AM | 9 | A    My position is that the amounts in which it was broken |
| 11:33AM | 10 | down demonstrates sale and not preservation for personal use |
| 11:33AM | 11 | down the line.  That's my -- that's my opinion, sir. |
| 11:33AM | 12 | Q    In -- in your experience as a -- in law enforcement, have |
| 11:33AM | 13 | you ever encountered a relatively average person someone who's |
| 11:33AM | 14 | not involved with a cartel or a -- a large organization in |
| 11:34AM | 15 | possession of a -- a very large amount of -- of cocaine, a |
| 11:34AM | 16 | brick say? |
| 11:34AM | 17 | A    If we're talking about a brick like a kilogram which is |
| 11:34AM | 18 | what I refer to as a brick just so we're on the same page. |
| 11:34AM | 19 | Q    Yes. |
| 11:34AM | 20 | A    I have encountered on rare occasions someone who's not |
| 11:34AM | 21 | directly affiliated with the cartel in possession of a kilogram |
| 11:34AM | 22 | or a brick of cocaine.  It's -- it's -- it's rather uncommon. |
| 11:34AM | 23 | Q    It's rare. |
| 11:34AM | 24 | A    It's uncommon. |
| 11:34AM | 25 | Q    Now, how -- if someone were going to the beach and they're |

| | | |
|---|---|---|
| 11:34AM | 1 | addicted, wanted to enjoy their -- their illegal substance and |
| 11:34AM | 2 | not to mention their detrimental substance at the beach, taking |
| 11:34AM | 3 | it in a smaller packet would be the way to do it.  You would |
| 11:35AM | 4 | you agree, correct? |
| 11:35AM | 5 | A    I would agree that if a user was going to in your example |
| 11:35AM | 6 | go to the beach to consume a small amount of cocaine, they |
| 11:35AM | 7 | would bring a small packet that they would set aside for their |
| 11:35AM | 8 | personal use, like one small packet or maybe two at the most. |
| 11:35AM | 9 | If they were going to have a -- a session perhaps I don't know |
| 11:35AM | 10 | that the beach is -- is a normal example but that would be an |
| 11:35AM | 11 | amount. |
| 11:35AM | 12 | Q    So they would take it in a smaller amount and there would |
| 11:35AM | 13 | be a reason to put it in a packet and to transport it that way |
| 11:35AM | 14 | for their own questionable enjoyment.  I mean, this is -- they |
| 11:35AM | 15 | would -- do you agree that they would take it -- likely take it |
| 11:35AM | 16 | in a very small package? |
| 11:35AM | 17 | A    My experience is that the end user would purchase it |
| 11:35AM | 18 | already in that packaging so that they would then just dump it |
| 11:35AM | 19 | onto a -- a smooth surface to then use it whenever they saw |
| 11:36AM | 20 | fit, but it would already be purchased in that small packaging. |
| 11:36AM | 21 | Q    And that most likely would be someone who is relative -- |
| 11:36AM | 22 | not financially well off and maybe sort of hand to mouth.  In |
| 11:36AM | 23 | other words, they buy it in a packet which is you stated is the |
| 11:36AM | 24 | more expensive way to purchase it packet to packet, day-to-day. |
| 11:36AM | 25 | That's what you're referring to, correct, that it's that level |

11:36AM    1    of consumption, that is buying it on a short-term basis to

11:36AM    2    consume it.  And then when they desire it again whether it's

11:36AM    3    the next day or the next hour, to go out and get from their

11:36AM    4    pusher or is a supplier another small packet.  And that's --

11:37AM    5    that -- that is what's your saying?

11:37AM    6    A    If I understand your question, I am saying that a consumer

11:37AM    7    or and end user would potentially purchase an amount that they

11:37AM    8    feel like they would use in a session or two.  And when they're

11:37AM    9    ready or when they have the means to what we call re-up or

11:37AM   10    purchase another similar amount that they would then seek out

11:37AM   11    their supplier and do it again in the same fashion that they

11:37AM   12    did at the last time.

11:37AM   13    Q    So they had -- they had a -- a daily or a once every

11:37AM   14    two-day habit, they would be making three, four trips to

11:37AM   15    their -- their pusher a week and that would go along as long as

11:37AM   16    they could sustain it or as long as they desired to -- to

11:37AM   17    maintain it without help.  Is that -- that's -- is that the

11:38AM   18    only way you can -- you in your experience of can see of how

11:38AM   19    it's kept and consumed by addicts?

11:38AM   20    A    In my experience, I've seen cocaine kept and consumed a

11:38AM   21    few different ways by addicts.  But a way or a common way if

11:38AM   22    they know that they're predisposed to use cocaine several times

11:38AM   23    a week, they may purchase a teen, which is a 16th of an ounce,

11:38AM   24    and then pour portions onto the surface or a line to consume

11:38AM   25    when they felt like it was their time to consume.  And then

11:38AM  1    purchase -- or -- or then pour out more and more from that one

11:38AM  2    bag, if they needed to do it, on a more regular basis until

11:38AM  3    they're out and decide that it's time for them to purchase

11:38AM  4    more.

11:38AM  5    Q    You're referring to the one bag.  You indicated that the

11:39AM  6    small one-gram bag was basically a single for consumption.  One

11:39AM  7    person would set it out in a line --

11:39AM  8        THE COURT REPORTER:  I'm sorry.  Could you say it

11:39AM  9    again.

11:39AM  10   BY MR. MOTTL:

11:39AM  11   Q    A single individual would set it out in a line and snort

11:39AM  12   it up or ingest it in some other way.  So a packet would be

11:39AM  13   just a one-time shot and then they would want more assuming

11:39AM  14   they -- they were so incline or needed it.

11:39AM  15       Now, I mentioned basically a street dealing and

11:39AM  16   individuals who are basically probably part-time offenders

11:39AM  17   themselves stealing and -- and doing other items or selling

11:40AM  18   themselves in order to support their habit, but there are

11:40AM  19   people with money who are employed.  It would make sense, would

11:40AM  20   it not, for them to buy larger quantities in order to extend

11:40AM  21   their dollar in -- in essentially wasting it on this drug, but

11:40AM  22   they need it.  They're addicted.  It would make sense for them,

11:40AM  23   assuming they could afford it, to buy a larger amount and to

11:40AM  24   use it over a period of time rather than you suggested one --

11:40AM  25       MS. PERLMUTTER:  Objection, Your Honor, is there a

| | | |
|---|---|---|
| 11:40AM | 1 | question? |
| 11:40AM | 2 | MR. MOTTL:  -- one packet at a time. |
| 11:40AM | 3 | THE COURT:  Mr. Mottl, I tried to give you a lot of |
| 11:40AM | 4 | leeway. |
| 11:40AM | 5 | MR. MOTTL:  Thank you, Your Honor.  I'll -- I'll -- |
| 11:40AM | 6 | I'll make it shorter. |
| 11:40AM | 7 | THE COURT:  Please ask it. |
| 11:40AM | 8 | MR. MOTTL:  I appreciate it. |
| 11:40AM | 9 | BY MR. MOTTL: |
| 11:40AM | 10 | Q    So you do not -- you can't conceive of that being the |
| 11:41AM | 11 | case, individuals wanting to buy a larger amount and sustaining |
| 11:41AM | 12 | their use over a period of time assuming they could afford it, |
| 11:41AM | 13 | that is nothing that you are familiar with in -- in -- in your |
| 11:41AM | 14 | career as a law enforcement officer specializing in -- in |
| 11:41AM | 15 | narcotics? |
| 11:41AM | 16 | A    There's a wide variety in which people make their |
| 11:41AM | 17 | individual decisions on what amounts to purchase at what time. |
| 11:41AM | 18 | And those could have many different outside factors which weigh |
| 11:41AM | 19 | into the large variety in which they decide they're going to |
| 11:41AM | 20 | purchase a gram or a couple of grams or three grams.  It |
| 11:41AM | 21 | depends on so many different factors. |
| 11:41AM | 22 | Q    It does.  I agree. |
| 11:41AM | 23 | In fact, I believe is not likely that you might have |
| 11:41AM | 24 | friends or acquaintances that might pool their money and get a |
| 11:42AM | 25 | larger quantity and just split it up because that's the cheap |

(110 of 280), Page 110 of 280 Case: 23-3016, 11/18/2024, DktEntry: 26.3, Page 110 of 280
Case 1:22-cr-00023-DKW    Document 182    Filed 02/21/24    Page 109 of 172
PageID.1642

109

| | | |
|---|---|---|
| 11:42AM | 1 | way to go in supporting their -- their habit? |
| 11:42AM | 2 | A    That has happened, yes. |
| 11:42AM | 3 | Q    So when an individual like Mr. Cummings has amounts as was |
| 11:42AM | 4 | described by previous witnesses, you indicated you observed in |
| 11:42AM | 5 | the discovery where there is a large amount in the small |
| 11:42AM | 6 | packets.  The immediate and logical conclusion isn't |
| 11:42AM | 7 | necessarily that they're a dealer, is it? |
| 11:42AM | 8 | A    My conclusion, sir, was based on the different tiers of |
| 11:42AM | 9 | varying quantities.  There were the gram quantities, the teen |
| 11:42AM | 10 | to eight ball quantities, and the half ounce to ounce |
| 11:42AM | 11 | quantities.  In its totally all roads lead to the fact that |
| 11:42AM | 12 | those are quantities packaged for distribution. |
| 11:43AM | 13 | Q    Okay.  Now, regarding what you just said and -- and you |
| 11:43AM | 14 | indicated as much earlier on in your direct testimony, the -- |
| 11:43AM | 15 | the amounts weighed out.  The net amounts varied considerably, |
| 11:43AM | 16 | true?  The ones in the smaller packets were a gram plus or |
| 11:43AM | 17 | minus, 20 percent of a gram, whatever that is.  So it varied |
| 11:43AM | 18 | but they were all in smaller packets presumably to be used at |
| 11:43AM | 19 | times when that's what was desired.  The larger ones, larger |
| 11:43AM | 20 | packets, again, no consistent -- there were no real consistent |
| 11:43AM | 21 | measures of weight, but in your -- in -- from your perspective |
| 11:44AM | 22 | understandably as a experienced officer, you estimated, well, |
| 11:44AM | 23 | this is about an eight ball, yet there's no indication in terms |
| 11:44AM | 24 | of the actual weight that it was an eight ball or, you know, |
| 11:44AM | 25 | even relatively close to an eight ball or a teen.  So these |

| | | |
|---|---|---|
| 11:44AM | 1 | were varying quantities and you assessed that they were |
| 11:44AM | 2 | probably intended to be those amounts because those amounts are |
| 11:44AM | 3 | transacted by dealers, correct? |
| 11:44AM | 4 | A    In terms of the amounts you just discussed, although they |
| 11:44AM | 5 | are not exactly to the hundredth of a gram, they are spot on |
| 11:44AM | 6 | within the range of what would be an eight ball or a teen and |
| 11:44AM | 7 | these are very normal amounts that consumers would purchase |
| 11:44AM | 8 | from a distributor. |
| 11:44AM | 9 | Q    You mentioned -- used the word spot on.  They were -- are |
| 11:45AM | 10 | you referring to a -- a ballpark interval where you could say, |
| 11:45AM | 11 | yes, this is a teenth (verbatim) or an eight ball or an ounce? |
| 11:45AM | 12 | A    Yes, sir.  That would have been based on my experience, |
| 11:45AM | 13 | this would -- it's well within the range.  When I say "spot |
| 11:45AM | 14 | on," I mean very within the range of what a consumer would look |
| 11:45AM | 15 | at and say this is what I'm expecting.  This is what I'm |
| 11:45AM | 16 | purchasing.  I'm not going to complain to my dealer that they |
| 11:45AM | 17 | shorted me. |
| 11:45AM | 18 | Q    It might be a -- a use and a half.  That is a -- well, you |
| 11:45AM | 19 | have a half ounce, an ounce.  You have a teen and then you have |
| 11:46AM | 20 | an eight ball.  These are larger quantities that would serve an |
| 11:46AM | 21 | individual who wanted that amount for a certain purpose or for |
| 11:46AM | 22 | certain period of time, correct?  And so they purchase it and |
| 11:46AM | 23 | so the dealers may prepare it -- |
| 11:46AM | 24 | MS. PERLMUTTER:  Objection, Your Honor -- |
| 11:46AM | 25 | MR. MOTTL:  -- isn't that correct? |

| 11:46AM | 1 | THE COURT:  Sustained. |

11:46AM   2   BY MR. MOTTL:

11:46AM   3   Q   The amounts that you talked to are in a way they're

11:46AM   4   servings of the drug how much an individual wants to buy an

11:46AM   5   eight ball or a teen.  That's a serving and a half, two

11:46AM   6   servings, correct?  So they buy what they're interested or

11:46AM   7   maybe what they could afford to buy, correct?

11:46AM   8   A   Not necessarily, sir.  In the drug consumption business,

11:46AM   9   there's no half servings so someone's either going use a

11:46AM   10  serving or a session or the -- it's just going to be divided up

11:46AM   11  and that's based on whoever is using it, what they want to

11:46AM   12  consume at that given time or if they want to stretch it out

11:46AM   13  for a prolonged period of time.

11:46AM   14  Q   Yeah, I'm sorry.  That's -- that's what I meant by a

11:47AM   15  serving.  In other words, an individual may buy as much as

11:47AM   16  they -- maybe they -- as much as they can afford at the time or

11:47AM   17  as much as they want to consume over a period of time that they

11:47AM   18  anticipate wanting the drug.  And so they ask for a certain

11:47AM   19  amount eight ball, a teen or, etcetera, or the other quantities

11:47AM   20  that you mentioned.  But so too an individual who would

11:47AM   21  purchase for them self and is breaking down a larger amount

11:47AM   22  might quite logically break it down into those amounts too

11:47AM   23  which are -- when I meant a serving, basically what they would

11:47AM   24  want just sit down and in one line.  When you said that was a

11:47AM   25  gram or maybe a gram plus an additional amount and that may be

112

| | | |
|---|---|---|
| 11:47AM | 1 | a teen, or maybe they wanted for a little longer.  So that |
| 11:47AM | 2 | would be a reason why an individual, would it not, who had |
| 11:47AM | 3 | bought a larger amount maybe not a huge amount but a larger |
| 11:47AM | 4 | amount because their budget allowed them to or because it was, |
| 11:48AM | 5 | you know, budget-wise to -- |
| 11:48AM | 6 | MS. PERLMUTTER:  Objection, question, Your Honor. |
| 11:48AM | 7 | THE COURT:  Mr. Mottl, you have to ask a question. |
| 11:48AM | 8 | Ask a question not give speeches. |
| 11:48AM | 9 | BY MR. MOTTL: |
| 11:48AM | 10 | Q    Okay.  It would not be unusual to find a person who |
| 11:48AM | 11 | possesses a small amount greater than a gram perhaps a teen or |
| 11:48AM | 12 | a ball for their own consumption, correct? |
| 11:48AM | 13 | A    Once a consumer or a person for that matter has amounts |
| 11:48AM | 14 | that are above an eight ball and we're talking about getting |
| 11:48AM | 15 | into the realms of quarter, half-ounce quantities, it then |
| 11:48AM | 16 | becomes more and more inconsistent with personal use and it |
| 11:48AM | 17 | crosses over into that line of distribution and then one would |
| 11:48AM | 18 | look at the -- the packaging from an overall perspective to |
| 11:49AM | 19 | confirm that theory. |
| 11:49AM | 20 | Q    I can see that.  More and more so someone's got a brick |
| 11:49AM | 21 | most likely they are an unusual person who likes to drop big |
| 11:49AM | 22 | money on things like that and keep to themselves.  But a |
| 11:49AM | 23 | greater the likelihood that they are engaging in some sort of |
| 11:49AM | 24 | trafficking, I would agree. |
| 11:49AM | 25 | But the amounts three -- three ounces of regular coke |

| | | |
|---|---|---|
| 11:49AM | 1 | and a smaller amount of -- of the crack is not a huge amount, |
| 11:49AM | 2 | is it not?  It's not a huge amount, is it, compared to what |
| 11:49AM | 3 | dealers deal with? |
| 11:49AM | 4 | A    That is a relatively consistent amount with what dealers |
| 11:49AM | 5 | deal with.  In the grand scheme of things, there are larger |
| 11:50AM | 6 | higher-level distributors that deal in larger wholesale |
| 11:50AM | 7 | quantities, but those amounts are very consistent with a retail |
| 11:50AM | 8 | distributor that has a customer base at a more retail level -- |
| 11:50AM | 9 | local level. |
| 11:50AM | 10 | Q    And that amount is three ounces? |
| 11:50AM | 11 | A    Or even less, yes. |
| 11:50AM | 12 | Q    Now, the individual you say who deal along those lines |
| 11:50AM | 13 | which you -- you just described, are they full-time dealers? |
| 11:50AM | 14 | They're -- they are dealer dealers.  They're not just sharing |
| 11:50AM | 15 | with friends or anything like that.  That's your experience? |
| 11:50AM | 16 | A    There is no one size fits all for whether or not someone |
| 11:50AM | 17 | deals full time or part-time based at the ounce level. |
| 11:50AM | 18 | Typically, at a much larger level like at the kilogram level, |
| 11:50AM | 19 | they're more likely to be full-time dealers and that's all that |
| 11:51AM | 20 | they do.  At the ounce level, they could be doing it to either |
| 11:51AM | 21 | support a habit, to make extra money.  They could support a |
| 11:51AM | 22 | drug or gambling habit or just want to live in a different -- |
| 11:51AM | 23 | better financial means than they -- than they currently have. |
| 11:51AM | 24 | There's -- there's -- I'd be speculating if I -- if I gave you |
| 11:51AM | 25 | more examples. |

114

| | | |
|---|---|---|
| 11:51AM | 1 | Q    So essentially they are living -- they're using drugs and |
| 11:51AM | 2 | living an illegal life style supporting their -- basically |
| 11:51AM | 3 | supporting their livelihood.  That's a livelihood.  It's |
| 11:51AM | 4 | basically drugs.  Now, there are people that work.  Some people |
| 11:51AM | 5 | work two jobs or three jobs and sustain themselves in those |
| 11:51AM | 6 | jobs because they're relying on maybe not cocaine which is sort |
| 11:51AM | 7 | of an expensive way -- |
| 11:51AM | 8 | MS. PERLMUTTER:  Objection, Your Honor. |
| 11:51AM | 9 | THE COURT:  Mr. Mottl -- |
| 11:52AM | 10 | MR. MOTTL:  There are -- yes, Your Honor. |
| 11:52AM | 11 | BY MR. MOTTL: |
| 11:52AM | 12 | Q    Is there anything beyond the three ounces roughly three |
| 11:52AM | 13 | ounces in various states of containment that were in |
| 11:52AM | 14 | Mr. Cummings' car that -- is there anything other than that |
| 11:52AM | 15 | that leads you to believe that he, in fact, was a dealer as |
| 11:52AM | 16 | opposed to a consumer? |
| 11:52AM | 17 | A    Yes, sir.  The cash that was recovered in the |
| 11:52AM | 18 | denominations in which they were recovered does also suggest |
| 11:52AM | 19 | that the person that had the drugs is also distributing the |
| 11:53AM | 20 | drugs. |
| 11:53AM | 21 | Q    Okay.  And, you know, fifties and hundreds, do you know |
| 11:53AM | 22 | anybody that takes money out of the bank in hundreds or is it |
| 11:53AM | 23 | only drug dealers or people that you would suspect as being |
| 11:53AM | 24 | drug dealers? |
| 11:53AM | 25 | A    I know people that take money out of the bank in hundreds |

| 11:53AM | 1 | if -- if you're talking about at a counter or an ATM, |
| 11:53AM | 2 | there's obviously two different -- we just answered that |
| 11:53AM | 3 | question but in general, yes, I do. |
| 11:53AM | 4 | Q    There are strange people -- and in my opinion strange |
| 11:53AM | 5 | people who would like to carry bills like that and they're not |
| 11:53AM | 6 | criminals necessarily.  I mean, some are.  Some aren't.  You |
| 11:53AM | 7 | would agree that your experience which is extensive shapes your |
| 11:53AM | 8 | assessment of any particular situation along the lines of your |
| 11:53AM | 9 | training and your education? |
| 11:54AM | 10 | A    Yes.  Those -- those factors do shape my opinions here |
| 11:54AM | 11 | today. |
| 11:54AM | 12 |         MR. MOTTL:  All right.  No other questions, Your |
| 11:54AM | 13 | Honor.  Thank you. |
| 11:54AM | 14 |         THE COURT:  Ms. Perlmutter, any redirect? |
| 11:54AM | 15 |         MS. PERLMUTTER:  Very short, Your Honor. |
| 11:54AM | 16 |                 REDIRECT EXAMINATION |
| 11:54AM | 17 | BY MS. PERLMUTTER: |
| 11:54AM | 18 | Q    Mr. Mottl I believe asked you a series of questions about |
| 11:54AM | 19 | potential personal use.  Do you recall that? |
| 11:54AM | 20 | A    I do. |
| 11:54AM | 21 | Q    Okay.  In your experience and training, can a person who |
| 11:54AM | 22 | engages in drug distribution also personally use drugs? |
| 11:54AM | 23 | A    Yes, that's quite common. |
| 11:54AM | 24 | Q    And are those two concepts mutually exclusive? |
| 11:54AM | 25 | A    No. |

| | | | |
|---|---|---|---|
| 11:54AM | 1 | Q | And your conclusion here that the items found were |
| 11:55AM | 2 | | consistent with distribution, is that under the totally of the |
| 11:55AM | 3 | | circumstances? |
| 11:55AM | 4 | A | Yes, it is. |
| 11:55AM | 5 | Q | That includes the various quantities of amounts that you |
| 11:55AM | 6 | | found? |
| 11:55AM | 7 | A | Yes. |
| 11:55AM | 8 | Q | And did you describe those as dealer-type amounts? |
| 11:55AM | 9 | A | Yes. |
| 11:55AM | 10 | Q | And that included baggies in gram amounts? |
| 11:55AM | 11 | A | Yes, it did. |
| 11:55AM | 12 | Q | It include baggies in teen amounts? |
| 11:55AM | 13 | A | Yes. |
| 11:55AM | 14 | Q | Included a baggy in an eight ball amount? |
| 11:55AM | 15 | A | Correct. |
| 11:55AM | 16 | Q | And did that include a baggy in a half-ounce amount? |
| 11:55AM | 17 | A | Yes.  I believe there were three. |
| 11:55AM | 18 | Q | And did that include another baggy in an ounce amount? |
| 11:55AM | 19 | A | Yes, ma'am. |
| 11:55AM | 20 | Q | And what's significance to you about the larger amounts |
| 11:55AM | 21 | | versus the smaller gram amounts? |
| 11:55AM | 22 | A | As I stated, those larger amounts are consistent with |
| 11:55AM | 23 | | having a customer that wanted to purchase something in a |
| 11:56AM | 24 | | half-ounce quantity perhaps to then break it down into smaller |
| 11:56AM | 25 | | quantities for further distribution or sale.  It doesn't |

| | | |
|---|---|---|
| 11:56AM | 1 | necessarily have to be a sale for profit.  It could be a number |
| 11:56AM | 2 | of different things that could be -- the -- the genesis of the |
| 11:56AM | 3 | distribution itself. |
| 11:56AM | 4 | Q    Is your conclusion also based on the way that the cocaine |
| 11:56AM | 5 | and cocaine base were found in their packaging? |
| 11:56AM | 6 | A    Yes. |
| 11:56AM | 7 | Q    That also the number of baggies? |
| 11:56AM | 8 | A    Yes, ma'am. |
| 11:56AM | 9 | Q    That includes the type of baggies that were used? |
| 11:56AM | 10 | A    Yes. |
| 11:56AM | 11 | Q    And is your conclusion based on the total amount, the |
| 11:56AM | 12 | three ounces of cocaine that were found? |
| 11:56AM | 13 | A    Yes, it is. |
| 11:56AM | 14 | Q    And is that also based on the fact that it was found in a |
| 11:56AM | 15 | car? |
| 11:56AM | 16 | A    Yes.  That was part the of the analysis. |
| 11:56AM | 17 | Q    And what about the fact of how the cocaine and the cocaine |
| 11:56AM | 18 | base were organized in the car, does that -- did that influence |
| 11:56AM | 19 | your opinion? |
| 11:56AM | 20 | A    Yes.  That was significant. |
| 11:57AM | 21 | Q    And is -- and why is that? |
| 11:57AM | 22 | A    Just for ease of access.  If someone has a customer that |
| 11:57AM | 23 | they're rolling up to conduct a short transaction with and |
| 11:57AM | 24 | the -- the customer wants a certain amount, they know which |
| 11:57AM | 25 | area to go to within a multi-compartmented bag or within |

11:57AM  1    several closed containers to get that amount that the customer

11:57AM  2    is asking for.

11:57AM  3    Q    And the iPhone box wasn't included in the black bag,

11:57AM  4    right, they were separate?

11:57AM  5    A    Yes.

11:57AM  6    Q    Why would a drug distributor want to separate the larger

11:57AM  7    amounts of cocaine from the smaller amounts?

11:57AM  8    A    One common reason would be that if the distributor was

11:57AM  9    going to a -- a place to meet with someone, took the fanny bag

11:57AM  10   or purse or smaller bag out of the car to do their transaction,

11:57AM  11   and was either encountered and arrested by law enforcement or

11:57AM  12   robbed by their customer and all of their supply was taken,

11:58AM  13   they would still have an additional large supply to fall back

11:58AM  14   on to get back on their feet.  That would be one reason.

11:58AM  15           MS. PERLMUTTER:  No further questions, Your Honor.

11:58AM  16           THE COURT:  Special Agent Faulkner --

11:58AM  17           MR. MOTTL:  May I have a brief recross?

11:58AM  18           THE COURT:  No.

11:58AM  19           Special Agent Faulkner, you may step down.

11:58AM  20           THE WITNESS:  Thank you, Your Honor.

11:58AM  21           THE COURT:  All right.  Does the government have any

11:58AM  22   other witnesses it wishes to call in its case in chief?

11:58AM  23           MS. OLSON:  The government rests, Your Honor.

11:58AM  24           THE COURT:  All right.  Ladies and gentlemen, the

11:58AM  25   government's case in chief has been concluded meaning the

| | | |
|---|---|---|
| 11:58AM | 1 | government does not intend to call any further witnesses or |
| 11:58AM | 2 | present any other evidence. |
| 11:58AM | 3 | Does the defense have a motion that it wishes to make? |
| 11:58AM | 4 | MR. MOTTL:  Yes, Your Honor. |
| 11:58AM | 5 | THE COURT:  Please approach. |
| 11:58AM | 6 | MR. MOTTL:  Yes. |
| 11:58AM | 7 | (Sidebar on the record:) |
| 11:58AM | 8 | THE COURT:  Go ahead, Mr. Mottl. |
| 11:58AM | 9 | MR. MOTTL:  Defense moves for a motion for judgment of |
| 11:58AM | 10 | acquittal where either those dates, recollection of the facts, |
| 11:59AM | 11 | as well as the applicable law.  Nothing further. |
| 11:59AM | 12 | THE COURT:  You don't wish to argue further? |
| 11:59AM | 13 | MR. MOTTL:  No. |
| 11:59AM | 14 | THE COURT:  All right.  That motion is denied.  There |
| 11:59AM | 15 | is more than sufficient evidence particularly when viewed in |
| 11:59AM | 16 | the light most favorable to the prosecution to establish all of |
| 11:59AM | 17 | the elements of Counts 1 and 2 beyond a reasonable doubt |
| 11:59AM | 18 | together with the fact that -- together with the absence of any |
| 11:59AM | 19 | entrapment issue.  I believe there's also evidence in the |
| 11:59AM | 20 | record beyond a reasonable doubt that would lead the jury to |
| 11:59AM | 21 | conclude that the defendant in this case was not entrapped in |
| 11:59AM | 22 | the manner as suggested by the defense in pretrial submissions |
| 11:59AM | 23 | as well as in argument during the course of trial. |
| 11:59AM | 24 | Mr. Mottl, do you intend to offer evidence now? |
| 11:59AM | 25 | MR. MOTTL:  Yes. |

120

| 11:59AM | 1 | THE COURT:  Okay.  Then let's call the first witness. |
| 12:00PM | 2 | (End of side bar.) |
| 12:00PM | 3 | THE COURT:  So ladies and gentlemen, with the close of |
| 12:00PM | 4 | the prosecution's case in chief, I instructed you earlier that |
| 12:00PM | 5 | you should keep an open mind until the close of all of the |
| 12:00PM | 6 | evidence.  The defendant himself also has an opportunity to |
| 12:00PM | 7 | present evidence of his own in his case in chief.  Mr. Mottl |
| 12:00PM | 8 | has indicated that the defense wishes to do so by calling |
| 12:00PM | 9 | several witnesses so we are going to start with that process |
| 12:00PM | 10 | now. |
| 12:00PM | 11 | Mr. Mottl, go ahead and call your first witness |
| 12:00PM | 12 | please. |
| 12:00PM | 13 | MR. MOTTL:  Yes.  We call to the stand Lyle Cummings, |
| 12:00PM | 14 | the defendant. |
| 12:00PM | 15 | MS. PERLMUTTER:  Your Honor, can we have a brief side |
| 12:00PM | 16 | bar? |
| 12:00PM | 17 | THE COURT:  Yes. |
| 12:00PM | 18 | MS. PERLMUTTER:  Thank you. |
| 12:00PM | 19 | THE COURT:  Mr. Cummings, could you please join us at |
| 12:00PM | 20 | sidebar, please? |
| 12:01PM | 21 | (Sidebar on the record:) |
| 12:01PM | 22 | THE COURT:  I apologize.  I didn't realize that |
| 12:01PM | 23 | Mr. Cummings was going to be one of the witnesses you called. |
| 12:01PM | 24 | MS. PERLMUTTER:  I did not either. |
| 12:01PM | 25 | THE COURT:  Mainly because he is not on your witness |

| | | |
|---|---|---|
| 12:01PM | 1 | list.  You understand that, right? |
| 12:01PM | 2 | MR. MOTTL:  Yes. |
| 12:01PM | 3 | THE COURT:  And you nonetheless are going to call him? |
| 12:01PM | 4 | MR. MOTTL:  Yes, I -- well, in state court that's the |
| 12:01PM | 5 | practice, my apologies, yes. |
| 12:01PM | 6 | THE COURT:  The practice, is what, to not include |
| 12:01PM | 7 | witnesses that you intend to call on your witness list?  That's |
| 12:01PM | 8 | your practice in state court? |
| 12:01PM | 9 | MR. MOTTL:  To -- to disclose whether if, in fact, at |
| 12:01PM | 10 | that time -- the time of preparation of the witness list, |
| 12:01PM | 11 | it's intent -- there is an intent to call a defendant as |
| 12:01PM | 12 | opposed to waiting until after the presentation of the state's |
| 12:01PM | 13 | case. |
| 12:01PM | 14 | THE COURT:  It's incumbent on you to include all those |
| 12:01PM | 15 | who may testify at trial.  The -- the defendant, Mr. Cummings, |
| 12:01PM | 16 | is not on your list. |
| 12:01PM | 17 | MR. MOTTL:  I'm sorry.  Yeah, that's -- |
| 12:01PM | 18 | THE COURT:  That's not the practice in this court nor |
| 12:02PM | 19 | is it the practice of any court with which I'm familiar.  It |
| 12:02PM | 20 | falls into the category of sand bagging, don't you think?  Is |
| 12:02PM | 21 | the government prepared to cross? |
| 12:02PM | 22 | MS. OLSON:  Your Honor, may I just add Mr. Mottl did |
| 12:02PM | 23 | inform me repeatedly over a period of time that he was most |
| 12:02PM | 24 | likely going to call the defendant, and we were aware and we |
| 12:02PM | 25 | are prepared to cross and we don't object. |

12:02PM    1         THE COURT:  All right.  I still -- this is not only

12:02PM    2    notice to the prosecution, it's notice to the Court.  And while

12:02PM    3    you guys may have had discussions with Mr. Mottl, I had not.

12:02PM    4    So the notice to me indicated that persons other than the

12:02PM    5    defendant were going to be called or may -- may be called.

12:02PM    6    Okay.

12:02PM    7         So next time you are to list on your trial witness

12:02PM    8    list all those who you may call at trial.  If you don't do

12:02PM    9    that, you risk exclusion of that witness when you do call them

12:02PM   10    at trial.  And I'm sure that's not a risk that you wish to

12:02PM   11    bear.  I'm going to allow the defendant to testify --

12:02PM   12         MR. MOTTL:  All right.  Sorry.

12:03PM   13         THE COURT:  But that shouldn't happen again.

12:03PM   14         So, Mr. Cummings, do you understand, sir, that you

12:03PM   15    have constitutional right to testify in your own defense, if

12:03PM   16    you wish to do that?

12:03PM   17         THE DEFENDANT:  Yes.  Yes.

12:03PM   18         THE COURT:  Do you further understand that if you

12:03PM   19    choose not to testify no inference or suggestion of your guilt

12:03PM   20    could be drawn by the jury by you -- by the fact that you

12:03PM   21    elected not to testify?

12:03PM   22         THE DEFENDANT:  Yes.

12:03PM   23         THE COURT:  Do you understand that if you take the

12:03PM   24    stand it is subject to cross-examination by the United States

12:03PM   25    attorney's office?

12:03PM    1                 THE DEFENDANT:  Yes.

12:03PM    2                 THE COURT:  And have you discussed whether or not it's

12:03PM    3     advisable to testify with Counsel?

12:03PM    4                 THE DEFENDANT:  I don't understand the question.

12:03PM    5                 THE COURT:  Have you discussed with your attorney

12:03PM    6     whether or not it's a good idea for you to take the stand?

12:03PM    7                 THE DEFENDANT:  Oh, yes.

12:03PM    8                 THE COURT:  And do you have any questions regarding

12:03PM    9     your rights to testify?

12:03PM    10                THE DEFENDANT:  No.

12:03PM    11                THE COURT:  Do you have -- do you have a need for

12:03PM    12    additional time to make your decision regarding whether to

12:03PM    13    testify or not?

12:03PM    14                THE DEFENDANT:  No.

12:03PM    15                THE COURT:  What have you decided to do, sir, testify

12:03PM    16    or not?

12:03PM    17                THE DEFENDANT:  Testify.

12:03PM    18                THE COURT:  All right.  Let's go.

12:03PM    19                THE DEFENDANT:  Thank you.

12:04PM    20                       (End of side bar.)

12:04PM    21                THE CLERK:  Please raise your right hand.

12:04PM    22                       LYLE CUMMINGS,

12:04PM    23    called as a witness, having been first duly sworn, was examined

12:04PM    24    and testified as follows:

12:04PM    25                THE CLERK:  Please state your full name and spell your

124

| | | |
|---|---|---|
| 12:04PM | 1 | last name for the record. |
| 12:04PM | 2 | THE WITNESS:  Lyle Rikio Cummings, C-U-M-M-I-N-G-S. |
| 12:04PM | 3 | DIRECT EXAMINATION |
| 12:04PM | 4 | BY MR. MOTTL: |
| 12:04PM | 5 | Q    Mr. Cummings, where were you born? |
| 12:05PM | 6 | A    What was that? |
| 12:05PM | 7 | Q    Where were you born? |
| 12:05PM | 8 | A    I was born on Maui. |
| 12:05PM | 9 | Q    And where do you live now? |
| 12:05PM | 10 | A    Hali'imaile. |
| 12:05PM | 11 | Q    And that's on the island of Maui? |
| 12:05PM | 12 | A    Yes, that is. |
| 12:05PM | 13 | Q    All right.  Who do you live with? |
| 12:05PM | 14 | A    I live with my mom and now my wife. |
| 12:05PM | 15 | Q    And your father, did he also live there? |
| 12:05PM | 16 | A    At the time of this incident, yes. |
| 12:05PM | 17 | Q    And where is he now? |
| 12:05PM | 18 | A    He passed away. |
| 12:05PM | 19 | Q    Now, have you been employed or were you employed at the |
| 12:05PM | 20 | time of this incident? |
| 12:05PM | 21 | A    Yes.  I was employed by the County of Maui. |
| 12:05PM | 22 | Q    County of Maui, and how long had you been -- been employed |
| 12:05PM | 23 | there? |
| 12:05PM | 24 | A    26 years. |
| 12:05PM | 25 | Q    And did you work throughout that time in a single |

| | | |
|---|---|---|
| 12:05PM | 1 | department? |
| 12:05PM | 2 | A    No.  My first five years was in recreation part-time.  And |
| 12:06PM | 3 | then I did about eight years as a park caretaker and then the |
| 12:06PM | 4 | final ten years I was a tractor mower operator. |
| 12:06PM | 5 | Q    And what did you do in the mower? |
| 12:06PM | 6 | A    I mowed various field parks, county parks around Kihei |
| 12:06PM | 7 | area. |
| 12:06PM | 8 | Q    Now, did you -- were you alone in work doing that or did |
| 12:06PM | 9 | you have working partners or companions? |
| 12:06PM | 10 | A    I worked solo on my own mower, but there was another mower |
| 12:06PM | 11 | operator doing the same operation in other parks too. |
| 12:06PM | 12 | Q    All right.  Are you no longer employed by the County of |
| 12:06PM | 13 | Maui? |
| 12:06PM | 14 | A    No.  I was forced to resign with no reason.  They gave -- |
| 12:06PM | 15 | I asked them for a reason why I had to resign and they said |
| 12:06PM | 16 | either I quit, I get fired or I resign on good terms. |
| 12:07PM | 17 | Q    And that was as a result of this incident? |
| 12:07PM | 18 | A    It was a result when I got picked up by the federal. |
| 12:07PM | 19 | Q    I see.  And are you employed now?  You're not |
| 12:07PM | 20 | incarcerated, you are on release, correct? |
| 12:07PM | 21 | A    Yes, pretrial release. |
| 12:07PM | 22 | Q    I beg your pardon? |
| 12:07PM | 23 | A    Pretrial release. |
| 12:07PM | 24 | Q    Release, correct. |
| 12:07PM | 25 |     Have you obtained new employment? |

| | | | |
|---|---|---|---|
| 12:07PM | 1 | A | Yes, I have. |
| 12:07PM | 2 | Q | And where is that with? |
| 12:07PM | 3 | | MS. OLSON:  Objection, relevance. |
| 12:07PM | 4 | | THE COURT:  I'll allow a little bit more background. |
| 12:07PM | 5 | Go ahead. |
| 12:07PM | 6 | | THE WITNESS:  It's MP Management, better known as Mahi |
| 12:07PM | 7 | Pono. |
| 12:07PM | 8 | Q | And what do you do there? |
| 12:07PM | 9 | A | I'm also a tractor mower operator. |
| 12:07PM | 10 | Q | So you -- you do the same tasks as you did with the |
| 12:07PM | 11 | county?  Thank you. |
| 12:07PM | 12 | A | Yeah, a lot larger mower. |
| | 13 | Q | Thank you. |
| | 14 | | THE COURT REPORTER:  Okay.  You guys are talking over |
| | 15 | each other. |
| | 16 | | THE WITNESS:  A lot larger tractor mower. |
| | 17 | BY MR. MOTTL: |
| 12:08PM | 18 | Q | Now, are -- are you married? |
| 12:08PM | 19 | A | At the time now, yes, I am. |
| 12:08PM | 20 | Q | Okay.  And at the time of this incident, were you married? |
| 12:08PM | 21 | A | No.  I was with -- I was -- she was my girlfriend at that |
| 12:08PM | 22 | time. |
| 12:08PM | 23 | Q | Okay.  And had you ever been married? |
| 12:08PM | 24 | A | No. |
| 12:08PM | 25 | Q | Do you have children? |

127

| 12:08PM | 1  | A | No. |
| 12:08PM | 2  | Q | So you -- what is the name of your wife? |
| 12:08PM | 3  | A | Vianna Kahanu, now she resides under Cummings. |
| 12:08PM | 4  | Q | Cummings. |
| 12:08PM | 5  |   | And she lives with you and your mother in Hali'imaile? |
| 12:08PM | 6  | A | Yes. |
| 12:08PM | 7  | Q | All right.  Where did you attend school? |
| 12:08PM | 8  | A | I went to Makawao Elementary, then I went to Kalama |
| 12:08PM | 9  |   | Intermediate, and I graduated from Maui High School. |
| 12:08PM | 10 | Q | And after that did you continue with school at all? |
| 12:08PM | 11 | A | I had one year at MCC. |
| 12:09PM | 12 | Q | And did you begin work; is that correct? |
| 12:09PM | 13 | A | I was -- I worked part-time at Ron's Auto Parts and then |
| 12:09PM | 14 |   | Woolworth's and then I was employed -- unemployed collecting |
| 12:09PM | 15 |   | unemployment. |
| 12:09PM | 16 | Q | And how -- how long after you finished your year at Maui |
| 12:09PM | 17 |   | Community College did you begin work with the county? |
| 12:09PM | 18 | A | About four -- four years, five years. |
| 12:09PM | 19 | Q | Okay.  You -- you had a cellphone which you had for quite |
| 12:09PM | 20 |   | long time, correct? |
| 12:09PM | 21 | A | Yes. |
| 12:09PM | 22 | Q | How long did that have that phone? |
| 12:09PM | 23 | A | Oh, about 20 years. |
| 12:09PM | 24 | Q | Now, you used that phone -- began using that phone at some |
| 12:09PM | 25 |   | point by utilizing the internet.  So you began to use it for |

| | | |
|---|---|---|
| 12:10PM | 1 | communication, you used it to engage in activities that are |
| 12:10PM | 2 | available on the internet; isn't that correct? |
| 12:10PM | 3 | A    Yes. |
| 12:10PM | 4 | Q    All right.  About what time -- what -- how many years ago |
| 12:10PM | 5 | was it that you started using the phone for internet purposes, |
| 12:10PM | 6 | approximate? |
| 12:10PM | 7 | A    Maybe 15 years. |
| 12:10PM | 8 | Q    Now, what -- what at that time did you begin using it for? |
| 12:10PM | 9 | What did you -- |
| 12:10PM | 10 | A    Facebook, Instagram. |
| 12:10PM | 11 | Q    So social websites.  All right. |
| 12:10PM | 12 |         Now, at some point in time you began using it with -- |
| 12:10PM | 13 | with a program called Skout; isn't that correct? |
| 12:10PM | 14 | A    Yes. |
| 12:10PM | 15 | Q    At the time were there others that you also utilized or |
| 12:11PM | 16 | explored using in addition to Skout and the two you mentioned |
| 12:11PM | 17 | previously? |
| 12:11PM | 18 | A    Yes. |
| 12:11PM | 19 | Q    Approximately how many others? |
| 12:11PM | 20 | A    Like two others. |
| 12:11PM | 21 | Q    All right.  Now, when did you begin using Skout? |
| 12:11PM | 22 | A    Maybe like five years ago. |
| 12:11PM | 23 | Q    And what -- Skout is -- could you describe Skout?  That is |
| 12:11PM | 24 | what one does with Skout? |
| 12:11PM | 25 | A    Skout is an adult chat site that you can go on and engage |

129

| | | |
|---|---|---|
| 12:11PM | 1 | in chatting and meeting people. |
| 12:11PM | 2 | Q    Did you meet over the five years that you engaged with |
| 12:11PM | 3 | Skout -- strike that. |
| 12:11PM | 4 | You said you began five years ago using Skout.  Did |
| 12:12PM | 5 | you continue using Skout after this incident? |
| 12:12PM | 6 | A    No. |
| 12:12PM | 7 | Q    So going back, you were using Skout at the time of this |
| 12:12PM | 8 | incident for how many years? |
| 12:12PM | 9 | A    Maybe like two years, it's kind of newer. |
| 12:12PM | 10 | Q    Okay, just approximate.  Now, how many -- did you -- did |
| 12:12PM | 11 | you establish any lasting relationships communicating with |
| 12:12PM | 12 | people on Skout? |
| 12:12PM | 13 | A    Yeah, I had a few friends on there that I would interact |
| 12:12PM | 14 | when I -- we saw each other on.  And then I came friends with |
| 12:12PM | 15 | one that and we all would hang out like.  We hanging out. |
| 12:12PM | 16 | Q    All right.  Now, in March of -- of 2020, the year 2020, |
| 12:12PM | 17 | you responded or at least engaged a person on Skout named |
| 12:13PM | 18 | Kiana; isn't that correct? |
| 12:13PM | 19 | A    Yes. |
| 12:13PM | 20 | Q    All right.  Now, it was you that saw this -- this page |
| 12:13PM | 21 | where this persona Kiana was -- had basically presented herself |
| 12:13PM | 22 | on Skout? |
| 12:13PM | 23 | A    Yes. |
| 12:13PM | 24 | Q    You contacted her on Skout and began communicating with |
| 12:13PM | 25 | her? |

12:13PM  1   A   Yes.

12:13PM  2   Q   Now, was there some point in time where you began

12:13PM  3   communicating by texting?

12:13PM  4   A   Yes.  She gave me her number and suggested we start

12:13PM  5   texting.

12:13PM  6   Q   Okay.  Now, getting back to Skout, when you join Skout,

12:13PM  7   was there some kind of an agreement that you engaged in with

12:13PM  8   the company Skout about allowing you to participate?

12:14PM  9   A   Yes.  You have to be over 18 to be on Skout.

12:14PM  10  Q   And are there other conditions also?

12:14PM  11  A   I know you got to be an adult over 18.  I believe you have

12:14PM  12  to have a credit card too.

12:14PM  13  Q   Okay.  Now, are there rules of conduct?

12:14PM  14  A   No.  It's just chatting, like what you want to do on -- on

12:14PM  15  Skout, like chat and hooking up and other -- it doesn't have

12:14PM  16  any -- I don't believe any guidelines really.

12:14PM  17  Q   Is there a way that a person using Skout can register some

12:14PM  18  kind of grievance or objection to any interactions that they

12:14PM  19  are exposed to on Skout that you're aware of?

12:14PM  20  A   Not that I know.

12:14PM  21  Q   Okay.  The -- the contract you entered into when you --

12:15PM  22  when you applied and were allowed to participate in Skout, that

12:15PM  23  you saw on your cellphone?

12:15PM  24  A   Yes.

12:15PM  25  Q   Was -- was it long?

| | | | |
|---|---|---|---|
| 12:15PM | 1 | A | What you mean by long? |
| 12:15PM | 2 | Q | That is the -- the agreement that -- |
| 12:15PM | 3 | A | Oh, yes. |
| 12:15PM | 4 | Q | Do you remember any other terms that were presented? |
| 12:15PM | 5 | A | I know you have to be an adult and you're pretty much |
| 12:15PM | 6 | | protected on Skout. |
| 12:15PM | 7 | Q | Okay.  Was the -- the provision of having to be 18 or |
| 12:15PM | 8 | | older on Skout one of the earlier statements in the contract? |
| 12:15PM | 9 | A | Yes. |
| 12:15PM | 10 | Q | All right.  Now, when you -- when you began communicating |
| 12:15PM | 11 | | with Kiana, what did you -- who did you think you were speaking |
| 12:16PM | 12 | | with or communicating with? |
| 12:16PM | 13 | A | 35-year-old female. |
| 12:16PM | 14 | Q | And 35 based on? |
| 12:16PM | 15 | A | Her profile. |
| 12:16PM | 16 | Q | Her profile. |
| 12:16PM | 17 | | Now, your experience with these social websites, is it |
| 12:16PM | 18 | | the case that you've always had positive interactions with |
| 12:16PM | 19 | | people that you've encountered?  Sort of -- go ahead. |
| 12:16PM | 20 | A | Not really, some they act like they're something that |
| 12:16PM | 21 | | they're not.  Like some is like mahus, but they act like |
| 12:16PM | 22 | | they're girls.  And then after they come out and they say, oh, |
| 12:16PM | 23 | | I actually mahu. |
| 12:16PM | 24 | Q | Now, so people present themselves and then they -- you |
| 12:17PM | 25 | | find out something else.  They tell you something that make you |

132

| | | |
|---|---|---|
| 12:17PM | 1 | realize like a person's sexual orientation that you -- you |
| 12:17PM | 2 | don't want to have anything to do with.  And did you continue |
| 12:17PM | 3 | with those or did you terminate them? |
| 12:17PM | 4 | A    Sometimes I just role play with them like what they want. |
| 12:17PM | 5 | Like they act like they like they can be something and, you |
| 12:17PM | 6 | know, just play the role and ask question and answer question. |
| 12:17PM | 7 | Q    So you say you roll with them.  Would you go along and you |
| 12:17PM | 8 | just continue interacting? |
| 12:17PM | 9 | A    Yeah. |
| 12:17PM | 10 | Q    All right.  Now, on the -- the night when your -- of your |
| 12:17PM | 11 | arrest, did you have something to do at a later point in time? |
| 12:17PM | 12 | A    Yes. |
| 12:18PM | 13 | Q    And in the evening or what was that? |
| 12:18PM | 14 | A    My wife now, my girlfriend then, was working.  So after |
| 12:18PM | 15 | she finished work, I would pick her up and then we would go to |
| 12:18PM | 16 | her -- |
| 12:18PM | 17 | THE COURT REPORTER:  Could you say that again? |
| 12:18PM | 18 | THE WITNESS:  She works nighttime, so after she |
| 12:18PM | 19 | finishes work, I would pick her up and we would go to her |
| 12:18PM | 20 | place. |
| 12:18PM | 21 | BY MR. MOTTL: |
| 12:18PM | 22 | Q    So you were supposed to pick her up -- |
| 12:18PM | 23 | A    Yeah. |
| 12:18PM | 24 | Q    -- at work later on that evening? |
| 12:18PM | 25 | A    Yes. |

12:18PM    1    Q    But you didn't.  You communicated with a person you
12:18PM    2    believed was Kiana and agreed to meet her in the street -- on a
12:18PM    3    street in Kihei; is that correct?
12:18PM    4    A    Yes.
12:18PM    5    Q    Why did you do that?
12:18PM    6    A    I just went down to be curious who -- who that was and she
12:19PM    7    said that she was having drama and whatnot.
12:19PM    8    Q    Could you repeat that answer, please?
12:19PM    9    A    She said she was having drama so I just went down identify
12:19PM   10    that this was an adult and she was.
12:19PM   11    Q    Okay.  Now, did you -- did you see her or what -- an
12:19PM   12    individual that you believed was this Kiana who you had agreed
12:19PM   13    to meet there?
12:19PM   14    A    Yes.
12:19PM   15    Q    And where were they when you -- when you saw this person
12:19PM   16    that you believed was Kiana?
12:19PM   17    A    She was across the street from where I approached.
12:19PM   18    Q    And you heard the testimony by the police officer.  You
12:19PM   19    basically tried to -- you were across the street from her and
12:19PM   20    you tried to -- what did you do?  Try to alert her that you
12:20PM   21    were there?
12:20PM   22    A    Yes.
12:20PM   23    Q    Did you use your lights, horn?
12:20PM   24    A    Yeah, my lights, I flashed my highlights.
12:20PM   25    Q    All right.  And -- and that's -- what happened then?

134

| | | | |
|---|---|---|---|
| 12:20PM | 1 | A | Then I was surrounded by police and I got arrested. |
| 12:20PM | 2 | Q | And you saw the -- the tape of the statement you gave to |
| 12:20PM | 3 | | the -- the two detectives, correct? |
| 12:20PM | 4 | A | Yes. |
| 12:20PM | 5 | Q | And you waived your rights and you spoke to them, correct? |
| 12:20PM | 6 | A | Yes. |
| 12:20PM | 7 | Q | Okay.  When did you become aware that that person you were |
| 12:20PM | 8 | | talking to was not a female but rather a -- a male detective? |
| 12:20PM | 9 | | Detective Surina testified and he was the one that was texting |
| 12:20PM | 10 | | you.  When did you first discover that? |
| 12:21PM | 11 | A | That day he testified that he was the one. |
| 12:21PM | 12 | Q | Oh, but him specifically, when did you discover that -- |
| 12:21PM | 13 | | I'm rephrasing the question. |
| 12:21PM | 14 | | When did you discover that Kiana was not a woman but |
| 12:21PM | 15 | | was a undercover police officer? |
| 12:21PM | 16 | A | In that interview. |
| 12:21PM | 17 | Q | In the interview with the -- the two detectives? |
| 12:21PM | 18 | A | Yes. |
| 12:21PM | 19 | Q | All right.  How did you feel -- how did you feel when |
| 12:21PM | 20 | | you -- when you were arrested? |
| 12:21PM | 21 | A | I was kind of surprised and shocked. |
| 12:21PM | 22 | Q | Because you looked pretty calm and, oh, somewhat |
| 12:21PM | 23 | | uncertain, so you felt all right? |
| 12:21PM | 24 | A | Not all right. |
| 12:21PM | 25 | Q | Yeah, yeah. |

135

| | | |
|---|---|---|
| 12:21PM | 1 | A    I was kind of in my mind like kind of like what's going |
| 12:22PM | 2 | on. |
| 12:22PM | 3 | Q    Now, the -- the interactions you had with the detective in |
| 12:22PM | 4 | the persona of Kiana, what type of impression did you get of |
| 12:22PM | 5 | the person that he was representing himself as Kiana?  You |
| 12:22PM | 6 | mentioned drama earlier? |
| 12:22PM | 7 | A    Right. |
| 12:22PM | 8 | Q    Yeah, and that's -- and -- |
| 12:22PM | 9 | A    And stressing.  Under stress. |
| 12:22PM | 10 | Q    Okay.  Anything else? |
| 12:22PM | 11 | A    That's pretty much what they on the Skout said that she |
| 12:23PM | 12 | was on the -- having drama and under stress. |
| 12:23PM | 13 | Q    That's what she told you on -- |
| 12:23PM | 14 | A    Skout. |
| 12:23PM | 15 | Q    -- Skout.  And -- and the texting that went on -- |
| 12:23PM | 16 | A    Yes. |
| 12:23PM | 17 | Q    -- in addition to Skout. |
| 12:23PM | 18 | MR. MOTTL:  All right.  I have no further questions. |
| 12:23PM | 19 | Thank you.  Oh, excuse me, if I may take that back? |
| 12:23PM | 20 | THE COURT:  Go ahead. |
| 12:23PM | 21 | MR. MOTTL:  Your Honor? |
| 12:23PM | 22 | THE COURT:  Yes, go ahead. |
| 12:23PM | 23 | BY MR. MOTTL: |
| 12:23PM | 24 | Q    You -- Mr. Cummings, you work full time?  You are working |
| 12:23PM | 25 | full time with the city -- with the County of Maui at the time |

2-SER-344

| | | |
|---|---|---|
| 12:23PM | 1 | of this incident, correct? |
| 12:23PM | 2 | A    Yes. |
| 12:23PM | 3 | Q    Yeah.  What did you do in your spare time? |
| 12:23PM | 4 | A    I ran a county soft -- not county but I ran softball |
| 12:23PM | 5 | leagues in Kihei for adult men and 40-and-over league for like |
| 12:23PM | 6 | on Maui.  They call it the makule league softball. |
| 12:23PM | 7 | Q    All right.  Now, how long had you been doing that? |
| 12:24PM | 8 | A    I've been running leagues maybe close to ten years.  I was |
| 12:24PM | 9 | approached by the county recreation.  They said they're not |
| 12:24PM | 10 | going to run men's league anymore so they approached me if I |
| 12:24PM | 11 | would over -- like oversee it and overtake it, the leagues. |
| 12:24PM | 12 | And so from there I started doing the men's league and the |
| 12:24PM | 13 | makule league and then they started doing men's league again. |
| 12:24PM | 14 | I approached them if they wanted to take it back and they said |
| 12:24PM | 15 | no you're going a good job.  You can keep on running the |
| 12:24PM | 16 | leagues. |
| 12:24PM | 17 | Q    Now, the leagues ran during a certain season? |
| 12:24PM | 18 | A    No.  It was all year round but like we will have one |
| 12:24PM | 19 | season like three or four months, take a break for a month or |
| 12:24PM | 20 | so then we'd start again.  So it pretty much ran all year long. |
| 12:24PM | 21 | Q    And there were tournaments? |
| 12:24PM | 22 | A    Yes, I ran tournaments too. |
| 12:25PM | 23 | Q    And there were -- there were statewide competitions that |
| 12:25PM | 24 | he engaged in too, yes? |
| 12:25PM | 25 | A    Oh, yes, yes. |

137

| | | |
|---|---|---|
| 12:25PM | 1 | Q    And where were those or what were those about? |
| 12:25PM | 2 | A    All the islands would have softball tournaments, Oahu, Big |
| 12:25PM | 3 | Island Kona side, Kauai, Maui. |
| 12:25PM | 4 | Q    And would -- now, you were part of the -- you were the |
| 12:25PM | 5 | organizer and you sort of kept the -- the league going.  Were |
| 12:25PM | 6 | you a member of a team? |
| 12:25PM | 7 | A    Yes.  I had a couple teams. |
| 12:25PM | 8 | Q    Okay.  And you played on those teams? |
| 12:25PM | 9 | A    Yes. |
| 12:25PM | 10 | Q    How did those teams -- how did you fund the activities of |
| 12:25PM | 11 | the league during the tournaments?  How was that done?  Was the |
| 12:25PM | 12 | county contributing money? |
| 12:26PM | 13 | A    No.  It was all made by our team.  I would put together |
| 12:26PM | 14 | the tournament, like do the foundation, getting the fields, the |
| 12:26PM | 15 | umpires -- |
| 12:26PM | 16 | THE COURT REPORTER:  Excuse me, the foundation? |
| 12:26PM | 17 | THE WITNESS:  Of the tournament -- getting the field |
| 12:26PM | 18 | permits, the insurance, ball, like making sure we get balls, |
| 12:26PM | 19 | setting up the concession and my team would participate in |
| 12:26PM | 20 | performing the tournament, cleaning up, cleaning up the area, |
| 12:26PM | 21 | keeping score, umpiring, doing the concession.  And from those |
| 12:26PM | 22 | proceeds, it would go to our uniforms, and if I had three |
| 12:26PM | 23 | tournaments throughout the year -- |
| 12:26PM | 24 | THE COURT:  I'm sorry to interrupt.  What relevance is |
| 12:26PM | 25 | this? |

138

| | | |
|---|---|---|
| 12:26PM | 1 | MR. MOTTL:  The -- the inference is that, one, |
| 12:27PM | 2 | Mr. Cummings was a -- a person who spent his time driving |
| 12:27PM | 3 | around selling drugs.  We are -- that's not the case.  He was a |
| 12:27PM | 4 | busy person, he was a hard working person throughout since high |
| 12:27PM | 5 | school.  And that certainly is important that's what he did |
| 12:27PM | 6 | not -- |
| 12:27PM | 7 | THE COURT:  I disagree.  Do you have any other |
| 12:27PM | 8 | questions? |
| 12:27PM | 9 | MR. MOTTL:  I will -- I'll wrap it up, if that's the |
| 12:27PM | 10 | case, Your Honor. |
| 12:27PM | 11 | BY MR. MOTTL: |
| 12:27PM | 12 | Q    The assertion is in the complaint that you intended to |
| 12:27PM | 13 | engage in sexual intercourse with a minor, this minor, or you |
| 12:28PM | 14 | attempted to.  It was a police officer.  But that was your |
| 12:28PM | 15 | intention.  Was that at all your intention? |
| 12:28PM | 16 | A    Not at all. |
| 12:28PM | 17 | Q    Okay.  Do you engage in -- I mean, do you -- you look at |
| 12:28PM | 18 | pornography? |
| 12:28PM | 19 | A    No. |
| 12:28PM | 20 | Q    Do you read pornography? |
| 12:28PM | 21 | A    No. |
| 12:28PM | 22 | Q    No. |
| 12:28PM | 23 | You watch television? |
| 12:28PM | 24 | A    Yes. |
| 12:28PM | 25 | Q    Okay.  Now, on television there are lots -- many kinds of |

(140 of 280), Page 140 of 280 Case: 23-3016, 11/18/2024, DktEntry: 26.3, Page 140 of 280
Case 1:22-cr-00023-DKW    Document 182    Filed 02/21/24    Page 139 of 172
PageID.1672

139

| | | |
|---|---|---|
| 12:28PM | 1 | shows.  Some you get pretty -- pretty adult, but you see a lot |
| 12:28PM | 2 | on these days, so there's a lot of -- a lot of language. |
| 12:28PM | 3 | Now, you use certain language in your texting to the |
| 12:28PM | 4 | detective.  Now, that's language you -- is that language you -- |
| 12:29PM | 5 | you heard between actors and actresses on television? |
| 12:29PM | 6 | A    No. |
| 12:29PM | 7 | Q    Where did you -- where did you get that -- those terms |
| 12:29PM | 8 | that you came up and you mentioned a number of things to -- to |
| 12:29PM | 9 | Kiana? |
| 12:29PM | 10 | A    I just -- I didn't know what to say.  She kept asking what |
| 12:29PM | 11 | you like do, what you like do, and I never know what for say, |
| 12:29PM | 12 | so I just wen' type and I send 'em. |
| 12:29PM | 13 | MR. MOTTL:  All right.  No further questions, Your |
| 12:29PM | 14 | Honor. |
| 12:29PM | 15 | THE COURT:  Ms. Olson? |
| 12:29PM | 16 | CROSS-EXAMINATION |
| 12:29PM | 17 | BY MS. OLSON: |
| 12:29PM | 18 | Q    Good afternoon. |
| 12:29PM | 19 | A    Good afternoon. |
| 12:29PM | 20 | MS. OLSON:  Could I please ask to publish previously |
| 12:30PM | 21 | exhibit -- Exhibit 1 previously admitted. |
| 12:30PM | 22 | THE COURT:  Yes, go ahead. |
| 12:30PM | 23 | BY MS. OLSON: |
| 12:30PM | 24 | Q    Mr. Cummings, can you see Exhibit 1? |
| 12:30PM | 25 | A    Yes. |

140

| | | | |
|---|---|---|---|
| 12:30PM | 1 | Q | What's this? |
| 12:30PM | 2 | A | This is an unfinished profile of Kiana. |
| 12:30PM | 3 | Q | This is the person that you -- this is the profile you |
| 12:30PM | 4 | | contacted in March 2020? |
| 12:30PM | 5 | A | It wasn't like this.  It had all the information. |
| 12:30PM | 6 | Q | This is the photograph though that you saw in the profile |
| 12:30PM | 7 | | you contacted? |
| 12:30PM | 8 | A | I can't recall. |
| 12:31PM | 9 | | MS. OLSON:  Permission to publish Exhibit 2. |
| 12:31PM | 10 | | THE COURT:  Yes, it's admitted.  Go ahead. |
| 12:31PM | 11 | | BY MS. OLSON: |
| 12:31PM | 12 | Q | You see the top of this page Exhibit 2? |
| 12:31PM | 13 | A | Yes. |
| 12:31PM | 14 | Q | Do you see it says, "Duckfat34"? |
| 12:31PM | 15 | A | Yes. |
| 12:31PM | 16 | Q | That was your Skout profile name? |
| 12:31PM | 17 | A | Yes. |
| 12:31PM | 18 | Q | You see it says, "109"? |
| 12:31PM | 19 | A | Yes. |
| 12:31PM | 20 | Q | That was your purported age? |
| 12:31PM | 21 | A | That was the age that you can put but when you get into |
| 12:31PM | 22 | | Skout you have to put your birth date. |
| 12:31PM | 23 | Q | You weren't 109 at the time, right? |
| 12:31PM | 24 | A | No. |
| 12:31PM | 25 | Q | So you made up that age when you filled out your profile? |

12:32PM   1   A    To get on Skout, you have to be an adult so you have to

12:32PM   2   put your proper age but you can put whatever you want on your

12:32PM   3   headline.

12:32PM   4   Q    But you didn't put your proper age, right?

12:32PM   5   A    When I entered Skout, I did.

12:32PM   6   Q    It says 109 years old here at the top of page two,

12:32PM   7   correct?

12:32PM   8   A    You can put your own headline.

12:32PM   9   Q    So you wrote in 109?

12:32PM  10   A    Yes.

12:32PM  11   Q    You said today you believed she was 35; Kiana was 35 at

12:32PM  12   the time in March 2020 when you were exchanging messages?

12:32PM  13   A    I believe she was over 18 but her Skout profile said she

12:33PM  14   was 35.

12:33PM  15   Q    Did you say you believed she was 35?

12:33PM  16   A    Yes.

12:33PM  17        MS. OLSON:  I'd like to publish Exhibit 4.

12:33PM  18        THE COURT:  Yes, go ahead.

12:33PM  19   BY MS. OLSON:

12:33PM  20   Q    Do you see page one of Exhibit 4, Mr. Cummings?

12:33PM  21   A    Yes.

12:33PM  22   Q    Kiana, or the undercover chatter, told you she was

12:33PM  23   13 years old, correct?

12:33PM  24   A    It doesn't say anything about 13.

12:34PM  25   Q    Can you see the yellow circle I just added to the exhibit?

| | | | |
|---|---|---|---|
| 12:34PM | 1 | A | Yes. |
| 12:34PM | 2 | Q | Could you please read that? |
| 12:34PM | 3 | A | "Cool, well, upfront I'm 14, well, I turn 14 next month. |
| 12:34PM | 4 | | Just hate stupid kids my age." |
| 12:34PM | 5 | Q | So she did tell you she wasn't yet 14? |
| 12:34PM | 6 | A | Yes. |
| 12:34PM | 7 | Q | When I say "she," I mean Kiana or the undercover chatter |
| 12:34PM | 8 | | in this context. |
| 12:35PM | 9 | | Can you please read what I just circled underneath |
| 12:35PM | 10 | | what you just read? |
| 12:35PM | 11 | A | "Yeah, I grant you this once tonight.  I'll come pick you |
| 12:35PM | 12 | | up." |
| 12:35PM | 13 | Q | So as soon as he said -- as soon as Kiana said she was 13, |
| 12:35PM | 14 | | you said you'd pick her up? |
| 12:35PM | 15 | A | I believe I was texting with my girlfriend at that time. |
| 12:35PM | 16 | | I was mass -- mass like texting and -- back and forth with |
| 12:35PM | 17 | | Skout and texting my girlfriend. |
| 12:35PM | 18 | Q | So you thought that this was suddenly a different |
| 12:35PM | 19 | | conversation with a different person? |
| 12:35PM | 20 | A | Yes.  Because usually during the weekends, I don't stay |
| 12:35PM | 21 | | out with my girlfriend but she asked me to come stay with her |
| 12:35PM | 22 | | that night.  So I told her, "Okay, I grant you this.  I'll come |
| 12:35PM | 23 | | pick you up." |
| 12:35PM | 24 | Q | Okay.  But a couple lines lower, you say, "Hang out |
| 12:36PM | 25 | | tonight." |

| 12:36PM | 1 | Are you still saying you thought that was to your |
|---------|---|---|
| 12:36PM | 2 | girlfriend? |
| 12:36PM | 3 | A    I'm not too sure what -- if I was coming -- if that was |
| 12:36PM | 4 | for her or not. |
| 12:36PM | 5 | Q    Then you said, "Come down rescue you for a few horse from |
| 12:36PM | 6 | your cousin." |
| 12:36PM | 7 | Did you think that was directed to your girlfriend? |
| 12:36PM | 8 | A    No. |
| 12:36PM | 9 | Q    You thought that that was directed to Kiana? |
| 12:36PM | 10 | A    Yes. |
| 12:36PM | 11 | Q    Please turn to page three of Exhibit 4.  Can you please |
| 12:37PM | 12 | read what I just circled starting with what kind of fun? |
| 12:37PM | 13 | A    "What kind of fun you gonna do with me or with a 13-year |
| 12:37PM | 14 | old girl?  I can't go into bars." |
| 12:37PM | 15 | "We can go to the beach and have our own fun.  Watch |
| 12:37PM | 16 | the moon reflect on your body." |
| 12:37PM | 17 | Q    So Kiana, or the undercover, told you a second time here |
| 12:37PM | 18 | that Kiana was 13, correct? |
| 12:37PM | 19 | A    Yes. |
| 12:37PM | 20 | Q    And you responded to that message, right? |
| 12:37PM | 21 | A    Yes.  I believe it was just role playing and just trying |
| 12:37PM | 22 | out her number.  Because every time I saw that, I would go back |
| 12:37PM | 23 | to her profile to make sure I was on Skout on a adult site |
| 12:37PM | 24 | where I got this information. |
| 12:37PM | 25 | Q    Please turn to page 11 of the same exhibit.  Can you |

| | | |
|---|---|---|
| 12:38PM | 1 | please read what I just circled towards the bottom of page 11 |
| 12:38PM | 2 | of this exhibit? |
| 12:39PM | 3 | A    "You okay with me being 13?" |
| 12:39PM | 4 |          "Okay, so long as you okay with me." |
| 12:39PM | 5 |          "Yeah, yeah.  So what you like looking for do with me |
| 12:39PM | 6 | being 13?  I can't go to bars." |
| 12:39PM | 7 | Q    So Kiana told you a third and fourth time here she or he |
| 12:39PM | 8 | was 13, correct? |
| 12:39PM | 9 | A    Yes. |
| 12:39PM | 10 | Q    And what was your response -- and you said it was okay |
| 12:39PM | 11 | with you, right? |
| 12:39PM | 12 | A    Yeah, I thought we was role playing just we're in there |
| 12:39PM | 13 | all day, yeah.  I asking and answering questions. |
| 12:39PM | 14 | Q    And you thought that I can't go to bars was also role |
| 12:39PM | 15 | playing? |
| 12:39PM | 16 | A    Yeah. |
| 12:39PM | 17 | Q    Can you please read those lines I just circled in yellow |
| 12:40PM | 18 | in the same exhibit? |
| 12:40PM | 19 | A    "How old you anyway?" |
| 12:40PM | 20 |          "31." |
| 12:40PM | 21 | Q    But you said you were 31 years old? |
| 12:40PM | 22 | A    Yeah. |
| 12:40PM | 23 | Q    That wasn't correct, right? |
| 12:40PM | 24 | A    No. |
| 12:40PM | 25 | Q    You were 46 at the time? |

145

| | | |
|---|---|---|
| 12:40PM | 1 | A    46 or 47, yeah. |
| 12:40PM | 2 | Q    You and Kiana talked about Kiana starting high school, |
| 12:40PM | 3 | right? |
| 12:40PM | 4 | A    Starting high school.  I don't know about starting high |
| 12:40PM | 5 | school. |
| 12:40PM | 6 | Q    I didn't hear the answer. |
| 12:41PM | 7 | A    I don't know about starting high school.  I don't recall |
| 12:41PM | 8 | that. |
| 12:41PM | 9 | Q    You talked to Kiana about going to -- how she was going to |
| 12:41PM | 10 | go to Baldwin? |
| 12:41PM | 11 | A    She said she went to Baldwin. |
| 12:41PM | 12 | Q    And you thought that was part of a role play also? |
| 12:41PM | 13 | A    Yeah, it's a basic question you can ask anybody, what |
| 12:41PM | 14 | school you go to. |
| 12:41PM | 15 | Q    Please turn to page eight of the same exhibit.  Can you |
| 12:42PM | 16 | please read the part I just circled in yellow starting with, we |
| 12:42PM | 17 | not playing games. |
| 12:42PM | 18 | A    "We not playing games, babe.  I'll spoil you if you want |
| 12:42PM | 19 | to hang out with me.  You just be real too.  What we get going |
| 12:42PM | 20 | on between us no more need know -- need to know where or how |
| 12:42PM | 21 | you being spoiled and taken care of." |
| 12:42PM | 22 |          I am, oh -- "Am being real.  That's why I want to |
| 12:42PM | 23 | know, not anyone else."  Laugh out loud or "LOL."  "Just saying |
| 12:42PM | 24 | cause I can't just break out whenever.  My parents -- my |
| 12:42PM | 25 | parents come back tomorrow.  My cousin's parents come back |

| | | |
|---|---|---|
| 12:42PM | 1 | tomorrow." |
| 12:42PM | 2 | Q    So you told Kiana this wasn't a game, right? |
| 12:42PM | 3 | A    Yeah. |
| 12:42PM | 4 | Q    And you said, "No one needed to know where or how you |
| 12:43PM | 5 | being spoiled"? |
| 12:43PM | 6 | A    Yes. |
| 12:43PM | 7 | Q    So you were saying you would keep it a secret? |
| 12:43PM | 8 | A    Secret but no -- nobody got to know how you getting -- |
| 12:43PM | 9 | getting spoiled. |
| 12:43PM | 10 | Q    Can you please read the yellow -- the -- the text that I |
| 12:43PM | 11 | just highlighted in yellow on page eight? |
| 12:43PM | 12 | A    "Look like spring break going go on all month for you. |
| 12:43PM | 13 | Where you go high school?" |
| 12:43PM | 14 | "Ha ha right?  Just started at Baldwin." |
| 12:44PM | 15 | MS. OLSON:  You can take down Exhibit 4 for now, |
| 12:44PM | 16 | please. |
| 12:44PM | 17 | BY MS. OLSON: |
| 12:44PM | 18 | Q    You participated in a -- in an interview with law |
| 12:44PM | 19 | enforcement officers after you were arrested on March 15, 2020? |
| 12:44PM | 20 | A    Yes. |
| 12:44PM | 21 | Q    That was voluntary? |
| 12:44PM | 22 | A    Not voluntary.  They pulled me into the -- into the room |
| 12:44PM | 23 | and they came in. |
| 12:44PM | 24 | Q    During that interview, you never told law enforcement that |
| 12:44PM | 25 | you believed Kiana was 35, correct? |

| | | | |
|---|---|---|---|
| 12:44PM | 1 | A | I didn't tell -- that I believed she was over 18. |
| 12:45PM | 2 | Q | So the -- the first thing you said when asked about |
| 12:45PM | 3 | | Kiana's age was Kiana was 18, right? |
| 12:45PM | 4 | A | Yes. |
| 12:45PM | 5 | Q | And then you changed that answer after that, right? |
| 12:45PM | 6 | A | Yes. |
| 12:45PM | 7 | Q | You said you believed Kiana was 13 maybe going to be 14, |
| 12:45PM | 8 | | right? |
| 12:45PM | 9 | A | She said on the site that she was 13 going to be 14. |
| 12:45PM | 10 | Q | And you said you knew she was very young, right? |
| 12:45PM | 11 | A | On the site, she said she was young. |
| 12:45PM | 12 | Q | Okay.  You said that you drove to meet Kiana in person |
| 12:45PM | 13 | | because you were just curious to meet her? |
| 12:46PM | 14 | A | Yes. |
| 12:46PM | 15 | Q | Not for sex? |
| 12:46PM | 16 | A | No. |
| 12:46PM | 17 | | MS. OLSON:  Please pull up Exhibit 4, again, if I may. |
| 12:46PM | 18 | | Please turn to page 13. |
| 12:46PM | 19 | | BY MS. OLSON: |
| 12:47PM | 20 | Q | Can you please read what I just circled on page 13? |
| 12:47PM | 21 | A | "What do you want to do for fun" -- I cannot see that last |
| 12:47PM | 22 | | word.  "We walking back up." |
| 12:47PM | 23 | | "Eat your pussy." |
| 12:47PM | 24 | Q | Please turn to page 14.  Can you please read the text |
| 12:48PM | 25 | | messages I just circled on page 14? |

| | | | |
|---|---|---|---|
| 12:48PM | 1 | A | "I'm going to eat you till you come a few times on my face |
| 12:48PM | 2 | | babes.  Get your pussy so wet. |
| 12:48PM | 3 | | "LOL.  Make it rain."  "Lololol." |
| 12:48PM | 4 | | "Have you slowly" -- sat on my -- "sat on me taking me |
| 12:48PM | 5 | | in you slowly.  You must be so tight.  You're going to squirt |
| 12:48PM | 6 | | when I make you cum.  Can't see with the light in the back." |
| 12:48PM | 7 | Q | You started the graphic sexual talk during this chat or |
| 12:48PM | 8 | | during the text message conversation, right? |
| 12:49PM | 9 | A | Yeah. |
| 12:49PM | 10 | Q | You asked Kiana, or the undercover chatter, repeatedly |
| 12:49PM | 11 | | over three days to meet you in person, correct? |
| 12:49PM | 12 | A | Yes. |
| 12:49PM | 13 | Q | You offered to take her shopping? |
| 12:49PM | 14 | A | Yes. |
| 12:49PM | 15 | Q | You said you'd bring her cash and you sent two picture -- |
| 12:49PM | 16 | | two photographs of stacks of cash, correct? |
| 12:49PM | 17 | A | I didn't say I would bring her cash.  I said I would have |
| 12:49PM | 18 | | cash with me. |
| 12:49PM | 19 | Q | Please turn to page five of the same exhibit.  What's that |
| 12:50PM | 20 | | image of that I just circled? |
| 12:50PM | 21 | A | That's a Photoshop picture that I -- I took from existing |
| 12:50PM | 22 | | photo that I saw and I had it on my -- in my library or |
| 12:50PM | 23 | | whatever you picture -- picture storage of cash. |
| 12:50PM | 24 | Q | And you had approximately $745 in your truck when you were |
| 12:50PM | 25 | | arrested, correct, in cash? |

149

| | | | |
|---|---|---|---|
| 12:50PM | 1 | A | No.  645. |
| 12:50PM | 2 | Q | You didn't have another hundred dollar bill hidden in your |
| 12:50PM | 3 | | cellphone protector? |
| 12:50PM | 4 | A | Oh, yeah, in my case, yeah. |
| 12:50PM | 5 | Q | So a total of about $745 in cash? |
| 12:50PM | 6 | A | Yes. |
| 12:51PM | 7 | Q | You told Kiana you would bring weed or potentially give |
| 12:51PM | 8 | | Kiana weed? |
| 12:51PM | 9 | A | I had weed with me. |
| 12:51PM | 10 | Q | But you said you would bring it, correct? |
| 12:51PM | 11 | A | Yes.  I have a medical card. |
| 12:51PM | 12 | Q | And you, in fact, did have various forms of marijuana, THC |
| 12:51PM | 13 | | in the truck when you were arrested, correct? |
| 12:51PM | 14 | A | Yes. |
| 12:51PM | 15 | Q | You initiated contact and conversation with Kiana or the |
| 12:51PM | 16 | | undercover for three days in a row, correct? |
| 12:51PM | 17 | A | Yes. |
| 12:51PM | 18 | Q | You asked Kiana to send you photographs and/or videos |
| 12:51PM | 19 | | approximately 14 times during the conversation, correct? |
| 12:52PM | 20 | A | Yeah, I'm not sure how -- exactly how many. |
| 12:52PM | 21 | Q | Including in the shower? |
| 12:52PM | 22 | A | Yes. |
| 12:52PM | 23 | Q | You never once expressed any concern in the messages about |
| 12:52PM | 24 | | the age of 13, correct? |
| 12:52PM | 25 | A | I never believed she was 13. |

150

| | | | |
|---|---|---|---|
| 12:52PM | 1 | Q | At some point in the conversation, Kiana told you about |
| 12:52PM | 2 | | where she was staying that night, right? |
| 12:52PM | 3 | A | Yes. |
| 12:52PM | 4 | Q | And you immediately looked up the location in Apple Maps, |
| 12:52PM | 5 | | correct? |
| 12:52PM | 6 | A | Yes. |
| 12:52PM | 7 | Q | Within approximately a minute? |
| 12:52PM | 8 | A | Yeah. |
| 12:52PM | 9 | Q | And then you drove -- you guys agreed to meet at a |
| 12:52PM | 10 | | location and you drove there? |
| 12:53PM | 11 | A | Yes. |
| 12:53PM | 12 | Q | Did you text when you -- when you believed you saw Kiana, |
| 12:53PM | 13 | | you flash your lights? |
| 12:53PM | 14 | A | Yes. |
| 12:53PM | 15 | Q | And you texted, "Come jump in"? |
| 12:53PM | 16 | A | Yeah. |
| 12:53PM | 17 | Q | Can we please turn to -- oh, we're already page five of |
| 12:53PM | 18 | | Exhibit 4.  One more question about this.  Can you please read |
| 12:53PM | 19 | | what I just circled? |
| 12:53PM | 20 | A | How can I get -- How can I get one of those stacks!!!" |
| 12:53PM | 21 | | "When you ride with me.  Is tonight going to happen |
| 12:53PM | 22 | | for us or just talk?" |
| 12:54PM | 23 | | MR. OLSON:  No more questions.  Thank you. |
| 12:54PM | 24 | | THE COURT:  Mr. Mottl, any redirect? |
| 12:54PM | 25 | | MR. MOTTL:  Briefly, Your Honor. |

151

| | | |
|---|---|---|
| 12:54PM | 1 | REDIRECT EXAMINATION |
| 12:54PM | 2 | BY MR. MOTTL: |
| 12:54PM | 3 | Q    Mr. Cummings. |
| 12:54PM | 4 | A    Yeah. |
| 12:54PM | 5 | Q    Earlier you testified that over a period of time you had |
| 12:54PM | 6 | communicated on Skout as well as other sites with individuals |
| 12:54PM | 7 | where you engaged in this social networking communication? |
| 12:54PM | 8 | A    At this time, only Skout I was on. |
| 12:54PM | 9 | Q    I beg your pardon? |
| 12:54PM | 10 | A    At this -- this time -- that time I was only on Skout. |
| 12:54PM | 11 | Q    Oh, correct. |
| 12:54PM | 12 | But previously you -- you'd been on other sites? |
| 12:55PM | 13 | A    I'd been on a few. |
| 12:55PM | 14 | Q    And you communicated, texted back and forth with people? |
| 12:55PM | 15 | A    Yes. |
| 12:55PM | 16 | Q    Now, on both sides in this conversation, this interaction |
| 12:55PM | 17 | that you had with Kiana, there was a lot of false information |
| 12:55PM | 18 | passed from you to her or him? |
| 12:55PM | 19 | A    Yes, yeah. |
| 12:55PM | 20 | Q    And from me to you.  And you mentioned, wasn't the word -- |
| 12:55PM | 21 | her or -- her word was drama, yours was -- you didn't use the |
| 12:55PM | 22 | word fantasy but basically you engaged in -- |
| 12:55PM | 23 | MS. OLSON:  Objection, leading. |
| 12:55PM | 24 | BY MR. MOTTL: |
| 12:55PM | 25 | Q    -- same thing, said you were -- strike that. |

| 12:55PM | 1 | Go ahead, Your Honor. |
| 12:55PM | 2 | MR. MOTTL:  Go ahead, Your Honor. |
| 12:55PM | 3 | THE COURT:  When I hear a question, I'll rule on the |
| 12:56PM | 4 | objection. |
| 12:56PM | 5 | MR. MOTTL:  Okay. |
| 12:56PM | 6 | BY MR. MOTTL: |
| 12:56PM | 7 | Q    On the face page you said you were 109 years old.  By |
| 12:56PM | 8 | contract you were over 18, you were an adult? |
| 12:56PM | 9 | A    Yes. |
| 12:56PM | 10 | Q    And then you told her you were 31? |
| 12:56PM | 11 | A    Yes. |
| 12:56PM | 12 | THE COURT:  The objection is sustained.  Stop leading |
| 12:56PM | 13 | your witness. |
| 12:56PM | 14 | BY MR. MOTTL: |
| 12:56PM | 15 | Q    You responded to a question saying that you never thought |
| 12:56PM | 16 | or you never knew and believed, I forget your exact -- the |
| 12:56PM | 17 | exact words, that Kiana was who she was saying she was. |
| 12:56PM | 18 | Certainly in relation to her age -- |
| 12:56PM | 19 | MS. OLSON:  Objection, leading. |
| 12:56PM | 20 | THE COURT:  Sustained. |
| 12:56PM | 21 | BY MR. MOTTL: |
| 12:56PM | 22 | Q    Did you believe that there was a person Kiana who was as |
| 12:57PM | 23 | she represented herself to be? |
| 12:57PM | 24 | A    I believe she was over 18 and 35 it said on the stuff but |
| 12:57PM | 25 | I believe she was over 18 from being on Skout. |

| | | |
|---|---|---|
| 12:57PM | 1 | Q    And how about these -- how about the other things that |
| 12:57PM | 2 | said her cousin, high school she went to.  Did you believe |
| 12:57PM | 3 | those?  Were you -- were you taking those as truth? |
| 12:57PM | 4 | A    I didn't believe she was in high school but I believe she |
| 12:57PM | 5 | went to Baldwin.  It was like I believed we was role playing |
| 12:57PM | 6 | just role playing and see where it goes.  You ask a question, |
| 12:57PM | 7 | I'll answer.  I ask a question, you answer it. |
| 12:57PM | 8 | Q    Had you -- earlier you testified that you had exchanged |
| 12:58PM | 9 | messages with someone who turned out to be gay.  Was the |
| 12:58PM | 10 | interaction similar in terms of the truthfulness being somewhat |
| 12:58PM | 11 | questionable? |
| 12:58PM | 12 | A    Yeah. |
| 12:58PM | 13 | Q    And was that something you experienced more than once? |
| 12:58PM | 14 | A    I had interactions with transvestites and whatnot but... |
| 12:58PM | 15 | Q    Beg your pardon? |
| 12:58PM | 16 | A    I had communications with like transvestites and, you |
| 12:58PM | 17 | know, other people trying to act like something they're not. |
| 12:58PM | 18 |          MR. MOTTL:  All right.  No further questions. |
| 12:58PM | 19 |          THE COURT:  You may step down. |
| 12:58PM | 20 |          Mr. Mottl, your next witness please. |
| 12:58PM | 21 |          MR. MOTTL:  Yes, Vianna Cummings is the next witness. |
| 01:00PM | 22 |          THE CLERK:  Please raise your right hand. |
| 01:00PM | 23 |                    VIANNA CUMMINGS, |
| 01:00PM | 24 | called as a witness, having been first duly sworn, was examined |
| 01:00PM | 25 | and testified as follows: |

154

| | | |
|---|---|---|
| 01:00PM | 1 | THE CLERK:  Please state your full name and spell your |
| 01:00PM | 2 | last name for the record. |
| 01:00PM | 3 | THE WITNESS:  Sure.  It's Vianna L. Cummings, |
| 01:00PM | 4 | C-U-M-M-I-N-G-S. |
| 01:00PM | 5 | DIRECT EXAMINATION |
| 01:00PM | 6 | BY MR. MOTTL: |
| 01:00PM | 7 | Q    Ms. Cummings, you know the defendant, Lyle Cummings? |
| 01:00PM | 8 | A    Yes.  He's my husband. |
| 01:00PM | 9 | Q    Your husband? |
| 01:00PM | 10 | A    Um-hm. |
| 01:00PM | 11 | Q    How long have you known -- how long have you known Lyle? |
| 01:00PM | 12 | A    I've known Lyle for a total of 15 years. |
| 01:00PM | 13 | Q    And how did you first get to know him? |
| 01:00PM | 14 | A    Through -- I play basketball so he was part of the parks |
| 01:00PM | 15 | and recreation crew that would come and keep score and help |
| 01:00PM | 16 | with facilitating tournaments and basketball games. |
| 01:01PM | 17 | Q    Now, you knew him at the -- you're familiar with the |
| 01:01PM | 18 | incident that led to his arrest? |
| 01:01PM | 19 | A    Yes. |
| 01:01PM | 20 | Q    Now, how long -- you were his girlfriend at the time? |
| 01:01PM | 21 | A    Yes. |
| 01:01PM | 22 | Q    How long had you been on that relationship? |
| 01:01PM | 23 | A    Prior to that, about three to five years off and on. |
| 01:01PM | 24 | Q    Okay.  Now, you -- have you been married before? |
| 01:01PM | 25 | A    No. |

| | | | |
|--|--|--|--|
| 01:01PM | 1 | Q | No. |
| 01:01PM | 2 | | And you have children though, correct? |
| 01:01PM | 3 | A | Yes, I do. |
| 01:01PM | 4 | Q | How old?  You have two children? |
| 01:01PM | 5 | A | Yes, I do. |
| 01:01PM | 6 | Q | A boy and a girl? |
| 01:01PM | 7 | A | Yes, I do. |
| 01:01PM | 8 | Q | Now, at the time of this -- this incident, where were you |
| 01:01PM | 9 | | living? |
| 01:01PM | 10 | A | I was living in Kihei.  I had my own home on South Kihei |
| 01:01PM | 11 | | Road. |
| 01:01PM | 12 | Q | Okay.  And you were working? |
| 01:01PM | 13 | A | Yes. |
| 01:01PM | 14 | Q | Okay.  Now, do you have any -- did you go to high school |
| 01:01PM | 15 | | on Maui? |
| 01:01PM | 16 | A | Yes, I did.  I went to Baldwin High School for my freshman |
| 01:01PM | 17 | | to junior year and then I finished over at Maui High in my |
| 01:01PM | 18 | | senior year. |
| 01:01PM | 19 | Q | And did you continue with a higher education? |
| 01:02PM | 20 | A | Yes.  And then I went to Maui Community College West Manoa |
| 01:02PM | 21 | | program on Maui. |
| 01:02PM | 22 | Q | And what did you study there? |
| 01:02PM | 23 | A | Business. |
| 01:02PM | 24 | Q | And did you graduate?  You get a degree? |
| 01:02PM | 25 | A | I got my liberal arts degree.  I didn't finish my business |

2-SER-364

01:02PM   1   degree.

01:02PM   2   Q    Okay.  Now, at the time you were working where the time of

01:02PM   3   this incident in 2020?

01:02PM   4   A    I was working my job at Three's Bar & Grill which is on

01:02PM   5   South Kihei Road.

01:02PM   6   Q    Okay.  Now, do you have a clear recollection of the events

01:02PM   7   of that day?

01:02PM   8   A    I do have a vivid recollection of what happened that day.

01:02PM   9   Q    Yeah, could you -- could you start at noon and describe

01:02PM   10  what you did and your contact with Lyle?

01:02PM   11  A    Okay.  So noon I started work at 3:00 p.m. that day.  And

01:03PM   12  it was -- we made arrangements that he was coming to pick me up

01:03PM   13  after I was done with my shift on March -- what day was that --

01:03PM   14  13th, 15th?

01:03PM   15  Q    15th, correct.

01:03PM   16  A    Yeah.  He was supposed to pick me up after my shift.  So

01:03PM   17  we were talking back and forth and how he was going to

01:03PM   18  coordinate and what time he was come and pick me up and that he

01:03PM   19  was going to spend the night that night that he got picked up

01:03PM   20  over at my house, too, so he could go to work on the Monday,

01:03PM   21  which he works right up the street from me at the parks and

01:03PM   22  county rec in Kihei.

01:03PM   23  Q    And -- and did he pick you up?

01:03PM   24  A    No, he did not.

01:03PM   25  Q    And what did you wind up doing the rest of the evening?

| | | |
|---|---|---|
| 01:03PM | 1 | A   So when it came close to the time where I was texting him |
| 01:03PM | 2 | and calling him and asking him when he was going to pick me up, |
| 01:03PM | 3 | I had no reply whatsoever.  So I ended up walking home that |
| 01:04PM | 4 | night not knowing what happened. |
| 01:04PM | 5 | Q   And did you get a call later that evening or -- |
| 01:04PM | 6 | A   I had a call two days later when he was released.  He |
| 01:04PM | 7 | actually came down and told me exactly what happened.  And the |
| 01:04PM | 8 | reason why he didn't answer the phone and where he was and that |
| 01:04PM | 9 | he got picked up supposedly talking to a 13-year-old on a chat |
| 01:04PM | 10 | room. |
| 01:04PM | 11 | Q   And that he was arrested for that? |
| 01:04PM | 12 | A   That he was arrested for that. |
| 01:04PM | 13 | Q   How did you respond to that? |
| 01:04PM | 14 | A   I was blown out of the water.  Like, I didn't -- I thought |
| 01:04PM | 15 | he was lying to me at -- at first.  I was, like, he would never |
| 01:04PM | 16 | engage a 13-year-old kid.  Like, I don't under -- I don't know |
| 01:04PM | 17 | how -- I don't even know how that part came up to get caught up |
| 01:04PM | 18 | in that kind of thing.  Like, I've not known him to -- |
| 01:05PM | 19 | Q   Did he ever explain in detail of how involved the contact |
| 01:05PM | 20 | on Skout -- |
| 01:05PM | 21 | A   So -- |
| 01:05PM | 22 |          MS. OLSON:  Objection, hearsay. |
| 01:05PM | 23 |          THE COURT:  Overruled.  Go ahead. |
| 01:05PM | 24 |          THE WITNESS:  Can you repeat the question one more |
| 01:05PM | 25 | time? |

158

| | | |
|---|---|---|
| 01:05PM | 1 | BY MR. MOTTL: |
| 01:05PM | 2 | Q    Go ahead.  No. |
| 01:05PM | 3 | Did you -- did you ever talk to him about his |
| 01:05PM | 4 | activities on Skout? |
| 01:05PM | 5 | A    Oh, after the event happened, I did ask him if he had been |
| 01:05PM | 6 | involved in chat rooms and he's -- I know way back when he did |
| 01:05PM | 7 | have a couple of apps on his phone.  At that point -- at that |
| 01:05PM | 8 | time in our relationship, it wasn't an exclusive relationship, |
| 01:05PM | 9 | so I knew that he did chat from time to time but not in any |
| 01:05PM | 10 | kind of derogatory or underage or anything like that.  It was |
| 01:05PM | 11 | pretty much Facebook and other platforms that he used to chat |
| 01:05PM | 12 | back and forth, but it was nothing more than chatting back and |
| 01:06PM | 13 | forth. |
| 01:06PM | 14 | Q    Did you -- did you participate in the activities that he |
| 01:06PM | 15 | had been involved with the softball league? |
| 01:06PM | 16 | A    Oh, I used to attend them and watch them, sometimes time |
| 01:06PM | 17 | when I did have time, because I work a lot. |
| 01:06PM | 18 | Q    And, yeah, you were working a lot? |
| 01:06PM | 19 | A    Yes. |
| 01:06PM | 20 | Q    Did you participate -- participate in fundraisers? |
| 01:06PM | 21 | A    Yes.  So they used to have a concession and then they |
| 01:06PM | 22 | had -- they used to have weekend tournament that started on |
| 01:06PM | 23 | Friday and then would end on Sunday.  So he was involved in |
| 01:06PM | 24 | that a lot and then I was working, if I wasn't at the softball |
| 01:06PM | 25 | park. |

159

| | | |
|---|---|---|
| 01:06PM | 1 | Q   Now, you -- did you have your children residing with you? |
| 01:06PM | 2 | A   No.  So from a younger age, my son had lived on Oahu and |
| 01:06PM | 3 | has gone to Kamehameha school and then I -- |
| 01:06PM | 4 | MS. OLSON:  Objection, relevance. |
| 01:06PM | 5 | THE COURT:  Sustained. |
| 01:07PM | 6 | BY MR. MOTTL: |
| 01:07PM | 7 | Q   Did you ever observe conduct on the part of Lyle that made |
| 01:07PM | 8 | you suspect that he had some sort of proclivity towards younger |
| 01:07PM | 9 | children? |
| 01:07PM | 10 | A   Not at all, not at all. |
| 01:07PM | 11 | Q   Now, was he ever around your daughter? |
| 01:07PM | 12 | A   When we -- when she was younger, yeah. |
| 01:07PM | 13 | MS. OLSON:  Objection, relevance. |
| 01:07PM | 14 | THE COURT:  Where is this going, Counsel? |
| 01:07PM | 15 | MR. MOTTL:  Just -- I'm going just to ask I believe |
| 01:07PM | 16 | she is going to describe periods of time when they -- her |
| 01:07PM | 17 | daughter and Lyle were together and what her observations were |
| 01:07PM | 18 | and what her sense -- sense was as to his perspective |
| 01:07PM | 19 | towards -- |
| 01:07PM | 20 | THE COURT:  The objection is overruled.  Go ahead and |
| 01:07PM | 21 | ask your question. |
| 01:08PM | 22 | BY MR. MOTTL: |
| 01:08PM | 23 | Q   All right.  Do you -- could you describe you're speaking |
| 01:08PM | 24 | about earlier at a time when you, your daughter and Lyle were |
| 01:08PM | 25 | engaging in some kind of activity?  What were you talking |

01:08PM   1   about?  Continue, please.

01:08PM   2   A    As far as Lyle's behavior towards my daughter, it was more

01:08PM   3   of a fatherly, if anything, to make sure that she was okay,

01:08PM   4   make sure that she was getting all her school work done, and

01:08PM   5   sports and not a situation is that the way it is.  It's kind of

01:08PM   6   hard because I have to be in between and we don't want to

01:08PM   7   complicate things, but she has a softball career now and we're

01:08PM   8   just trying to get her to a good place and she doesn't have her

01:08PM   9   step-dad in her life because of this.

01:08PM  10           MR. MOTTL:  All right.  Thank you.

01:08PM  11           No further questions, Your Honor.

01:08PM  12           THE COURT:  Ms. Olson, any questions?

01:09PM  13           MS. OLSON:  Thank you, Your Honor.

01:09PM  14                      CROSS-EXAMINATION

01:09PM  15   BY MS. OLSON:

01:09PM  16   Q    Just a few.  Good afternoon.

01:09PM  17   A    Good afternoon.

01:09PM  18   Q    You were Mr. Cummings' girlfriend in March 2020?

01:09PM  19   A    Yes.

01:09PM  20   Q    And you're now married to him?

01:09PM  21   A    Yes, I am.

01:09PM  22   Q    You don't want to see him get in trouble, right?

01:09PM  23   A    No.

01:09PM  24   Q    Have you read the Skout messages and text messages at

01:09PM  25   issue in this case?

161

| | | | |
|---|---|---|---|
| 01:09PM | 1 | A | Yes, I have. |
| 01:09PM | 2 | Q | You don't watch over him 24/7, right? |
| 01:09PM | 3 | A | Not now.  I mean, not -- not prior to the incident but now |
| 01:09PM | 4 | | I do, 24/7. |
| 01:09PM | 5 | Q | Okay.  I should -- I should clarify. |
| 01:09PM | 6 | | In March 2020, you weren't watching him 24/7, right? |
| 01:09PM | 7 | A | No. |
| 01:09PM | 8 | Q | He was a grown -- he was a grown man? |
| 01:09PM | 9 | A | Right. |
| 01:09PM | 10 | Q | You know he had a cellphone at the time? |
| 01:09PM | 11 | A | Yes. |
| 01:09PM | 12 | Q | You weren't using that phone, were you? |
| 01:10PM | 13 | A | No, I was not. |
| 01:10PM | 14 | Q | You weren't monitoring the phone, were you? |
| 01:10PM | 15 | A | No, it wasn't -- no. |
| 01:10PM | 16 | Q | You weren't reading all his text messages on the phone, |
| 01:10PM | 17 | | right? |
| 01:10PM | 18 | A | At the time, no. |
| 01:10PM | 19 | Q | You weren't the one texting Kiana from that phone, right? |
| 01:10PM | 20 | A | No. |
| 01:10PM | 21 | Q | Mr. Cummings drove a Toyota Tacoma at that time? |
| 01:10PM | 22 | A | Yes. |
| 01:10PM | 23 | Q | You weren't in that Toyota Tacoma with him the evening of |
| 01:10PM | 24 | | March 15, 2020, right? |
| 01:10PM | 25 | A | No. |

| | | | |
|---|---|---|---|
| 01:10PM | 1 | Q | You weren't in the car when he drove to Kilohana Drive? |
| 01:10PM | 2 | A | No. |
| 01:10PM | 3 | Q | And you were not at the scene of the arrest, correct? |
| 01:10PM | 4 | A | No. |

01:10PM  5          MS. OLSON:  No more questions.  Thank you.

01:10PM  6          THE COURT:  Mr. Mottl, any further questions?

01:11PM  7          MR. MOTTL:  Yes, briefly.

01:11PM  8                    REDIRECT EXAMINATION

01:11PM  9  BY MR. MOTTL:

01:11PM 10  Q    During your times with Lyle, were you aware that -- that

01:11PM 11  he was using cocaine?

01:11PM 12  A    No.

01:11PM 13  Q    You never saw him?

01:11PM 14  A    No.

01:11PM 15  Q    Did you ever travel in his truck with him?

01:11PM 16  A    Many of times but I had no knowledge that there was

01:11PM 17  cocaine in it.

01:11PM 18  Q    Was he -- he had a pretty busy schedule?

01:11PM 19  A    Yes, very busy.

01:11PM 20  Q    And you also you said you worked long hours?

01:11PM 21  A    Yes, um-hm.

01:11PM 22  Q    Did he ever seem tired at times?

01:11PM 23  A    Did he ever seem tired?  Yes.

01:11PM 24          MR. MOTTL:  All right.  No further questions.  Thank

01:11PM 25  you.

| 01:11PM | 1 | THE COURT:  You may step down, ma'am. |
| 01:11PM | 2 | Your next witness. |
| 01:13PM | 3 | THE CLERK:  Please raise your right hand. |
| 01:13PM | 4 | EVELYN CUMMINGS, |
| 01:13PM | 5 | called as a witness, having been first duly sworn, was examined |
| 01:13PM | 6 | and testified as follows: |
| 01:13PM | 7 | THE CLERK:  Please state your full name and spell your |
| 01:13PM | 8 | last name for the record. |
| 01:13PM | 9 | THE WITNESS:  Evelyn Teruya Cummings, C-U-M-M-I-N-G-S. |
| 01:13PM | 10 | DIRECT EXAMINATION |
| 01:13PM | 11 | BY MR. MOTTL: |
| 01:13PM | 12 | Q    Ms. Cummings, are you married? |
| 01:13PM | 13 | A    Yes.  Well, I'm a widow. |
| 01:14PM | 14 | Q    You're a widow. |
| 01:14PM | 15 | Now, do you remember the events of March 16, 2020? |
| 01:14PM | 16 | A    Do I know the events? |
| 01:14PM | 17 | Q    Yeah, when your house was searched? |
| 01:14PM | 18 | A    Yes. |
| 01:14PM | 19 | Q    Now, could you describe how that started that is a search |
| 01:14PM | 20 | of your home? |
| 01:14PM | 21 | A    The officers came to my door saying that they had a |
| 01:14PM | 22 | warrant to search my house.  He showed it to me and I actually |
| 01:14PM | 23 | didn't really read it, but I said, okay and then I let them in. |
| 01:14PM | 24 | There must have been like eight of them.  So they came into my |
| 01:14PM | 25 | house.  They asked me which was Lyle's room.  They are going to |

164

01:14PM   1    search Lyle's room.  So I showed them the bedrooms, all the

01:14PM   2    three bedrooms and which was Lyle's room.  Then they asked me

01:14PM   3    to go outside with my husband into the -- in the garage and

01:14PM   4    wait while they searched the house.

01:15PM   5    Q    Was your husband present?

01:15PM   6    A    At that time, he was, yeah.  He was living and he was

01:15PM   7    present.

01:15PM   8    Q    Now, do you recall approximately how long they were there?

01:15PM   9    A    I think they were there like maybe an hour.  They did a

01:15PM  10    thorough search of Lyle's room and they also searched the

01:15PM  11    garage where he has a desk and he has some personal things

01:15PM  12    there.  And he also -- they also went into my bedroom and the

01:15PM  13    spare room and they searched the outside of the -- the -- the

01:15PM  14    yard.

01:15PM  15    Q    Now, did they take anything away from the search?

01:15PM  16    A    They -- they found some money in Lyle's room that he had

01:15PM  17    in his safe and I think it was two -- two condoms.  And when

01:15PM  18    they completed the search, they called me into the room, the

01:15PM  19    house, the kitchen, and they had counted the money that they

01:16PM  20    found.  And I think it was like 11,000 and so they counted it

01:16PM  21    out.  And I told the officers that that money was from Lyle's

01:16PM  22    softball tournament, part of the money was from his softball

01:16PM  23    tournament and also part of a -- for his savings.  And so

01:16PM  24    they -- they showed me the money and they showed me the condoms

01:16PM  25    and then they made me sign the whatever they were taking with

| | | |
|---|---|---|
| 01:16PM | 1 | them.  But they also -- |
| 01:16PM | 2 | Q    Go ahead.  Thank you.  Continue. |
| 01:16PM | 3 | A    They also found my wallet in my room which I had stored |
| 01:16PM | 4 | away and they also took money from my wallet which was |
| 01:16PM | 5 | unreported. |
| 01:16PM | 6 | Q    Did they take anything else other than the -- |
| 01:16PM | 7 | A    Not that I am aware of. |
| 01:16PM | 8 | THE COURT REPORTER:  I'm sorry? |
| 01:16PM | 9 | THE WITNESS:  I'm not aware of but if they took |
| 01:16PM | 10 | anything else. |
| 01:17PM | 11 | BY MR. MOTTL: |
| 01:17PM | 12 | Q    Now, the -- the money was from the tournament.  Did you |
| 01:17PM | 13 | participate in these tournaments at all? |
| 01:17PM | 14 | A    I did a lot of the cooking for the concession. |
| 01:17PM | 15 | Q    So it was a -- a fundraiser, too, you sold food? |
| 01:17PM | 16 | A    Yeah, it was a tournament and then he had a concession |
| 01:17PM | 17 | stand, and I prepared a lot of the food and -- |
| 01:17PM | 18 | Q    How -- how long has Lyle lived at that home? |
| 01:17PM | 19 | A    Pardon? |
| 01:17PM | 20 | Q    How long did Lyle live at that home? |
| 01:17PM | 21 | A    All his life. |
| 01:17PM | 22 | Q    And is this a home that his grandparents lived also? |
| 01:17PM | 23 | A    Yeah, it's a home that my grandparents -- my parents owned |
| 01:17PM | 24 | and then was handed down to me.  So it's going to be 59 years. |
| 01:17PM | 25 | So it's going to be 59 years that he has lived there.  All his |

| | | |
|---|---|---|
| 01:17PM | 1 | life. |
| 01:17PM | 2 | Q    Did the -- the officers tell you the reason for the |
| 01:17PM | 3 | search? |
| 01:17PM | 4 | A    They didn't -- I don't remember he telling me what, you |
| 01:18PM | 5 | know, what the search was.  He just showed the -- the warrant |
| 01:18PM | 6 | to me and I kind of -- I looked at it but I don't really |
| 01:18PM | 7 | remember. |
| 01:18PM | 8 |         MR. MOTTL:  All right.  All right.  Thank you. |
| 01:18PM | 9 | Nothing further. |
| 01:18PM | 10 |         THE COURT:  Any questions for this witness from the |
| 01:18PM | 11 | government? |
| 01:18PM | 12 |         MS. OLSON:  Yes, Your Honor. |
| 01:18PM | 13 |                        CROSS-EXAMINATION |
| 01:18PM | 14 | BY MS. OLSON: |
| 01:18PM | 15 | Q    Good afternoon. |
| 01:18PM | 16 | A    Good afternoon. |
| 01:18PM | 17 | Q    Just a few questions.  You are Lyle Cummings' mother? |
| 01:18PM | 18 | A    I'm his mother. |
| 01:18PM | 19 | Q    And you don't want to see him get in trouble, right? |
| 01:18PM | 20 | A    Pardon? |
| 01:18PM | 21 | Q    You don't want to see him get in trouble, right? |
| 01:18PM | 22 | A    No.  Nobody does.  No parent wants to see that. |
| 01:18PM | 23 | Q    And in March 2020, you weren't watching over him 24/7, |
| 01:18PM | 24 | right? |
| 01:18PM | 25 | A    I was what? |

| | | | |
|---|---|---|---|
| 01:18PM | 1 | Q | You were not watching over him all the time in March 2020, |
| 01:18PM | 2 | | right? |
| 01:18PM | 3 | A | No.  No. |
| 01:19PM | 4 | Q | You didn't monitor his cellphone? |
| 01:19PM | 5 | A | No. |
| 01:19PM | 6 | Q | You weren't using his cellphone in March 2020? |
| 01:19PM | 7 | A | No. |
| 01:19PM | 8 | Q | You weren't with him in the truck the night he was |
| 01:19PM | 9 | | arrested in March 2020, right? |
| 01:19PM | 10 | A | No. |
| 01:19PM | 11 | Q | Couple of questions for you about the search of the house |
| 01:19PM | 12 | | that you talked about earlier.  Was that on March 16th, 2020? |
| 01:19PM | 13 | A | I cannot remember that exact date. |
| 01:19PM | 14 | Q | Okay. |
| 01:19PM | 15 | A | On or about that date. |
| 01:19PM | 16 | Q | But you were home during the search? |
| 01:19PM | 17 | A | I was home. |
| 01:19PM | 18 | Q | And Lyle Cummings was living with you in that house at the |
| 01:19PM | 19 | | time.  Did he have his own room? |
| 01:20PM | 20 | A | His own room. |
| 01:20PM | 21 | Q | And the desk you referred to in the garage, was that |
| 01:20PM | 22 | | Lyle's desk? |
| 01:20PM | 23 | A | Yes. |
| 01:20PM | 24 | Q | Are you aware that during the search law enforcement found |
| 01:20PM | 25 | | clear plastic empty baggies of the same type that were found in |

| | | |
|---|---|---|
| 01:20PM | 1 | the truck on the day of his arrest? |
| 01:20PM | 2 | A    No.  No. |
| 01:20PM | 3 | Q    But you did mention that law enforcement found about |
| 01:20PM | 4 | $11,000 in cash? |
| 01:20PM | 5 | A    Yes. |
| 01:20PM | 6 | Q    And they recovered that from Lyle's bedroom? |
| 01:20PM | 7 | A    Yes. |
| 01:20PM | 8 | Q    Are you aware that after the $11,000 in cash was found in |
| 01:21PM | 9 | his room Maui Police Department had a canine sniff the $11,000 |
| 01:21PM | 10 | and that the canine alerted to the thousand dollars indicating |
| 01:21PM | 11 | an odor of illegal narcotics on the cash? |
| 01:21PM | 12 | A    No. |
| 01:21PM | 13 |        MS. OLSON:  No more questions. |
| 01:21PM | 14 |        THE COURT:  Any redirect? |
| 01:21PM | 15 |        MR. MOTTL:  No, Your Honor.  Thank you. |
| 01:21PM | 16 |        THE COURT:  You may step down, ma'am. |
| 01:21PM | 17 |        Your next witness. |
| 01:21PM | 18 |        MR. MOTTL:  No further witnesses, Your Honor. |
| 01:21PM | 19 |        THE COURT:  Defense rests? |
| 01:21PM | 20 |        MR. MOTTL:  Yes, defense rests. |
| 01:21PM | 21 |        THE COURT:  Any rebuttal? |
| 01:21PM | 22 |        MS. OLSON:  No, Your Honor. |
| 01:21PM | 23 |        THE COURT:  All right.  So ladies and gentlemen of the |
| 01:22PM | 24 | jury, what that means then is the presentation of the evidence |
| 01:22PM | 25 | in this case has now been concluded.  There are a few matters |

(170 of 280), Page 170 of 280    Case: 23-3016, 11/18/2024, DktEntry: 26.3, Page 170 of 280
Case 1:22-cr-00023-DKW    Document 182    Filed 02/21/24    Page 169 of 172
PageID.1702

169

| | | |
|---|---|---|
| 01:22PM | 1 | that the Court needs to take up with counsel. Given the hour |
| 01:22PM | 2 | of the day, we are at 1:22. It seems appropriate for us to |
| 01:22PM | 3 | adjourn for the day. |
| 01:22PM | 4 | As we go to break for the day, I will remind you to |
| 01:22PM | 5 | refrain from discussing the substance of this case with anyone, |
| 01:22PM | 6 | including one another until I advise otherwise; to refrain from |
| 01:22PM | 7 | accessing any media or other accounts of this case that may be |
| 01:22PM | 8 | out there; and finally do not conduct any independent |
| 01:22PM | 9 | investigation into the facts, circumstances or persons |
| 01:22PM | 10 | involved. |
| 01:22PM | 11 | We will see you back here at 8:30 tomorrow morning |
| 01:22PM | 12 | when I expect to instruct you on the law that you must apply in |
| 01:22PM | 13 | this case during the course of your deliberations. That will |
| 01:22PM | 14 | then be immediately followed by the closing arguments of the |
| 01:22PM | 15 | lawyers and then you will begin your deliberations. Okay. So |
| 01:22PM | 16 | that's what we have coming up in the immediate future. |
| 01:22PM | 17 | (At 1:22 p.m., the jury was excused, and the following |
| 01:22PM | 18 | proceedings were held:) |
| 01:23PM | 19 | THE COURT: All right. Our 14 jurors have departed |
| 01:23PM | 20 | the courtroom. Any requests or other issues counsel wishes to |
| 01:23PM | 21 | take up with the court. |
| 01:23PM | 22 | MS. OLSON: No, Your Honor. |
| 01:23PM | 23 | THE COURT: Mr. Mottl. |
| 01:23PM | 24 | MR. MOTTL: None from the defense, Your Honor. |
| 01:23PM | 25 | THE COURT: All right. So first thing tomorrow |

01:24PM   1    morning, we -- actually, this afternoon we will finalize the

01:24PM   2    jury instructions and verdict form consistent with our

01:24PM   3    discussions.  We will file the files final sets of both

01:24PM   4    documents on the docket later this afternoon.  I will begin at

01:24PM   5    8:30 tomorrow instructing the jury.  That usually takes about

01:24PM   6    30 minutes.  And then we will immediately go into closing

01:24PM   7    arguments.  Any questions from either side?

01:24PM   8            MS. OLSON:  Do I need to request closing argument

01:24PM   9    rebuttal?

01:24PM   10           THE COURT:  I'm not concerned really about it.  I

01:24PM   11   mean, this trial has been fairly quick.  You know, I've

01:24PM   12   mentioned to you both in the past that I -- I thinking

01:24PM   13   30 minutes per side, but if, you know, we have some flexibility

01:24PM   14   with that.  I'm not going to cut anybody short if you feel like

01:24PM   15   you need a few more minutes than that -- that's acceptable with

01:24PM   16   me.  Any other questions?

01:24PM   17           MR. MOTTL:  No, Your Honor.  Will there be -- are we

01:24PM   18   going to have a session settling instructions following this or

01:25PM   19   go on the stipulations?

01:25PM   20           THE COURT:  I'm sorry.  Your question is what?

01:25PM   21           MR. MOTTL:  We will have a -- we'll have a settling

01:25PM   22   conference on the jury instructions this afternoon you said.

01:25PM   23   Is that --

01:25PM   24           THE COURT:  No, that's not what I said.

01:25PM   25           MR. MOTTL:  Oh, I -- I --

171

01:25PM    1         THE COURT:  Reconciliation of jury instruction has
01:25PM    2    already occurred.  If there is some other issues that you want
01:25PM    3    to bring to my attention with regard to those instructions that
01:25PM    4    I'm not aware of, I'm listening.
01:25PM    5         MR. MOTTL:  No.  I -- I -- you referred to this
01:25PM    6    afternoon.  It will be settled everything will be filed.  Okay.
01:25PM    7    That's fine.
01:25PM    8         THE COURT:  When I refer to this afternoon is we, my
01:25PM    9    chambers, will finalize those instructions consistent with our
01:25PM    10   discussions that have already occurred.  We will also finalize
01:25PM    11   the verdict form at that time.  Both documents will then be
01:25PM    12   presented as final documents on the court docket of this case.
01:25PM    13        You -- you're free to print them, if you wish.  If you
01:25PM    14   do not, we will have nonetheless hard copies for both sides
01:25PM    15   tomorrow morning before we begin.  Those documents will be
01:25PM    16   available for the jurors, of course, at the start of their
01:26PM    17   deliberations.  Any questions?
01:26PM    18        MR. MOTTL:  None for the defense.  Thank you.
01:26PM    19        MS. OLSON:  No.  Thank you, Your Honor.
01:26PM    20        THE COURT:  All right.  We'll see you tomorrow
01:26PM    21   morning.
01:26PM    22        (Proceedings were concluded at 1:26 p.m.)
           23
           24
           25

172

1               COURT REPORTER'S CERTIFICATE

2          I, Gloria T. Bediamol, Official Court Reporter, United

3     States District Court, District of Hawaii, do hereby certify

4     that pursuant to 28 U.S.C. §753 the foregoing is a complete,

5     true, and correct transcript from the stenographically reported

6     proceedings held in the above-entitled matter and that the

7     transcript page format is in conformance with the regulations

8     of the Judicial Conference of the United States.

9

10          DATED at Honolulu, Hawaii, February 12, 2024.

11

12

13                              /s/ Gloria T. Bediamol

14                              GLORIA T. BEDIAMOL.

15                              RMR, CRR, FCRR

16

17

18

19

20

21

22

23

24

25

1

|    |                                |    |                              |
|----|--------------------------------|----|------------------------------|
| 1  | IN THE UNITED STATES DISTRICT COURT |  |                          |
| 2  | FOR THE DISTRICT OF HAWAII     |    |                              |
| 3  |                                |    |                              |
| 4  | UNITED STATES OF AMERICA,      | )  | CRIMINAL NO. 22-00023-DKW    |
|    |                                | )  |                              |
|    | Plaintiff,                     | )  | Honolulu, Hawaii             |
| 5  |                                | )  |                              |
|    | vs.                            | )  | June 15, 2023                |
| 6  |                                | )  |                              |
|    | LYLE RIKIO CUMMINGS,           | )  |                              |
| 7  |                                | )  |                              |
|    | Defendant.                     | )  |                              |
| 8  | _____ | )|                              |

9

10                   TRANSCRIPT OF JURY TRIAL (DAY 6)
                BEFORE THE HONORABLE DERRICK K. WATSON,
11           CHIEF UNITED STATES DISTRICT COURT JUDGE

12
     APPEARANCES:
13

14   For the Plaintiff:          REBECCA PERLMUTTER, ESQ.
                                  CHRISTINE OLSON, ESQ.
15                                Office of the United States Attorney
                                  PJKK Federal Building
16                                300 Ala Moana Boulevard, Suite 6100
                                  Honolulu, Hawaii  96850
17
     For the Defendant:          JOSEPH R. MOTTL, III, ESQ.
18                                2009 Makiki Street #C
                                  Honolulu, HI 96822
19

20
     Official Court Reporter:    Gloria T. Bediamol, RPR RMR CRR FCRR
21                                United States District Court
                                  300 Ala Moana Boulevard
22                                Honolulu, Hawaii 96850

23

24
     Proceedings recorded by machine shorthand, transcript produced
25   with computer-aided transcription (CAT).

| 09:13AM | 1 | making their closing arguments.  As I just mentioned, what they |
| 09:13AM | 2 | say is not evidence and you are not bound by their |
| 09:13AM | 3 | interpretations or recollection of the evidence. |
| 09:13AM | 4 | The evidence that you must consider in the course of |
| 09:13AM | 5 | your deliberations comes from the witnesses and from the |
| 09:13AM | 6 | evidence, which are in evidence -- the exhibits.  I'm sorry, |
| 09:13AM | 7 | the exhibits that are in evidence.  You are to rely on your own |
| 09:14AM | 8 | collective recollection of the evidence in reaching a decision |
| 09:14AM | 9 | in this case. |
| 09:14AM | 10 | Ms. Olson, is the government prepared for its closing |
| 09:14AM | 11 | argument? |
| 09:14AM | 12 | MS. OLSON:  Yes, Your Honor. |
| 09:14AM | 13 | THE COURT:  You may proceed. |
| 09:14AM | 14 | MS. OLSON:  Good morning.  It's the defendant's own |
| 09:14AM | 15 | words and actions that are at the heart of this case.  His |
| 09:14AM | 16 | words and the messages he wrote, and his actions searching for |
| 09:14AM | 17 | Kiana's location on the phone, driving to meet up with her, |
| 09:15AM | 18 | flashing his headlights at her, showing up with marijuana, cash |
| 09:15AM | 19 | and a large amount of cocaine and crack packaged for sale in |
| 09:15AM | 20 | the truck.  The defendant chose to say these things and the |
| 09:15AM | 21 | defendant chose to do these things, and he's the reason we are |
| 09:15AM | 22 | here today. |
| 09:15AM | 23 | In my opening statement I said this case would be |
| 09:15AM | 24 | straightforward, and now that you've heard all the evidence in |
| 09:15AM | 25 | the case, you can see it is straightforward and simple.  The |

```
09:15AM   1   evidence shows not just beyond a reasonable doubt, but beyond
09:15AM   2   any doubt, the defendant tried to persuade a 13-year-old to
09:15AM   3   meet him for sex.  Kiana, or the undercover chatter, told him
09:15AM   4   four times very clearly she was 13 years old.  The defendant
09:15AM   5   responded very clearly, her being 13 didn't bother him.  There
09:15AM   6   was never any suggestion in any of the messages exchanged that
09:16AM   7   this was some kind of fantasy or role playing, and the whole
09:16AM   8   context of the conversation shows that Mr. Cummings believed
09:16AM   9   she was a minor.  He never hesitated.  He never showed the
09:16AM  10   slightest reluctance; instead, he became more and more
09:16AM  11   aggressive.
09:16AM  12          He persisted and he escalated things after he found
09:16AM  13   out her age.  He asked her over and over and over to meet her
09:16AM  14   in person, and there's no question he tried in many ways to
09:16AM  15   persuade her to meet him for sex.  He repeatedly offered her
09:16AM  16   cash, offered to take her shopping, including at Victoria's
09:16AM  17   Secret, take her to hotels, sent her photographs of large
09:16AM  18   amounts of cash and offered her marijuana.  He asked her 14
09:16AM  19   times to send videos or pictures of herself, including while
09:16AM  20   she was in the shower.
09:16AM  21          After she told him 4 times she was 13, and after he
09:16AM  22   spent time trying to groom and persuade her, he then chose to
09:17AM  23   escalate things further.  He described in graphic detail how he
09:17AM  24   wanted to have oral sex and intercourse with her.  He couldn't
09:17AM  25   have been more clear about what he wanted from Kiana.  Within
```

09:17AM  1   about one minute of Kiana telling him her location, he looked
09:17AM  2   it up on his phone on Apple Maps.  That's the action of someone
09:17AM  3   who is serious.
09:17AM  4          Within less than an hour of discussing a meetup
09:17AM  5   location, he was there.  He drove his truck to the spot.  He
09:17AM  6   flashed his headlights and when his truck was searched after he
09:17AM  7   was arrested, he was caught red-handed with a significant
09:17AM  8   amount of cocaine and crack packaged and ready to sell or
09:17AM  9   distribute.
09:17AM  10         He then admitted to many of the key facts about the
09:17AM  11  enticement in his post-arrest interview.
09:17AM  12         So the facts are simple.  Let's talk about the law and
09:17AM  13  what the government needs to prove for each of the two counts.
09:18AM  14         Count 1, I'm going to, for shorthand, refer to this as
09:18AM  15  the enticement count.  Count 1 is attempting to persuade,
09:18AM  16  coerce, induce or entice a minor into sexual activity.
09:18AM  17         Count 2, for shorthand I'll call it the drug count.
09:18AM  18  Possession with intent to distribute cocaine and crack.
09:18AM  19         The government must prove these crimes beyond a
09:18AM  20  reasonable doubt.  That doesn't mean beyond all possible doubt,
09:18AM  21  beyond a shadow of a doubt.  A reasonable doubt is based on
09:18AM  22  reason and common sense.  The government has met its burden on
09:18AM  23  both of these two counts.
09:18AM  24         Let's talk about the counts.  We will start with Count
09:18AM  25  1.  There are four subparts to Count 1 that you'll need to

```
09:18AM    1   consider and I'm going to talk about each of these four parts
09:18AM    2   in some detail.
09:19AM    3        This is a breakdown of part one.  Part one is the
09:19AM    4   longest of the four parts and you'll need to consider all of
09:19AM    5   these components of Count 1, part one.  We'll talk about the
09:19AM    6   defendant.  We'll talk about what knowingly means; did he
09:19AM    7   attempt to persuade, induce, entice or coerce an individual
09:19AM    8   under the age of 18 to engage in unlawful sexual activity, for
09:19AM    9   which any person could be charged with an offense under the
09:19AM   10   Hawaii Revised Statutes.  So we'll talk about each of these
09:19AM   11   step by step.
09:19AM   12        First let's talk about, very briefly, the defendant.
09:19AM   13   I'm going to go over this very quickly.  Identifying the
09:19AM   14   defendant is not an issue in this case.  The defendant got on
09:19AM   15   the stand yesterday.  He told you he was the one who was
09:19AM   16   exchanging the messages.  There's no question it was him behind
09:20AM   17   the messages.  There's no question that Lyle Cummings is the
09:20AM   18   one who was arrested on March 15th, 2020, and that it was his
09:20AM   19   truck.  As you can see, I included a photograph here.  This is
09:20AM   20   the DuckFat hat that was found, a photograph, in the back of
09:20AM   21   his Toyota Tacoma when it was searched pursuant to the search
09:20AM   22   warrant on March 16th, 2020, and as you'll recall, DuckFat was
09:20AM   23   the name that he chose to put on his Skout profile, Duckfat34.
09:20AM   24   As the defendant has admitted to this point, we will move on.
09:20AM   25        Let's talk about attempt very briefly.  This is an
```

09:20AM    1    attempt crime for obvious reasons.  There was no actual minor.

09:21AM    2    So attempted enticement.  Keep in mind, however, as you were

09:21AM    3    just instructed, an actual minor victim is not required for an

09:21AM    4    attempt conviction under the enticement count, so it's okay

09:21AM    5    that Kiana was not real for Count 1.

09:21AM    6        A couple other things to keep in mind generally for

09:21AM    7    Count 1.  As the judge just instructed you, the use of the

09:21AM    8    undercover operation was okay.  This is the relevant jury

09:21AM    9    instructions.  "Law enforcement officials may engage in stealth

09:21AM    10   and deception, such as the use of informants and undercover

09:21AM    11   agents in order to investigate criminal activities.  Undercover

09:21AM    12   agents and informants may also use false names and identities."

09:21AM    13       So it doesn't matter that Kiana was fake.  Doesn't

09:21AM    14   matter if she had a fake name.  It was an undercover operation.

09:21AM    15   That's fine.

09:21AM    16       You also heard Detective Surina talk about that on the

09:22AM    17   stand.  You heard them talk about Operation Keiki Shield and

09:22AM    18   you heard Officer Surina say this was an acceptable and

09:22AM    19   standard police practice, and the purpose of these undercover

09:22AM    20   operations, according to Detective Surina, is to prevent people

09:22AM    21   from exploiting minors.  That's why officers engage in these

09:22AM    22   undercover operations.

09:22AM    23       The next part to mention is just briefly talk about

09:22AM    24   the word "knowingly."  That's in part one of Count 1.

09:22AM    25   Defendant -- knowingly means he did it voluntarily and

09:22AM  1   intentionally and not by mistake or accident.  There was
09:22AM  2   nothing that the defendant did here that was by mistake or
09:22AM  3   accident except getting caught.

09:22AM  4         So note here this is Count 1, still on part one.  "The
09:23AM  5   defendant knowingly attempted to persuade, induce, entice, or
09:23AM  6   coerce an individual."  I'll just point out the word "or" there
09:23AM  7   so you don't have to find -- if you like the word "persuasion"
09:23AM  8   better, you feel that better fits the situation, that's enough,
09:23AM  9   or enticement, that's enough.  You don't have to find all of
09:23AM  10  these adjectives, although they are all clearly shown here.

09:23AM  11        Another thing to keep in mind is that although the
09:23AM  12  defendant did promise her money and offer her money,
09:23AM  13  persuasion, inducement, enticement and coercion just have their
09:23AM  14  common sense, common language meaning.  It doesn't have to be
09:23AM  15  money.  It can be money, but it can be other things.  It can be
09:23AM  16  shopping, it can be persuasive language and other things.  So
09:23AM  17  just apply your common sense meaning of the term.

09:24AM  18        So what did the defendant do to persuade, induce,
09:24AM  19  entice or coerce Kiana?  Let's talk about what he did.

09:24AM  20        So first he contacted her three days in a row.  He's
09:24AM  21  the one who initiated the contact on each of the three days.
09:24AM  22  He asked her repeatedly to meet up in person.  He offered to
09:24AM  23  give her cash, sending her photographs of stacks of cash.
09:24AM  24  Offered to take her shopping, hotel rooms, spoil her and he
09:24AM  25  offered to give her marijuana.

| | | |
|---|---|---|
| 09:24AM | 1 | You may want to, in your deliberations, go through |
| 09:24AM | 2 | Exhibits 3 and 4, which are the Skout messages and the text |
| 09:24AM | 3 | messages, and perhaps count how many times did he ask her to |
| 09:24AM | 4 | meet in person; how many times did he offer to give her a |
| 09:24AM | 5 | benefit for meeting him; how many times did he offer to take |
| 09:24AM | 6 | her shopping. |
| 09:25AM | 7 | Here's an example of him offering her cash.  This is |
| 09:25AM | 8 | from Exhibit 4.  This is one of the two photographs of the |
| 09:25AM | 9 | actual cash that he sent to Kiana by text message.  This was |
| 09:25AM | 10 | after she said she was 13 years old.  In this context, |
| 09:25AM | 11 | defendant also said "I'll be your sugar daddy.  Let's spoil |
| 09:25AM | 12 | you." |
| 09:25AM | 13 | Here's another one of the photographs of the cash that |
| 09:25AM | 14 | the defendant texted to Kiana, and this one was after she said |
| 09:25AM | 15 | two times that she was 13 years old.  As you can see, I pulled |
| 09:25AM | 16 | a little snippet of the chats that was close to this from |
| 09:25AM | 17 | Exhibit 4.  Kiana says, "How can I get one of those stacks?" |
| 09:26AM | 18 | Cummings says, "When you ride with me."  So he's |
| 09:26AM | 19 | making it clear if she meets up with him, he's going to give |
| 09:26AM | 20 | her some money. |
| 09:26AM | 21 | Also note in his post-arrest interview he admitted to |
| 09:26AM | 22 | law enforcement he told Kiana he would have money when he met |
| 09:26AM | 23 | up with her, and he did have money when he met up with her. |
| 09:26AM | 24 | Here's another example of where Cummings offers to |
| 09:26AM | 25 | spoil her.  This was after she said she was 13, 4 times. |

```
09:26AM    1    Cummings said, "Walk around the Shops of Wailea holding your
09:26AM    2    hand, taking you to the beach and sleeping under the stars
09:26AM    3    waking up to you.  Renting hotel rooms during the weekend.
09:26AM    4    Spoiling you late night watching movies and whatever you like
09:26AM    5    to do."  Here he is building up.  He's working on the
09:26AM    6    persuasion.
09:26AM    7         Here's where he offers her marijuana.  This was after
09:26AM    8    she said she was 13, 2 times.  Cummings said, "You burn weed?"
09:27AM    9         "Kiana.  Yeah, but puts me to," sleepy face emoji."
09:27AM   10         "Cummings.  I'll have some if you like."  Puff emoji.
09:27AM   11    He's offering her marijuana.
09:27AM   12         So this, I'm going back to the full language of Count
09:27AM   13    1, which is enticement.  We're still talking about part one.
09:27AM   14    So we talked about the defendant, we talked about knowingly,
09:27AM   15    attempted, persuade, induce, entice or coerce, and now we'll
09:27AM   16    move on to the next part; was it an individual under the age of
09:27AM   17    18.
09:27AM   18         Now, we know Kiana said she was 13.  That's enough for
09:27AM   19    that part of the statute.  She said it 4 times in no uncertain
09:27AM   20    terms.  Although she is fictional, again, that doesn't matter
09:28AM   21    for this purpose of this statute.
09:28AM   22         Let's look at the next part; what was he trying to
09:28AM   23    persuade her to do?  He was trying to persuade her to engage in
09:28AM   24    unlawful sexual activity, unlawful sexual activity that would
09:28AM   25    be illegal under Hawaii state law.  So we've got to look at
```

36

| | | |
|---|---|---|
| 09:28AM | 1 | Hawaii state law as part of this.  Here's the relevant Hawaii |
| 09:28AM | 2 | state law.  "A person commits the offense of sexual assault in |
| 09:28AM | 3 | the first degree if the person knowingly engages in sexual |
| 09:28AM | 4 | penetration with another person who is less than 14 years old. |
| 09:28AM | 5 | Sexual penetration includes oral sex or intercourse." |
| 09:28AM | 6 | So again, here we have another -- a person who is less |
| 09:28AM | 7 | than 14 years old.  Kiana was 13.  Again, it doesn't matter |
| 09:28AM | 8 | that she was fictional. |
| 09:28AM | 9 | "Sexual penetration includes oral sex or intercourse." |
| 09:28AM | 10 | It's very clear from the chats from the text messages that is |
| 09:29AM | 11 | exactly what Cummings was talking about and what his intention |
| 09:29AM | 12 | was. |
| 09:29AM | 13 | Now remember, there is no requirement here that any |
| 09:29AM | 14 | actual sexual act occurred.  It doesn't matter that there was |
| 09:29AM | 15 | no actual sexual penetration.  If you go back to the language, |
| 09:29AM | 16 | this just means that the defendant was trying to persuade her |
| 09:29AM | 17 | to do these things.  So there's no actual sex needed.  This is |
| 09:29AM | 18 | again, attempt. |
| 09:29AM | 19 | Now, we'll go into a few examples of him trying to |
| 09:29AM | 20 | persuade her to meet him for sex.  Now you heard the defendant |
| 09:29AM | 21 | read quite a few of these.  I won't read them again.  Here's |
| 09:29AM | 22 | one example where Mr. Cummings very clearly describes he wants |
| 09:30AM | 23 | to have oral sex with her.  This was after she said 4 times |
| 09:30AM | 24 | that she was 13 years old.  Same thing here.  This was also |
| 09:30AM | 25 | after Kiana said 4 times she was 13 years old, and you heard |

09:30AM  1    the defendant read these words yesterday.  Again, this clearly

09:30AM  2    counts as sexual penetration under the Hawaii statute.

09:30AM  3        Now the defendant said yesterday on the stand he met

09:30AM  4    up with Kiana because he was just curious.  He was just curious

09:30AM  5    to meet her.  This is just not credible in light of the

09:30AM  6    messages we just discussed.  It's very clear he wasn't just

09:30AM  7    curious, he wanted to meet her for sex.  It's also clear that

09:31AM  8    this wasn't just talk.  Cummings himself said, "Is tonight

09:31AM  9    going to happen for us or just talk?"  He doesn't want to just

09:31AM  10   talk.  He's making clear what he's trying to persuade Kiana to

09:31AM  11   do, which is meet him for sex.

09:31AM  12       Now, one thing to keep in mind, a minor cannot consent

09:31AM  13   to sex, so again, it doesn't matter that we're talking about a

09:31AM  14   fictional minor here.  So whatever Kiana or the undercover

09:31AM  15   chatter may have said, if you interpret that as being

09:31AM  16   encouraging, that doesn't matter.  What matters here are the

09:31AM  17   defendant's words and the defendant's actions.

09:31AM  18       Okay.  We're done with part one of Count 1, which is

09:31AM  19   the enticement charge.  Now we're on part two.  Remember I said

09:31AM  20   there would be four parts.  We're on part two, interstate

09:31AM  21   commerce.  This is super quick and easy because the parties

09:32AM  22   agreed by stipulation to this.  You can just look at

09:32AM  23   Exhibit 18.  There's just no issue and you know that the

09:32AM  24   defendant used the internet and a cellular telephone when he

09:32AM  25   committed this crime.

| | | |
|---|---|---|
| 09:32AM | 1 | Count 1, which is enticement, part three, the |
| 09:32AM | 2 | defendant believed Kiana was under 18. This was very clear |
| 09:32AM | 3 | from all the messages and from the defendant's post-arrest |
| 09:32AM | 4 | interview. Again, as I said many times, Kiana told him very |
| 09:32AM | 5 | clearly, four times, she was 13 years old. Let's look briefly |
| 09:32AM | 6 | at each time she told him that and what his response was. |
| 09:32AM | 7 | This was the first time Kiana says she's 13 years old. |
| 09:32AM | 8 | Here she says at the top, "Kiana. Yeah, but up front I'm waaay |
| 09:33AM | 9 | younger. Just put a random number in my profile." |
| 09:33AM | 10 | So defendant said on the stand yesterday he thought |
| 09:33AM | 11 | she was 35 because her profile said 35. Right here she's |
| 09:33AM | 12 | telling him she is not 35. The profile age is not correct. |
| 09:33AM | 13 | She is 13 years old. She is about to turn 14. The defendant |
| 09:33AM | 14 | responds to this, so you know he read it, he responded. He |
| 09:33AM | 15 | says, "Age no matter." He doesn't care what her age is. |
| 09:33AM | 16 | And then when she very clearly says it, turning 14 |
| 09:33AM | 17 | next month, he says, "I'll grant you this once tonight. I'll |
| 09:33AM | 18 | come pick you up." That's his very next message after she |
| 09:33AM | 19 | first says she's 13. He doesn't say wait, I thought you were |
| 09:33AM | 20 | 35, I thought you were an adult. He says, that's fine. I |
| 09:34AM | 21 | don't care. I'll come pick you up. |
| 09:34AM | 22 | On the stand yesterday the defendant said this |
| 09:34AM | 23 | response, "I'll come pick you up" right here was an accident he |
| 09:34AM | 24 | claims he was texting with two people at once, one of which was |
| 09:34AM | 25 | Kiana, one of which was his girlfriend, and he meant to say he |

09:34AM    1    was going to pick up his girlfriend.  That is not credible.

09:34AM    2         You can apply your common sense here.  Look at the

09:34AM    3    context of the whole conversation.  Again, look at his own

09:34AM    4    words.  The defendant asking to pick her up here is completely

09:34AM    5    consistent with the entire rest of the conversation.

09:34AM    6         And one of the very first messages to her on Skout on

09:34AM    7    day one he says, "Like me come rescue you, come pick you up?"

09:34AM    8    Later he says, "What time I coming to pick you up?"  This is

09:35AM    9    day two.  Later in the evening on day two, "What time can I

09:35AM   10    come pick you up?"  Then, "Let me come pick you up to take you

09:35AM   11    away from the drama.  Later.  Come pick you up, go by the

09:35AM   12    beach."

09:35AM   13         He says the same thing many times; pick you up.  He

09:35AM   14    asks to pick -- he says he wants to pick her up over and over

09:35AM   15    and over again.  You can count the number of times he said it.

09:35AM   16    So him claiming that saying he's going to pick up his

09:35AM   17    girlfriend here and it was an accidental text is just not

09:35AM   18    credible.

09:35AM   19         Then let's look at his actions.  Those are his words.

09:35AM   20    Let's look at his actions.  He actually does go to pick her up.

09:35AM   21    He tries to.  He drives the truck to pick her up, so it's not

09:35AM   22    just words.  His testimony on the stand yesterday about this

09:35AM   23    point just doesn't add up.

09:35AM   24         Second time Kiana says she's 13 years old, she says,

09:36AM   25    "What kind of fun you going to do with a 13-year-old girl.  I

| | | |
|---|---|---|
| 09:36AM | 1 | can't go into bars." You see here it's not just that she's |
| 09:36AM | 2 | saying the number 13. There's other context in the |
| 09:36AM | 3 | conversation, she can't go into bars. |
| 09:36AM | 4 | And how does he respond? "We can go to the beach and |
| 09:36AM | 5 | have our own fun." He starts talking about her body. About 10 |
| 09:36AM | 6 | minutes later he offers her the weed. |
| 09:36AM | 7 | Now, let's look at the third and fourth time Kiana |
| 09:36AM | 8 | says she is 13. She asks if he is okay with it. He says okay. |
| 09:36AM | 9 | Again, What are you going to do with me. Being 13, I can't go |
| 09:36AM | 10 | into bars." So this is the third and fourth time that she says |
| 09:36AM | 11 | she's 13. |
| 09:36AM | 12 | Less than 30 minutes later after this, he starts |
| 09:36AM | 13 | graphically describing how he wants to have oral sex and |
| 09:37AM | 14 | intercourse with her. |
| 09:37AM | 15 | They also talk about how she's about to start high |
| 09:37AM | 16 | school. So again, it's not just the numerical numbers she |
| 09:37AM | 17 | says, it's the whole context of the conversation. |
| 09:37AM | 18 | The defendant says they could keep their relationship |
| 09:37AM | 19 | a secret. Why would he say that if she was an adult? Why |
| 09:37AM | 20 | would it need to be secret? |
| 09:37AM | 21 | He admits in his post-arrest interview that he |
| 09:37AM | 22 | believed she was 14. Then he sort of stumbles. Actually, |
| 09:37AM | 23 | first he says 18. Why does he say 18? He's in his post-arrest |
| 09:37AM | 24 | interview. He doesn't say oh, she's 35. If he really thought |
| 09:37AM | 25 | he was talking to a 35-year-old, he gets arrested, he's in the |

| | | |
|---|---|---|
| 09:37AM | 1 | interview and they ask him about the age, he would say, I would |
| 09:37AM | 2 | think he would say, excuse me, she told me she was 35.  He |
| 09:38AM | 3 | doesn't say that in the interview at all, not once. |
| 09:38AM | 4 | He says, she said she was 18.  Why does he choose that |
| 09:38AM | 5 | number?  Because he knows that's the age of consent.  He won't |
| 09:38AM | 6 | get in trouble if she's 18. |
| 09:38AM | 7 | When he's pressed a little bit more in the interview |
| 09:38AM | 8 | by law enforcement, then he admits, he drops it down.  He says |
| 09:38AM | 9 | oh, 14 or maybe about to turn 14.  He thinks so.  He admits he |
| 09:38AM | 10 | knows she's very young and she's a minor. |
| 09:38AM | 11 | Yesterday the defendant testified he thought that the |
| 09:38AM | 12 | whole age thing, the whole 13 thing, they were just role |
| 09:38AM | 13 | playing.  The defendant specifically told -- said in the |
| 09:38AM | 14 | messages, We are not playing games.  He wanted her to be real. |
| 09:39AM | 15 | Count 1, still on enticement, part four.  Government |
| 09:39AM | 16 | needs to show the defendant took a substantial step towards |
| 09:39AM | 17 | committing the crime that strongly corroborated the defendant's |
| 09:39AM | 18 | intent to commit the crime.  Now keep in mind, jurors do not |
| 09:39AM | 19 | have to be unanimous on agreeing what the substantial step is. |
| 09:39AM | 20 | You just need to all agree there was a substantial step, |
| 09:39AM | 21 | defendant took a substantial step. |
| 09:39AM | 22 | So what are the possible substantial steps?  There are |
| 09:39AM | 23 | many.  I'm going to go over this briefly because it's very, |
| 09:39AM | 24 | very clear and you can see in highlighting, he drove to meet |
| 09:39AM | 25 | her.  He physically looked up her location on his phone as soon |

| 09:39AM | 1 | as he found out about where she was, and then he got in his |
| 09:39AM | 2 | truck and he drove to meet her. He brought marijuana and cash, |
| 09:39AM | 3 | just as he said. He flashed his headlights when he sees Kiana, |
| 09:39AM | 4 | the undercover officer playing Kiana. He texts her then, she |
| 09:40AM | 5 | should cross the street. In fact the undercover officer is |
| 09:40AM | 6 | standing across the street. |
| 09:40AM | 7 | The text messages themselves and the persuasive |
| 09:40AM | 8 | techniques he used are also substantial steps to commit the |
| 09:40AM | 9 | crime, and again, the crime is the attempted persuasion to meet |
| 09:40AM | 10 | him for sex. |
| 09:40AM | 11 | Again, you don't have to find all of these. Just |
| 09:40AM | 12 | driving to the meet location is enough. That's your |
| 09:40AM | 13 | substantial step. |
| 09:40AM | 14 | Here's an image from Exhibit 11. He brought marijuana |
| 09:40AM | 15 | with him. In fact he had these five marijuana cigarettes |
| 09:40AM | 16 | sitting outside the center console, right between the driver |
| 09:40AM | 17 | side and the passenger seat with a butane lighter or two there, |
| 09:40AM | 18 | ready to give Kiana some marijuana as soon as she got into the |
| 09:40AM | 19 | truck. He brought cash, just as he said he would. Now let's |
| 09:41AM | 20 | talk about entrapment. |
| 09:41AM | 21 | The judge read you an instruction on entrapment, so |
| 09:41AM | 22 | we'll go over this briefly. The government has to prove to you |
| 09:41AM | 23 | the defendant was predisposed to commit the crime before being |
| 09:41AM | 24 | contacted by government agents, or, note that's an "or," not an |
| 09:41AM | 25 | "and," the defendant was not induced by the government agents |

| | | |
|---|---|---|
| 09:41AM | 1 | to commit the crime. |
| 09:41AM | 2 | So here we have both. We'll talk about each one, but |
| 09:41AM | 3 | we have both here. Now keep in mind that for number one, |
| 09:41AM | 4 | predisposition, you can consider the defendant's words and |
| 09:41AM | 5 | actions in this case. It doesn't have to be something he did |
| 09:41AM | 6 | long ago, it can be actually what he said in the text, what he |
| 09:41AM | 7 | did here. That can show you he was predisposed to commit this |
| 09:41AM | 8 | crime. |
| 09:41AM | 9 | So let's talk about number one, predisposition. When |
| 09:42AM | 10 | a person, independent of and before government contact, is |
| 09:42AM | 11 | predisposed to commit the crime, it is not entrapment if |
| 09:42AM | 12 | government agents merely provide an opportunity to commit the |
| 09:42AM | 13 | crime. That's what happened here. The law enforcement agents |
| 09:42AM | 14 | provided an opportunity for Mr. Cummings to commit the crime |
| 09:42AM | 15 | with the undercover operation with Kiana's profile. That does |
| 09:42AM | 16 | not mean that we don't have predisposition. |
| 09:42AM | 17 | So what are the facts here that shows -- what factors |
| 09:42AM | 18 | should you consider to decide whether or not there's |
| 09:42AM | 19 | predisposition. These are the factors that the judge just read |
| 09:42AM | 20 | you in the jury instructions. Now note, these are just for |
| 09:42AM | 21 | your consideration. You don't have to go mechanically through |
| 09:42AM | 22 | each one and make a finding on each one of these. You could |
| 09:43AM | 23 | consider all of them. You could -- you don't have -- what I |
| 09:43AM | 24 | would suggest to you is that number one is the most significant |
| 09:43AM | 25 | in this case. You should consider whether the defendant |

44

| | | |
|---|---|---|
| 09:43AM | 1 | demonstrated reluctance to commit the offense. |
| 09:43AM | 2 | And here on these facts, the defendant never showed |
| 09:43AM | 3 | the slightest hesitation or reluctance to try to persuade her |
| 09:43AM | 4 | to meet him for sex.  If reluctance is over here, Mr. Cummings |
| 09:43AM | 5 | is way over here.  Every time she says she's 13, it doesn't |
| 09:43AM | 6 | bother him and in fact, he ratchets up his behavior and his |
| 09:43AM | 7 | words and he escalates it.  He becomes more aggressive.  He |
| 09:43AM | 8 | starts talking about graphic sex.  He shows no reluctance at |
| 09:43AM | 9 | any point in the conversation with Kiana.  He's very aggressive |
| 09:43AM | 10 | and persistent. |
| 09:43AM | 11 | The defendant had every opportunity to get out of the |
| 09:44AM | 12 | situation.  He had every opportunity to stop what was happening |
| 09:44AM | 13 | and walk away.  Every time she said she was 13, he could have |
| 09:44AM | 14 | ended the conversation.  And why didn't he?  Because he was |
| 09:44AM | 15 | already predisposed to commit this crime.  If he hadn't been |
| 09:44AM | 16 | predisposed, he would have ended conversation when she said she |
| 09:44AM | 17 | was 13. |
| 09:44AM | 18 | Let's talk about step two, which is inducement.  This |
| 09:44AM | 19 | is related to predisposition.  You can apply your common sense |
| 09:44AM | 20 | here and decide was there government inducement.  The facts |
| 09:44AM | 21 | that are important here are keep in mind the defendant |
| 09:44AM | 22 | initiated contact with the undercover Skout profile.  The |
| 09:44AM | 23 | defendant started the conversation himself for three days in a |
| 09:44AM | 24 | row.  The defendant is the one who was pushing to meet Kiana |
| 09:44AM | 25 | over and over, and over again, despite a lot of the hesitation |

09:45AM    1    and long delays by Kiana.

09:45AM    2         Kiana didn't agree to meet with him until day three of

09:45AM    3    him begging to meet her.  The defendant is the one who offered

09:45AM    4    cash, shopping, hotel rooms and marijuana.  The defendant is

09:45AM    5    the one who started the sexual conversation, and the defendant

09:45AM    6    didn't hesitate to do a GPS search for her location and

09:45AM    7    immediately drive to the location.

09:45AM    8         Law enforcement did not push him into this.  Law

09:45AM    9    enforcement created the opportunity and Mr. Cummings was the

09:45AM    10   one who did the pushing.

09:45AM    11        That is all I have to say for now about Count 1, the

09:45AM    12   enticement.

09:45AM    13        Let's talk about Count 2, the drug count.

09:45AM    14        Here the government needs to show that the defendant

09:45AM    15   knowingly possessed any controlled substance; that is, cocaine

09:45AM    16   or cocaine base.  And as you heard during the trial, cocaine

09:45AM    17   base means crack.

09:46AM    18        So although you need to determine the defendant

09:46AM    19   possessed a controlled substance, just keep in mind you don't

09:46AM    20   have to be unanimous about whether the substance was cocaine or

09:46AM    21   cocaine base, or both.  As the judge told you, the government

09:46AM    22   doesn't have to prove a specific amount or quantity, just that

09:46AM    23   there was some cocaine and some crack.

09:46AM    24        A person has possession -- let's talk about possession

09:46AM    25   first; did he possess a controlled substance, did he possess

09:46AM  1   cocaine or crack.  A person has possession of something if the

09:46AM  2   person knows of its presence and has physical control of it, or

09:46AM  3   knows of its presence and has the power and intention to

09:46AM  4   control it.

09:46AM  5        So how do we know the defendant possessed the drugs?

09:46AM  6   Well, you heard Brandi Kaoni, the expert.  She explained to you

09:46AM  7   the drugs were tested, and they tested positive for cocaine and

09:47AM  8   crack.  There's no doubt it was cocaine and crack.

09:47AM  9        You also heard a lot about chain of custody and how

09:47AM  10  law enforcement was extremely professional and careful about

09:47AM  11  how the drugs were transported and kept at every stage.

09:47AM  12       So how do we know the defendant possessed it?  You

09:47AM  13  should apply your common sense here.  The officer found the

09:47AM  14  cocaine and crack in the center console of Mr. Cummings's

09:47AM  15  truck.  The drugs were in a black -- most of the drugs or both

09:47AM  16  of the drugs were found in a black bag along with his ID and

09:47AM  17  cash.  The ID and cash were also in that same black bag; his

09:47AM  18  identification, multiple pieces of his identification in the

09:47AM  19  bag with the cocaine and crack.  He's driving the truck with

09:47AM  20  the cocaine and crack right next to him in the center console.

09:47AM  21  The truck is registered to him.

09:48AM  22       So as you saw in the trial, here's the black bag in

09:48AM  23  the center console.  This is from Exhibit 11.  Here are some

09:48AM  24  photographs from Exhibit 11 of his expired Hawaii driver's

09:48AM  25  license, HMSA card with his name on it, and you can see from

| 09:48AM | 1 | these photographs, these were taken out of the black bag that |
| 09:48AM | 2 | contained much of the crack and cocaine. |
| 09:48AM | 3 | Also in the black bag you have this metallic tin.  In |
| 09:48AM | 4 | the tin you have four baggies of powder cocaine.  This was also |
| 09:48AM | 5 | in the black bag. |
| 09:48AM | 6 | Then also in the black bag you have six more baggies |
| 09:48AM | 7 | of powder cocaine, four baggies of crack rocks, and you can see |
| 09:48AM | 8 | the bags are in the photograph and you can see a little -- in |
| 09:49AM | 9 | the bottom left-hand corner, a little bit of that, I would call |
| 09:49AM | 10 | it magenta, pinkish, purplish plastic container.  That's where |
| 09:49AM | 11 | all of the drugs photographed here were found.  So these four |
| 09:49AM | 12 | baggies of crack rocks and six baggies of powder cocaine were |
| 09:49AM | 13 | found in this magenta plastic container, and that container was |
| 09:49AM | 14 | in the black bag. |
| 09:49AM | 15 | So we know Lyle Rikio Cummings possessed the cocaine |
| 09:49AM | 16 | and crack.  That's the easy part. |
| 09:49AM | 17 | Distribution, part two.  How do we know he intended to |
| 09:49AM | 18 | distribute it.  Government has to also prove the defendant |
| 09:49AM | 19 | possessed it with the intent to distribute to another person. |
| 09:49AM | 20 | Notice the word "intent."  We don't have to prove that he did |
| 09:49AM | 21 | distribute it, just that he intended to distribute it.  Also |
| 09:49AM | 22 | note, distribute just means to give to somebody else, so that |
| 09:50AM | 23 | could be for sale, could be just giving it to someone for some |
| 09:50AM | 24 | other reason.  It doesn't have to be for money, but it could |
| 09:50AM | 25 | be. |

| | | |
|---|---|---|
| 09:50AM | 1 | You heard from a highly qualified and experienced drug |
| 09:50AM | 2 | expert, Special Agent Ryan Faulkner, and he explained to you in |
| 09:50AM | 3 | detail why his expert opinion is that Cummings had the coke and |
| 09:50AM | 4 | crack, and he intended it for sale or distribution and not for |
| 09:50AM | 5 | his own personal use. |
| 09:50AM | 6 | So let's talk more about Special Agent Faulkner's |
| 09:50AM | 7 | testimony. What did you hear? Let's talk briefly about what |
| 09:50AM | 8 | Special Agent Faulkner said about the total amounts of cocaine |
| 09:50AM | 9 | and crack. First of all, there are 18 plastic baggies total |
| 09:50AM | 10 | that were found in the truck; 14 baggies of cocaine powder, and |
| 09:50AM | 11 | 4 baggies of crack. The total powder cocaine weighed about 3 |
| 09:51AM | 12 | ounces or 83.686 grams. |
| 09:51AM | 13 | You heard from Special Agent Faulkner, 3 ounces, or |
| 09:51AM | 14 | that many grams, that's 83 sessions, approximately, of usage. |
| 09:51AM | 15 | That means 83 sessions, one session would be about 1 gram per |
| 09:51AM | 16 | session. That means someone who is sitting down to use powder |
| 09:51AM | 17 | cocaine, an average user, is likely to use about 1 gram per |
| 09:51AM | 18 | sitting. 83. You can listen to Special Agent Ryan Faulkner's |
| 09:51AM | 19 | opinion that 83 sessions is not consistent with personal use, |
| 09:51AM | 20 | but you can also apply your common sense. Lyle Cummings was |
| 09:51AM | 21 | not sitting there doing these cocaine bags for 83 times in a |
| 09:51AM | 22 | row. |
| 09:51AM | 23 | Next, Special Agent Faulkner talked about the |
| 09:51AM | 24 | packaging and organization of the cocaine and crack, and why |
| 09:52AM | 25 | that shows that this was for distribution or sale. |

| | | |
|---|---|---|
| 09:52AM | 1 | Let's look again at this photograph.  This is the same |
| 09:52AM | 2 | photograph I showed you before of everything that was found in |
| 09:52AM | 3 | that magenta plastic container in the black bag in the console. |
| 09:52AM | 4 | These baggies all have about one gram, the baggies of powder. |
| 09:52AM | 5 | All have about one gram of powder cocaine.  Each baggy is about |
| 09:52AM | 6 | approximately one session or an average user would use it in |
| 09:52AM | 7 | one sitting, each of these little bags. |
| 09:52AM | 8 | Remember that Special Agent Faulkner explained using |
| 09:52AM | 9 | these clear plastic baggies is consistent with selling the |
| 09:53AM | 10 | drugs, so for obvious reasons the consumer can see the drugs |
| 09:53AM | 11 | inside.  You can see these little baggies would be easy to |
| 09:53AM | 12 | distribute to customers and notice that these are all full |
| 09:53AM | 13 | baggies.  Each of these baggies weighed approximately one gram. |
| 09:53AM | 14 | If Mr. Cummings were sitting there using these for his personal |
| 09:53AM | 15 | use, you would expect to see some that were half empty, |
| 09:53AM | 16 | partially empty.  They are full, packaged, ready to go for |
| 09:53AM | 17 | sale. |
| 09:53AM | 18 | Next we have four baggies of cocaine powder that were |
| 09:53AM | 19 | found in the tin, which were also in the black bag.  These |
| 09:53AM | 20 | baggies weigh a little bit more.  They're a little bit bigger |
| 09:53AM | 21 | than the six baggies that were in the magenta container.  They |
| 09:53AM | 22 | weigh about 1.74 grams, which Special Agent Faulkner described |
| 09:53AM | 23 | as a half of an 8 ball, and 3.4 grams, which is an 8 ball.  8 |
| 09:54AM | 24 | ball is just a term for the measurement of this particular |
| 09:54AM | 25 | weight.  So these baggies are for more than just one session or |

| 09:54AM | 1 | for one sitting, so these are a little bit bigger. |
| 09:54AM | 2 | So notice he has the different sizes and different |
| 09:54AM | 3 | amounts organized and separated in different locations.  The |
| 09:54AM | 4 | smallest amounts are in the magenta plastic container, the |
| 09:54AM | 5 | medium-sized amounts are separated into this tin.  That's |
| 09:54AM | 6 | intentional.  As Special Agent Faulkner explained, that's |
| 09:54AM | 7 | consistent with selling the drugs. |
| 09:54AM | 8 | Next, officers found four more baggies of powder |
| 09:54AM | 9 | cocaine in an iPhone box.  The iPhone box was not in the black |
| 09:54AM | 10 | bag.  It was under the black bag in the center console of the |
| 09:54AM | 11 | truck.  These baggies contain the most amount of cocaine, the |
| 09:54AM | 12 | biggest quantity, and they weigh the most; 27 grams or about 1 |
| 09:54AM | 13 | ounce, and 14 grams, a half ounce. |
| 09:55AM | 14 | Special Agent Faulkner told you these bigger amounts |
| 09:55AM | 15 | are consistent with subdistributors; in other words, selling |
| 09:55AM | 16 | the bigger bags to someone else and then that person sells them |
| 09:55AM | 17 | further.  Recreational users normally buy smaller amounts like |
| 09:55AM | 18 | the one gram. |
| 09:55AM | 19 | So you can see that the defendant had the baggies of |
| 09:55AM | 20 | cocaine and there are this -- a range of different amounts. |
| 09:55AM | 21 | That's because buyers want to buy in different amounts.  They |
| 09:55AM | 22 | want to buy different quantities.  He had a range available for |
| 09:55AM | 23 | sale.  Special Agent Faulkner explained that's consistent with |
| 09:55AM | 24 | selling drugs.  One customer might want to buy a little bit, |
| 09:55AM | 25 | one customer might want to buy a little bit more. |

09:55AM   1          And Special Agent Faulkner also told you that these
09:55AM   2    exact weights, or approximate weights that we just discussed
09:55AM   3    are typical weights that drug dealers sell.  These quantities
09:55AM   4    are common in the drug world.
09:56AM   5          Also note that as we talked about, the different
09:56AM   6    amounts were stored in separate containers.  You have the
09:56AM   7    magenta container, the tin and the iPhone box.  They are
09:56AM   8    organized so that he knows quickly what size to grab for which
09:56AM   9    customer.  That allows him to do quick transactions.  He kept
09:56AM   10   the small and medium-sized baggies in the black bag.  The black
09:56AM   11   bag is mobile.  That way he can jump out of the truck if he
09:56AM   12   needs to and sell those.
09:56AM   13         The truck is also mobile.  Special Agent Faulkner
09:56AM   14   explained the truck is an ideal place to do these -- conduct
09:56AM   15   these kind of quick transactions.  It makes sense that the
09:56AM   16   smaller baggies would be in the mobile bag for these quick
09:56AM   17   transactions.
09:56AM   18         The bag also has separate compartments so he could
09:56AM   19   organize the different amounts.  There was a little side pocket
09:56AM   20   for all the cash so he can jump out of the car, make change,
09:57AM   21   get his money from a sale, put it in the bag.
09:57AM   22         Now, why would he leave the bigger amounts in the
09:57AM   23   iPhone box?  Why are they not in the black bag?  Special Agent
09:57AM   24   Faulkner explained that's also consistent with drug sales.  You
09:57AM   25   don't want to be walking around with all of your drugs at the

| | | |
|---|---|---|
| 09:57AM | 1 | same time. |
| 09:57AM | 2 | Special Agent Faulkner also told you that the center |
| 09:57AM | 3 | console is a perfect place for a drug dealer to keep their |
| 09:57AM | 4 | drugs.  It's common for drug dealers to want to have their |
| 09:57AM | 5 | drugs for sale in close reach.  So he's sitting in the driver's |
| 09:57AM | 6 | seat where he can quickly reach the drugs, but they're also |
| 09:58AM | 7 | somewhat concealed so if he's stopped by a police officer, |
| 09:58AM | 8 | somebody walks up, it's concealed, but he can also quickly and |
| 09:58AM | 9 | easily reach in and access his stash. |
| 09:58AM | 10 | Let's talk about the total value of the cocaine and |
| 09:58AM | 11 | crack.  Special Agent Faulkner told you the total value of the |
| 09:58AM | 12 | cocaine was approximately $6,000 wholesale, and maybe around |
| 09:58AM | 13 | $8,500 retail, $400 for the crack rock.  Use your common sense. |
| 09:58AM | 14 | That's an awfully large amount, a very high value to be driving |
| 09:58AM | 15 | around with and consuming for your personal use. |
| 09:58AM | 16 | Couple of other reasons why it's clear these drugs |
| 09:58AM | 17 | were not for Mr. Cummings's personal use.  When law enforcement |
| 09:59AM | 18 | conducted -- executed the search warrant on March 16, 2020, |
| 09:59AM | 19 | they did not find a crack pipe.  And you can see that in |
| 09:59AM | 20 | Exhibit 9 you have the, it's called the return, which is |
| 09:59AM | 21 | basically just a list of everything significant found in the |
| 09:59AM | 22 | truck that officers seized.  There's no crack pipe.  And as you |
| 09:59AM | 23 | heard Special Agent Faulkner say, you need a crack pipe to |
| 09:59AM | 24 | smoke the crack, so Mr. Cummings was clearly not about to smoke |
| 09:59AM | 25 | those crack rocks. |

09:59AM   1        You heard Mr. Cummings's wife testify yesterday.  She

09:59AM   2    hasn't seen him with cocaine.  That suggests he's not a user,

09:59AM   3    not for his personal use.

09:59AM   4        So you can look at the expert opinion, but you should

09:59AM   5    also look at all of these factors combined, the totality of the

09:59AM   6    circumstances, put all the pieces together, apply your common

09:59AM   7    sense and common knowledge, and you'll see this was for sale

10:00AM   8    and distribution and not for Mr. Cummings's personal use.

10:00AM   9        THE COURT:  Counsel, you're past the 45-minute mark.

10:00AM  10        MS. OLSON:  I'll wrap it up.

10:00AM  11        This case again is about the defendant's own words and

10:00AM  12    actions.  He had every opportunity to walk away.  Why didn't he

10:00AM  13    walk away?  He told you why with his own words and actions; he

10:00AM  14    wanted to have sex with a 13-year-old.  That's why he tried so

10:00AM  15    hard to persuade her.  He didn't hesitate, he was persistent

10:00AM  16    and he escalated his persuasion.  He is in this predicament

10:00AM  17    today due to his own words and actions.

10:00AM  18        He has now received a full and fair trial and the only

10:00AM  19    just result is to hold him accountable.  The application of the

10:00AM  20    law to the evidence proves beyond a reasonable doubt Lyle

10:00AM  21    Cummings is guilty as charged in both counts.

10:01AM  22        Thank you.

10:01AM  23        THE COURT:  Closing argument, Mr. Mottl?

10:01AM  24        MR. MOTTL:  Yes.  Thank you, Your Honor.

10:01AM  25        Good morning again.  Thank you for sitting as jurors.

88

```
 1                COURT REPORTER'S CERTIFICATE

 2         I, Gloria T. Bediamol, Official Court Reporter, United

 3    States District Court, District of Hawaii, do hereby certify

 4    that pursuant to 28 U.S.C. §753 the foregoing is a complete,

 5    true, and correct transcript from the stenographically reported

 6    proceedings held in the above-entitled matter and that the

 7    transcript page format is in conformance with the regulations

 8    of the Judicial Conference of the United States.

 9

10         DATED at Honolulu, Hawaii, February 12, 2024.

11

12

13                            /s/ Gloria T. Bediamol

14                            GLORIA T. BEDIAMOL.

15                            RMR, CRR, FCRR

16

17

18

19

20

21

22

23

24

25
```



CUMMINGS_000030



2-SER-411

CUMMINGS_000032



CUMMINGS_000744

### United States v. Lyle Rikio Cummings
**Text Messages Between Cummings and "Kiana"**

| Speaker | Date | Time | Text Message |
|---|---|---|---|
| Cummings (808) 357-3711 | 2020/03/14 | 07:37:41 PM HST | Hi Kiana  My name Lyle |
| Cummings | 2020/03/14 | 07:38:00 PM HST | From skout lol |
| Kiana (808) 793-4791 | 2020/03/14 | 07:46:40 PM HST | 👋 |
| Kiana | 2020/03/14 | 07:46:47 PM HST | howzit!!! |
| Cummings | 2020/03/14 | 07:49:00 PM HST | You out in kihei ?.? |
| Kiana | 2020/03/14 | 08:16:58 PM HST | Yeah. Crusin at my cousins place, her parents outta town |
| Cummings | 2020/03/14 | 09:10:20 PM HST | what time I coming to pick you up |
| Cummings | 2020/03/14 | 09:16:10 PM HST | You have a picture with no filter blocking your face |
| Kiana | 2020/03/14 | 09:39:55 PM HST | yeah. but upfront, im waaaay younger. jus put a random number in my profile. |
| Cummings | 2020/03/14 | 09:44:33 PM HST | Like how old .. age no matter if we going out hanging out having a good time |
| Cummings | 2020/03/14 | 09:46:01 PM HST | What time you like me come down. ?.? |
| Kiana | 2020/03/14 | 09:55:23 PM HST | Cool😊. well, upfront Im 14, well I turn 14 next month, just hate stupid kids my age. |
| Cummings | 2020/03/14 | 09:57:43 PM HST | I yah  I'll grant you this once tonight I'll come pick you up .. |
| Kiana | 2020/03/14 | 09:58:24 PM HST | grant me what???? 🙁 |
| Cummings | 2020/03/14 | 09:58:29 PM HST | Let me see a picture with out a filter covering your face |
| Cummings | 2020/03/14 | 09:59:06 PM HST | hang out tonight |
| Cummings | 2020/03/14 | 10:00:07 PM HST | Come down rescue you for a few hours from your cousin |
| Cummings | 2020/03/14 | 10:00:12 PM HST | Come down rescue you for a few hours from your cousin |
| Cummings | 2020/03/14 | 10:03:00 PM HST | Have a good weekend |

Bates Nos. CUMMINGS_000001-9, 34

2-SER-413



EXHIBIT

4

**United States v. Lyle Rikio Cummings**
**Text Messages Between Cummings and "Kiana"**

| Speaker | Date | Time | Text Message |
|---|---|---|---|
| Kiana | 2020/03/14 | 10:03:22 PM HST |  |
| Cummings | 2020/03/14 | 10:04:15 PM HST | You wanna go hang out ?.? |
| Cummings | 2020/03/14 | 10:04:52 PM HST | Take you to the shops wailea or out Lahaina |
| Cummings | 2020/03/14 | 10:05:12 PM HST | What time I can come pick you up tonight ?.? |
| Cummings | 2020/03/14 | 10:10:57 PM HST | Yes, no ?.? |
| Kiana | 2020/03/14 | 10:22:29 PM HST | maybe. sry drama wit my gf |
| Cummings | 2020/03/14 | 10:23:23 PM HST | With your gf ?? |
| Cummings | 2020/03/14 | 10:28:42 PM HST | Let spoil you  |
| Cummings | 2020/03/14 | 10:32:54 PM HST | Let me come pick you up take you away from the drama |
| Kiana | 2020/03/14 | 10:41:37 PM HST | damn!! that sounds so much better than this stupid bs :) |
| Kiana | 2020/03/14 | 10:41:55 PM HST | girlfriend drama |
| Cummings | 2020/03/14 | 10:42:53 PM HST | I'll be your sugah daddy |
| Cummings | 2020/03/14 | 10:43:02 PM HST | Send me couple more picture of you |

2

**United States v. Lyle Rikio Cummings**
**Text Messages Between Cummings and "Kiana"**

| Speaker | Date | Time | Text Message |
|---------|------|------|--------------|
| Kiana | 2020/03/14 | 10:45:20 PM HST | 🔍💣🍧🧁 |
| Kiana | 2020/03/14 | 10:45:25 PM HST | I likey |
| Kiana | 2020/03/14 | 10:45:47 PM HST | Can u send me pic 2? |
| Cummings | 2020/03/14 | 10:47:11 PM HST | should I start to drive come down |
| Cummings | 2020/03/14 | 10:47:16 PM HST | should I start to drive come down |
| Cummings | 2020/03/14 | 10:47:26 PM HST | Ok |
| Kiana | 2020/03/14 | 10:47:35 PM HST |  |
| Cummings | 2020/03/14 | 10:48:19 PM HST | So am I going to see you tonight ?., |
| Kiana | 2020/03/14 | 10:49:03 PM HST | maybe. gotta trynna get away from my girlfriend |
| Kiana | 2020/03/14 | 10:49:10 PM HST | what u got in mind? |
| Cummings | 2020/03/14 | 10:49:43 PM HST | what Evers you like do |
| Cummings | 2020/03/14 | 10:49:59 PM HST | I get $ for us have fun |
| Cummings | 2020/03/14 | 10:50:42 PM HST | What you like do ?.? |
| Kiana | 2020/03/14 | 10:55:22 PM HST | what kinda fun u gonna do wit a 13 year old girl? I can't go into bars 😒 |
| Cummings | 2020/03/14 | 10:56:01 PM HST | We can go to the beach n have our own fun |
| Cummings | 2020/03/14 | 10:56:55 PM HST | Watch the the moon reflect on your body |

3

**United States v. Lyle Rikio Cummings**
**Text Messages Between Cummings and "Kiana"**

| Speaker | Date | Time | Text Message |
|---|---|---|---|
| Cummings | 2020/03/14 | 10:57:19 PM HST | As we lay n cuddle up together |
| Cummings | 2020/03/14 | 10:57:40 PM HST | Lol nah jk |
| Cummings | 2020/03/14 | 10:57:49 PM HST | What Evers |
| Kiana | 2020/03/14 | 10:59:26 PM HST | cuddles? 😄 |
| Cummings | 2020/03/14 | 11:00:19 PM HST | you burn weed ?, |
| Kiana | 2020/03/14 | 11:02:32 PM HST | yeah. but puts me to 🥴 |
| Cummings | 2020/03/14 | 11:03:10 PM HST | I'll have some if you like 👉 |
| Cummings | 2020/03/14 | 11:03:38 PM HST | So should I come down or you can't come out if I come down ?.? |
| Cummings | 2020/03/14 | 11:04:59 PM HST | Lol why you don't answer |
| Kiana | 2020/03/14 | 11:06:15 PM HST | My girlfriend is over rn. Watchin a movie |
| Cummings | 2020/03/14 | 11:07:04 PM HST | Send a pic of you two |
| Kiana | 2020/03/14 | 11:09:08 PM HST | u haven't  even sent me 1 pic yet |
| Cummings | 2020/03/14 | 11:11:30 PM HST |  |
| Cummings | 2020/03/14 | 11:11:58 PM HST | My profile picture |

4

**United States v. Lyle Rikio Cummings**
**Text Messages Between Cummings and "Kiana"**

| Speaker | Date | Time | Text Message |
|---|---|---|---|
| | | |  |
| Cummings | 2020/03/14 | 11:14:48 PM HST | Is your gf going home soon ?.? |
| Kiana | 2020/03/14 | 11:15:39 PM HST | already saw the profile pic |
| Kiana | 2020/03/14 | 11:15:58 PM HST | 🤑🤑🤑 |
| Kiana | 2020/03/14 | 11:16:04 PM HST | how can I get one of those stacks!!! |
| Cummings | 2020/03/14 | 11:17:31 PM HST | when you ride  with me |
| Cummings | 2020/03/14 | 11:18:13 PM HST | is tonight gonna happen for us or just talk |
| Kiana | 2020/03/14 | 11:18:41 PM HST | what u gonna do? |
| Kiana | 2020/03/14 | 11:18:48 PM HST | we |
| Cummings | 2020/03/14 | 11:20:30 PM HST | Come down pick you up go by the beach |
| Cummings | 2020/03/14 | 11:21:23 PM HST | Listen music talk n hang out for a few hours |
| Kiana | 2020/03/14 | 11:25:43 PM HST | so just talk wit u and I get a stack? |
| Cummings | 2020/03/14 | 11:27:36 PM HST | Few 💯💯 |
| Cummings | 2020/03/14 | 11:27:59 PM HST | You know you not going |
| Cummings | 2020/03/14 | 11:32:03 PM HST | Yes or no |
| Cummings | 2020/03/14 | 11:35:36 PM HST | Or we just do tomorrow  Either shops of wailea, outlets in Lahaina or Victoria secrets |
| Kiana | 2020/03/14 | 11:41:56 PM HST | what I not going? |

5

**United States v. Lyle Rikio Cummings**
**Text Messages Between Cummings and "Kiana"**

| Speaker | Date | Time | Text Message |
|---------|------|------|--------------|
| Kiana | 2020/03/14 | 11:42:05 PM HST | u didn't even send me a pic yet |
| Cummings | 2020/03/14 | 11:45:44 PM HST | What pic you like |
| Kiana | 2020/03/14 | 11:46:32 PM HST | whatever |
| Cummings | 2020/03/14 | 11:46:40 PM HST | You not going come with me .. you just talking like you like go |
| Cummings | 2020/03/14 | 11:47:41 PM HST | Lol you want me come get you tonight ?? |
| Kiana | 2020/03/14 | 11:50:47 PM HST | Pic of u not from profile |
| Cummings | 2020/03/15 | 12:06:30 AM HST | Good night |
| Kiana | 2020/03/15 | 12:08:44 AM HST | im not playin games. why can't u send a pic.. all is former profile |
| Cummings | 2020/03/15 | 12:11:57 AM HST | I no more any |
| Kiana | 2020/03/15 | 12:13:00 AM HST | u like see pics of me but u don't have any?? 🙃 😂 |
| Cummings | 2020/03/15 | 11:01:44 AM HST | Good morning |
| Kiana | 2020/03/15 | 11:03:53 AM HST | 👋 😘 😘 😘 |
| Cummings | 2020/03/15 | 11:04:18 AM HST | You still sleeping |
| Kiana | 2020/03/15 | 11:06:09 AM HST | Jus wakin |
| Cummings | 2020/03/15 | 11:06:38 AM HST | You have any plans for today ?? |
| Kiana | 2020/03/15 | 11:09:45 AM HST | Dunno yet. Cousin jus got back..she kinda get in irraz already 😌 |
| Cummings | 2020/03/15 | 11:11:01 AM HST | Can you get away .. let me take you shops of wailea couple hours or go by the beach |
| Kiana | 2020/03/15 | 11:14:17 AM HST | Dunno yet. She all up in bizness rn 🙄 |

6

**United States v. Lyle Rikio Cummings**
**Text Messages Between Cummings and "Kiana"**

| Speaker | Date | Time | Text Message |
|---------|------|------|--------------|
| Cummings | 2020/03/15 | 11:15:20 AM HST | Wanna go hang out .. couple hours |
| Cummings | 2020/03/15 | 11:16:43 AM HST | Ok babes lmk |
| Kiana | 2020/03/15 | 01:30:45 PM HST | Brah. So such stupid shit 👿 I wanna go beach and cousin just fckin watching movies. |
| Cummings | 2020/03/15 | 01:32:30 PM HST | Well let me come get you n disappear for a few hours |
| Cummings | 2020/03/15 | 01:33:23 PM HST | Let's go buy you a 👙 n go beach |
| Kiana | 2020/03/15 | 01:34:15 PM HST | iirrrrrraaaaaazzzzzzzzz 🚲🚲 |
| Kiana | 2020/03/15 | 01:34:36 PM HST | I wish. |
| Cummings | 2020/03/15 | 01:34:38 PM HST | Babes want me come get you |
| Kiana | 2020/03/15 | 01:35:32 PM HST | shes cool and all.like my hanai sister but she's hella boring |
| Cummings | 2020/03/15 | 01:36:13 PM HST | Let's go have our fun n you can go back be boring later |
| Kiana | 2020/03/15 | 01:37:27 PM HST | Can't just skip on obv kine. She's all up in my biz cause she knows what I'm like..lol 😈😈 |
| Kiana | 2020/03/15 | 01:38:22 PM HST | She's only 17, but she watch ova me more then my moms |
| Cummings | 2020/03/15 | 01:39:27 PM HST | We should just go for little while |
| Kiana | 2020/03/15 | 01:40:10 PM HST | Can later prolly |
| Cummings | 2020/03/15 | 01:40:56 PM HST | yeah lmk  Give me at least 30/45 min early so I can get to kihei  I stay up country |
| Kiana | 2020/03/15 | 01:41:15 PM HST | Kk |
| Cummings | 2020/03/15 | 01:41:21 PM HST | We can go do what Evers you like n go take you shopping |
| Cummings | 2020/03/15 | 01:41:49 PM HST | What you think you wanna go do ?.? |

7

**United States v. Lyle Rikio Cummings**
**Text Messages Between Cummings and "Kiana"**

| Speaker | Date | Time | Text Message |
|---------|------|------|--------------|
| Kiana | 2020/03/15 | 01:44:48 PM HST | Why u really wanna buy me 👹 n 👗? Just |
| Kiana | 2020/03/15 | 01:45:30 PM HST | be real. Hate Games dat HS boys play |
| Cummings | 2020/03/15 | 01:48:25 PM HST | We not playing games .. babes I'll spoil you if you wanna hang with me  You just be REAL too |
| Cummings | 2020/03/15 | 01:50:02 PM HST | What we get going be between us .. no one need to know where or how you being spoiled m taken cared of |
| Kiana | 2020/03/15 | 02:08:58 PM HST | Am being REAL.. dats why I wanna know, not nyone else, lol. Jus sayin cus I can't jus breakout wheneva.. my cousins parents come back tmrw |
| Cummings | 2020/03/15 | 02:11:10 PM HST | Well when ever you can we go do things .. I'm down for what Evers you like n when you like go |
| Cummings | 2020/03/15 | 02:12:16 PM HST | Look like Spring break going go on all month for you |
| Cummings | 2020/03/15 | 02:12:33 PM HST | Where you go high school ?.? |
| Kiana | 2020/03/15 | 02:16:25 PM HST | Hahah 😄 😄 right? 👦👦♂️👦👧 Just started at Baldwin, |
| Cummings | 2020/03/15 | 02:19:44 PM HST | fuck Baldwin lol send me a picture of you laying around bored 😑 |
| Cummings | 2020/03/15 | 02:28:32 PM HST | Wyd |
| Kiana | 2020/03/15 | 02:34:18 PM HST | Fuck Baldwin??.?.? Why dat |
| Cummings | 2020/03/15 | 02:35:05 PM HST | lol Maui High our island School |
| Cummings | 2020/03/15 | 02:36:38 PM HST | Babes send me a picture of you laying around being  bored |
| Kiana | 2020/03/15 | 02:41:50 PM HST | Why that? |
| Kiana | 2020/03/15 | 02:42:05 PM HST | U havnt even sent me one pic yet |

2-SER-420

**United States v. Lyle Rikio Cummings**
**Text Messages Between Cummings and "Kiana"**

| Speaker | Date | Time | Text Message |
|---------|------|------|--------------|
| Cummings | 2020/03/15 | 02:42:34 PM HST | Send me then I'll send you |
| Kiana | 2020/03/15 | 02:42:48 PM HST | I do love the 🫶 🫶 pic tho |
| Kiana | 2020/03/15 | 02:44:40 PM HST | U send a pic wit peace sign and I'll send u one |
| Cummings | 2020/03/15 | 03:10:42 PM HST | It's not sending |
| Cummings | 2020/03/15 | 03:10:51 PM HST | The pictures |
| Kiana | 2020/03/15 | 03:14:53 PM HST | ? |
| Cummings | 2020/03/15 | 03:15:19 PM HST | Trying to send you picture |
| Cummings | 2020/03/15 | 03:15:31 PM HST | It won't go thru |
| Kiana | 2020/03/15 | 03:33:41 PM HST | omg. |
| Kiana | 2020/03/15 | 03:33:53 PM HST | 🙄 |
| Cummings | 2020/03/15 | 04:42:21 PM HST |  |
| Kiana | 2020/03/15 | 04:46:45 PM HST | :) K.. hold on. |
| Cummings | 2020/03/15 | 04:48:03 PM HST | Send me picture of you laying in your Booty shorts bored |
| Kiana | 2020/03/15 | 04:50:09 PM HST |  |

9

2-SER-421

**United States v. Lyle Rikio Cummings**
**Text Messages Between Cummings and "Kiana"**

| Speaker | Date | Time | Text Message |
|---------|------|------|--------------|
| Cummings | 2020/03/15 | 04:52:41 PM HST | Still bored |
| Kiana | 2020/03/15 | 04:53:05 PM HST | omg 🙂 I not wearing booty shorts. |
| Kiana | 2020/03/15 | 04:53:39 PM HST | yeah. jus chillin wit cousin and her GF |
| Cummings | 2020/03/15 | 04:54:12 PM HST | Show me what you got on |
| Cummings | 2020/03/15 | 04:54:55 PM HST | Your cousin is a guy or girl ?.? |
| Kiana | 2020/03/15 | 04:55:50 PM HST | omg. brah why u being pushy wit da pics? |
| Kiana | 2020/03/15 | 04:55:57 PM HST | girl |
| Cummings | 2020/03/15 | 04:56:29 PM HST | Well you no let me come see you |
| Cummings | 2020/03/15 | 04:56:39 PM HST | Sorry |
| Kiana | 2020/03/15 | 04:57:51 PM HST | I cannot help rn 🙂 |
| Cummings | 2020/03/15 | 04:58:49 PM HST | You can by sending me pic |
| Cummings | 2020/03/15 | 04:59:21 PM HST | 😂 |
| Kiana | 2020/03/15 | 05:09:02 PM HST | 🙂 🙂 lol |
| Kiana | 2020/03/15 | 05:09:12 PM HST | Wyd? |
| Cummings | 2020/03/15 | 05:09:37 PM HST | Nothing watching tv n 👈 👈 |
| Kiana | 2020/03/15 | 05:12:15 PM HST | Cool. So how u makin all dat 💵 💵 ? |
| Cummings | 2020/03/15 | 05:12:53 PM HST | Work Monday-Friday |
| Cummings | 2020/03/15 | 05:14:07 PM HST | Single no bills |
| Kiana | 2020/03/15 | 05:19:14 PM HST | Lol. U look flashy tho.. hustlin 🏷️ 🛩️ 💎 lol. I like that |

10

**United States v. Lyle Rikio Cummings**
**Text Messages Between Cummings and "Kiana"**

| Speaker | Date | Time | Text Message |
|---|---|---|---|
| Cummings | 2020/03/15 | 05:31:45 PM HST | Just came back from Vegas |
| Kiana | 2020/03/15 | 05:33:46 PM HST | Brah. I wanna go so bad. Nevah been |
| Cummings | 2020/03/15 | 05:34:52 PM HST | I'm ready for go back |
| Cummings | 2020/03/15 | 05:34:57 PM HST | Stay on the VEGAS strip Planet Hollywood has its own mall in it |
| Kiana | 2020/03/15 | 05:45:29 PM HST | 💁👱💁👱💁👱💁👱✈✈✈ |
| Cummings | 2020/03/15 | 05:47:14 PM HST | Lol you can't even Cruz fit couple hours yet you like go Vegas |
| Kiana | 2020/03/15 | 05:51:44 PM HST | Lol. I can l8er on when cousin goes to her BF's place. We going down beach now. |
| Cummings | 2020/03/15 | 05:52:20 PM HST | Ok |
| Kiana | 2020/03/15 | 05:52:57 PM HST | How old u nyway? |
| Cummings | 2020/03/15 | 05:53:37 PM HST | 31 |
| Kiana | 2020/03/15 | 05:54:20 PM HST | Cool. |
| Cummings | 2020/03/15 | 05:55:04 PM HST | You ok with it |
| Kiana | 2020/03/15 | 05:58:33 PM HST | Yeah. I like older guys.. duh 😊😄 |
| Kiana | 2020/03/15 | 05:58:51 PM HST | U okay wit me being 13? |
| Cummings | 2020/03/15 | 05:59:32 PM HST | ok .. so long your ok with me |
| Kiana | 2020/03/15 | 06:01:33 PM HST | Yeah yeah. |
| Kiana | 2020/03/15 | 06:04:55 PM HST | So what u lookin 4 do wit me bein 13? |
| Kiana | 2020/03/15 | 06:05:04 PM HST | I can't go bars |

11

2-SER-423

**United States v. Lyle Rikio Cummings**
**Text Messages Between Cummings and "Kiana"**

| Speaker | Date | Time | Text Message |
|---|---|---|---|
| Cummings | 2020/03/15 | 06:18:58 PM HST | Walk around the shops wailea holding your hand ... taking you to the beach n sleeping under the stars waking up to you .. renting hotel rooms during the weekends spoiling you .. late nights watching movies .. and what ever you like do |
| Cummings | 2020/03/15 | 06:20:07 PM HST | Walk around the shops wailea holding your hand ... taking you to the beach n sleeping under the stars waking up to you .. renting hotel rooms during the weekends spoiling you .. late nights watching movies .. and what ever you like do |
| Cummings | 2020/03/15 | 06:20:42 PM HST | What you want me to do with you ?.? |
| Cummings | 2020/03/15 | 06:21:23 PM HST | Walk around the shops wailea holding your hand ... taking you to the beach n sleeping under the stars waking up to you .. renting hotel rooms during the weekends spoiling you .. late nights watching movies .. and what ever you like do |
| Kiana | 2020/03/15 | 06:21:47 PM HST | So u wanna like be my BF? Keep it in the friend zone? |
| Cummings | 2020/03/15 | 06:23:27 PM HST | What you want ?.? |
| Cummings | 2020/03/15 | 06:23:40 PM HST | What you want ?.? |
| Cummings | 2020/03/15 | 06:23:40 PM HST | What you want ?.? |
| Cummings | 2020/03/15 | 06:23:41 PM HST | So I don't expect to much or do to much n disrespect you |
| Kiana | 2020/03/15 | 06:25:24 PM HST | I like have fun, n like guys who keep it 💯 .. sry |
| Cummings | 2020/03/15 | 06:26:12 PM HST | For sure we going have fun 😊 |
| Kiana | 2020/03/15 | 06:26:19 PM HST | sry but can't be having a 31yo full time bf |
| Cummings | 2020/03/15 | 06:26:44 PM HST | Hopefully we can. Start from tonight |

12

**United States v. Lyle Rikio Cummings**
**Text Messages Between Cummings and "Kiana"**

| Speaker | Date | Time | Text Message |
|---|---|---|---|
| Kiana | 2020/03/15 | 06:26:51 PM HST | Sry my phone glitching up |
| Cummings | 2020/03/15 | 06:26:56 PM HST | on the down low can |
| Cummings | 2020/03/15 | 06:27:23 PM HST | You still down the beach |
| Kiana | 2020/03/15 | 06:27:50 PM HST | What u wanna do for fun then? |
| Kiana | 2020/03/15 | 06:28:13 PM HST | We walkin back up |
| Cummings | 2020/03/15 | 06:28:41 PM HST | Eat your pussy |
| Cummings | 2020/03/15 | 06:29:05 PM HST | Eat your pussy |
| Cummings | 2020/03/15 | 06:29:07 PM HST | send me a picture of you n the sunset |
| Kiana | 2020/03/15 | 06:30:24 PM HST | we walkin back to her house already |
| Kiana | 2020/03/15 | 06:33:49 PM HST | U good at that??? 👅 😊 |
| Cummings | 2020/03/15 | 06:34:54 PM HST | You didn't take a picture down by the beach |
| Cummings | 2020/03/15 | 06:37:51 PM HST | wyd |
| Kiana | 2020/03/15 | 06:40:02 PM HST | k. hold on. |
| Cummings | 2020/03/15 | 06:41:45 PM HST | You gonna find out 😣 |
| Cummings | 2020/03/15 | 06:42:17 PM HST | You gonna find out 😣 |
| Cummings | 2020/03/15 | 06:42:18 PM HST | You gonna find out 😣 |
| Kiana | 2020/03/15 | 06:42:44 PM HST | 😊😊🙃🙃 I like that |
| Cummings | 2020/03/15 | 06:43:24 PM HST | Let gonna let me shave you first |
| Kiana | 2020/03/15 | 06:44:18 PM HST | Lol. Don't get much hair nyway. Hana |

13

**United States v. Lyle Rikio Cummings**
**Text Messages Between Cummings and "Kiana"**

| Speaker | Date | Time | Text Message |
|---------|------|------|--------------|
| Cummings | 2020/03/15 | 06:44:20 PM HST | You going to let me ?.? |
| Kiana | 2020/03/15 | 06:44:28 PM HST | hapa Japanese |
| Cummings | 2020/03/15 | 06:44:45 PM HST | any guy eat you yet |
| Kiana | 2020/03/15 | 06:45:29 PM HST | My ex bf tried. He was horrors tho 🙂 |
| Cummings | 2020/03/15 | 06:46:12 PM HST | I'm gonna eat you till you cum a few times on my face babes |
| Cummings | 2020/03/15 | 06:46:37 PM HST | get your pussy so wet |
| Kiana | 2020/03/15 | 06:47:15 PM HST | Lol. Make it rain? 💦💦🌊 |
| Kiana | 2020/03/15 | 06:47:33 PM HST | Lololol |
| Cummings | 2020/03/15 | 06:47:54 PM HST | Have you slowly sat on me taking me in you slowly |
| Cummings | 2020/03/15 | 06:48:03 PM HST | You must be so tight |
| Cummings | 2020/03/15 | 06:48:38 PM HST | You gonna squirt when I make you cum |
| Cummings | 2020/03/15 | 06:49:45 PM HST | can't see with the light in the back |
| Kiana | 2020/03/15 | 06:49:50 PM HST | |
| Kiana | 2020/03/15 | 06:49:51 PM HST | Lololol... just wit my exbf. He wasn't dat big 🍆🙂 |
| Cummings | 2020/03/15 | 06:50:53 PM HST | Your cousin going to leave soon ?.? |
| Cummings | 2020/03/15 | 06:51:14 PM HST | I'm gonna head down |
| Kiana | 2020/03/15 | 06:52:27 PM HST | Can u make it rain 🔲🔲🔲 over my body? Lol |
| Cummings | 2020/03/15 | 06:52:35 PM HST | Jump in the shower I'm gonna head down pick you up .. take a few pic in the shower for me 🙏🥰😋 |

14

2-SER-426

**United States v. Lyle Rikio Cummings**
**Text Messages Between Cummings and "Kiana"**

| Speaker | Date | Time | Text Message |
|---|---|---|---|
| Cummings | 2020/03/15 | 06:52:48 PM HST | Yes I'll bring some for you tonight |
| Kiana | 2020/03/15 | 06:53:13 PM HST | 😊😊😊😊😊 |
| Cummings | 2020/03/15 | 06:53:15 PM HST | Or make me a video |
| Cummings | 2020/03/15 | 06:53:41 PM HST | You be ready by 7:45 ?.? |
| Kiana | 2020/03/15 | 06:53:42 PM HST | My cousin still home.. I gotta make n excuse to leave.. |
| Kiana | 2020/03/15 | 06:53:57 PM HST | We stay off Kilohana |
| Cummings | 2020/03/15 | 06:54:14 PM HST | You gotta run store get pads lol |
| Cummings | 2020/03/15 | 06:55:34 PM HST | By the fire station |
| Kiana | 2020/03/15 | 06:55:43 PM HST | 😂 |
| Kiana | 2020/03/15 | 06:57:26 PM HST | Yeah. Jus down from there |
| Kiana | 2020/03/15 | 06:57:37 PM HST | U got condoms? |
| Kiana | 2020/03/15 | 07:01:11 PM HST | I can meet u kilohana park, |
| Cummings | 2020/03/15 | 07:02:14 PM HST | Ok 7:45 ?.? |
| Kiana | 2020/03/15 | 07:02:51 PM HST | Yah can |
| Cummings | 2020/03/15 | 07:05:19 PM HST | Ok see soon |
| Kiana | 2020/03/15 | 07:06:59 PM HST | Kk. |
| Cummings | 2020/03/15 | 07:07:30 PM HST | You gonna shower n take me a picture |
| Cummings | 2020/03/15 | 07:07:41 PM HST | Or video |
| Kiana | 2020/03/15 | 07:07:59 PM HST | i stay tryin to get away from my cousin. |

15

2-SER-427

**United States v. Lyle Rikio Cummings**
**Text Messages Between Cummings and "Kiana"**

| Speaker | Date | Time | Text Message |
|---|---|---|---|
| Kiana | 2020/03/15 | 07:12:06 PM HST |  |
| Kiana | 2020/03/15 | 07:18:07 PM HST | I gonna leave now… |
| Kiana | 2020/03/15 | 07:18:12 PM HST | where u stay? |
| Cummings | 2020/03/15 | 07:18:40 PM HST | Coming |
| Cummings | 2020/03/15 | 07:19:06 PM HST | Almost passing puunene |
| Kiana | 2020/03/15 | 07:20:42 PM HST | ok. |
| Cummings | 2020/03/15 | 07:20:59 PM HST | I like that last picture .. wish you wouldn't cover your beautiful face |
| Cummings | 2020/03/15 | 07:21:27 PM HST | Are you wearing that tonight |
| Kiana | 2020/03/15 | 07:22:32 PM HST | lol. ty… kinda self concious bout my skin.. |
| Kiana | 2020/03/15 | 07:22:51 PM HST | no. wearing pink hoody |
| Cummings | 2020/03/15 | 07:23:29 PM HST | Ok  no panties ?.? |
| Kiana | 2020/03/15 | 07:24:00 PM HST | hahahha. i get thong :) |
| Kiana | 2020/03/15 | 07:24:45 PM HST | Theres a weirdo at the dog park… Imm walk down Kilohana to the parking lot across Sidewalks |
| Cummings | 2020/03/15 | 07:24:59 PM HST | Ok |
| Kiana | 2020/03/15 | 07:25:16 PM HST | what kinda car u got? |

16

**United States v. Lyle Rikio Cummings**
**Text Messages Between Cummings and "Kiana"**

| Speaker | Date | Time | Text Message |
|---------|------|------|--------------|
| Cummings | 2020/03/15 | 07:26:14 PM HST | Toy truck |
| Kiana | 2020/03/15 | 07:26:54 PM HST | ok. U wanna walk over to the beach? |
| Cummings | 2020/03/15 | 07:27:42 PM HST | Let's go drive to a spot by the beach |
| Kiana | 2020/03/15 | 07:28:36 PM HST | ok, u dont wanna cruise keawakapu? |
| Cummings | 2020/03/15 | 07:29:05 PM HST | The gate not going close |
| Kiana | 2020/03/15 | 07:29:55 PM HST | oh. i dunno. okay den |
| Kiana | 2020/03/15 | 07:33:29 PM HST | Yeah think it gonna close. |
| Kiana | 2020/03/15 | 07:33:39 PM HST | can park on the street tho |
| Cummings | 2020/03/15 | 07:33:59 PM HST | Just getting into kihei |
| Kiana | 2020/03/15 | 07:34:11 PM HST | Ok. |
| Kiana | 2020/03/15 | 07:35:21 PM HST | i stay by entrance to sidewalks. we can walk down beach from here |
| Cummings | 2020/03/15 | 07:37:45 PM HST | I no like leave my truck there |
| Kiana | 2020/03/15 | 07:38:20 PM HST | can park on street |
| Kiana | 2020/03/15 | 07:40:41 PM HST | we can jus cruise beach for lil bit |
| Kiana | 2020/03/15 | 07:45:47 PM HST | what color your truck? did u just pass me? |
| Cummings | 2020/03/15 | 07:48:40 PM HST | Where you |
| Cummings | 2020/03/15 | 07:49:21 PM HST | Come jump in |
| Cummings | 2020/03/15 | 07:49:32 PM HST | Hurry up |
| Kiana | 2020/03/15 | 07:49:41 PM HST | Come here |

2-SER-429

**United States v. Lyle Rikio Cummings**
**Text Messages Between Cummings and "Kiana"**

| Speaker | Date | Time | Text Message |
|---------|------|------|--------------|
| Cummings | 2020/03/15 | 07:50:12 PM HST | Cross the street now |
| Kiana | 2020/03/15 | 07:56:15 PM HST | test |
| Kiana | 2020/03/15 | 07:56:17 PM HST | test |
| Kiana | 2020/03/15 | 07:56:18 PM HST | test |
| Kiana | 2020/03/15 | 07:56:20 PM HST | test |
| Kiana | 2020/03/15 | 07:56:21 PM HST | test |
| Kiana | 2020/03/15 | 07:56:22 PM HST | test |
| Kiana | 2020/03/15 | 07:56:23 PM HST | test |
| Kiana | 2020/03/15 | 07:56:25 PM HST | test |
| Kiana | 2020/03/15 | 07:56:26 PM HST | test |
| Kiana | 2020/03/15 | 07:56:29 PM HST | test |

2-SER-430

**SUSPECT: LYLE RIKIO CUMMINGS**
**DATE: March 15, 2020**                      **Case Number: HL07QS20HL0007**

### INTERVIEW OF LYLE RIKIO CUMMINGS

The following was transcribed by Homeland Security Investigations (HSI) Special Agent (SA) Special Agent (SA) Murray Acosta from October 2-6, 2020. The transcript describes an audio/visual recording interview of Lyle Rikio CUMMINGS at the Maui Police Department, Kihei Substation which took place on March 15, 2020.

Legend:
LAGG:     Maui Police Department, Detective Lee Ann Galario-Guzman
LC:       Lyle Rikio CUMMINGS
LD:       HSI SA Laura Dai
IA:       Inaudible
UI:       Unintelligible

---

(Video Camera Activated)

(LD presents her badge and credentials for LC to observe and inspect.)

LD:       I'm a Special Agent with Homeland Security [Investigations]. We're working together.

(LC affirmatively nods his head.)

Yeah. Yeah.

LAGG:     Okay. So...um...before I ask questions, we're going to read you your rights and then...(UI) it's up to you if you want to say anything or not. Okay? But...um... let me start with this okay.

(LAGG presents MAUI POLICE DEPARTMENT, YOUR CONSTITUTIONAL RIGHTS form to LC.)

Okay, so...today's date is March 15, 2020. The time now is 8:36 p.m. We're in the Kihei Police Station, in interview room number two. Um...state your full name.

LC:       Lyle R. Cumming'...Rikio Cummings.

LAGG:     Ly'...Lyle...

LC:       Rikio Cummings.

LAGG:     Rikio...?



Page 1 of 21     EXHIBIT 8     M. ACOSTA

**SUSPECT: LYLE RIKIO CUMMINGS**
**DATE: March 15, 2020**                         **Case Number: HL07QS20HL0007**

(LC affirmatively nods his head.)

Okay. Okay…uh…this is for report number 20-010287. Um…regarding Electronic Enticement of a Child in the First Degree. Okay. Lyle, before we start, yeah, you can…um…write your full name over here on the top.

(LAGG hands LC a pen to write with. LC writes his name on the MAUI POLICE DEPARTMENT, YOUR CONSTITUTIONAL RIGHTS form.)

And then I going read this aloud to you, you just g'…follow with me. Yeah, after every sentence I like you initial…after I'm done reading the…the sentence. It's just so you understand it. Alright?

(LAGG reads from the MAUI POLICE DEPARTMENT, YOUR CONSTITUTIONAL RIGHTS form.)

"Before we ask you any questions, we want to tell you about your rights." So if you understand that, can you initial.

(LC writes his initial.)

Uh…"You have the right to remain silent." You understand? You understand that?

(LC writes his initial.)

LC:        Yes.

LAGG:      Okay, "Anything you say can be used against you in court."

LC:        Yes.

(LC writes his initial.)

LAGG:      You understand? Okay. "You have the right to talk to a lawyer for advice before we ask you any questions and to have your lawyer with you during questioning." You understand?

LC:        Yeah.

(LC writes his initial.)

LAGG:      Okay…um…"If you cannot afford a lawyer one will be appointed for you before any questioning." You understand?

LC:        Yes.

**M. ACOSTA**

**Page 2 of 21**

2-SER-432

CUMMINGS_000765

**SUSPECT: LYLE RIKIO CUMMINGS**
**DATE: March 15, 2020**                    **Case Number: HL07QS20HL0007**

(LC writes his initial.)

LAGG:    Okay.  Initial please.  Okay…so…we'll ask you…skip that part and just like you read this one out loud.  And if you understand it sign, today's date, and time.

LC:    "I understand the English language.  I have read and heard this statement of my rights and I understand what my rights are."

LAGG:    You understand, yeah, what just read?

LC:    Yeah.

LAGG:    Okay.  Just sign

(LC signs his name.)

Today's date is March 15, 2020.

(LC writes the date.)

Right now it's 8:38 p.m.

(LC writes the time.)

Okay and the next line is "Would you like to waive your rights and speak with me now?"  So…like I…like how you…right now is…if you want to speak with us and then later on say you don't to speak with us, that's fine.  We'll end the conversation and…and you get…um…taken with the officers out there.

LC:    Okay.

LAGG:    You want to speak with me?

LC:    Yeah.

LAGG:    Okay.

(LC writes his initials on the line corresponding with the word "Yes" indicating that he wished to speak with law enforcement.  LC then hands the RIGHTS form to LAGG.)

(LAGG signs her name on the "Warnings given by" section on the form and writes the date and time.)

**M. ACOSTA**

**Page 3 of 21**

2-SER-433

CUMMINGS_000766

**SUSPECT: LYLE RIKIO CUMMINGS**
**DATE: March 15, 2020**        **Case Number: HL07QS20HL0007**

Okay, Lyle, so…tonight…um…

(LD signs her name on the "Witness" section on the form and writes the date and time.)

You know why you're here?

LC:        Yes.

LAGG:      Okay.  Why…why you're here?

LC:        Because I was…on the phone with one…supposedly, one young girl.

LAGG:      Okay.  How young did this girl say she was, the person you was on the phone with?

LC:        On the phone said eighteen.

LAGG:      You sure she said eighteen?

LC:        On the phone it said eighteen.

LAGG:      What phone…what phone like…what are you talking about?

LC:        Get…get their name and age on the top.

LAGG:      Okay you were on…what…your…your regular phone or some kind of social media site?

LC:        Yeah, one site.

LAGG:      Okay, what site was this?

LC:        *Skout.*

LAGG:      You was on *Skout*?  So on *Skout* she said she was eighteen?

LC:        It had it on top…eighteen.

LAGG:      Did she talk to you in any other format?  Did she continue to talk to you on *Skout* or…did she talk to you in any other way?

LC:        (UI.)

LAGG:      Did she send you messages?  You sent her messages?

**Page 4 of 21**

**M. ACOSTA**

**SUSPECT: LYLE RIKIO CUMMINGS**
**DATE: March 15, 2020**                    **Case Number: HL07QS20HL0007**

LC:        We both sent back and forth.

LAGG:      Okay.

LC:        Then she gave me her number.

LAGG:      Okay, so you got her number?

LC:        She gave me her number.

LAGG:      Okay.

LC:        Text her.

LAGG:      Okay, so you were texting her?

LC:        Yup. (Affirmative.)

LAGG:      Okay, and so what was the conversation then?

LC:        Um…"What you like do?" and I…was, "Whatever. If you like hang out."

LAGG:      Okay. Okay, so…um…what else was said in that conversation?

LC:        She kept asking what I like do? What I like do? I said, "I don't know. If
           you like hang out, we can hang out."

LAGG:      Okay, did she at any time mention how old she was during those
           conversations?

LC:        Uh…she mentioned her cousin was seventeen.

LAGG:      Her cousin was seventeen. What about her? Did she mention how old
           she was?

LC:        Um…no. (Negatively shakes his head.)

LAGG:      Okay, so…not at any time did sh'…you…you sure she never mention her
           age because…um…

LC:        I think she said…she going be…she was fourteen or something.

LAGG:      Fourteen? Okay, she said she was going to turn fourteen, I think, yeah?
           She was going turn fourteen next month. But if I understand correctly,
           from the messages.

**M. ACOSTA**

2-SER-435

CUMMINGS_000768

**SUSPECT:  LYLE RIKIO CUMMINGS**
**DATE:  March 15, 2020**              **Case Number:  HL07QS20HL0007**

LC:      I think so.

LAGG:    Okay.  So you know sh'…you know, at that point, she was…around thirteen or fourteen?

LC:      (UI) she was young.

LAGG:    Yeah.  And you continue conversation?

LC:      Um…she kept asking, oh, if I, "What you like do?  What you like do?"

LAGG:    Mm-hmm.  (Affirmative.)

LC:      I was like, "Oh, whatever, if you like hang out."  'Cause she was having problems with her cousin or something she said.

LAGG:    Okay.  And…you remember what else was said?

LC:      Mmmm.  (Pondering.)  (UI) cruise with you if you like.

LAGG:    Okay.  And was there any conversation of wanting to…um…participate in any type of sexual…

LC:      At one point…

LAGG:    …contact?

LC:      …she kept going and going, I just wen'…say I would do something.

LD:      Okay.

LAGG:    Remember what you said?

LC:      Yeah.

LAGG:    What was that you said on text?

LC:      "I'll eat your pussy."

LAGG:    Okay, you told her that on text messaging?

LC:      Yes.

LAGG:    Okay, and…did the conversation continue?  You remember what else you said?

**Page 6 of 21**

**M. ACOSTA**

2-SER-436

CUMMINGS_000769

**SUSPECT: LYLE RIKIO CUMMINGS**
**DATE: March 15, 2020**                    **Case Number: HL07QS20HL0007**

LC:      Umm. (Negatively shakes his head.) That's about it.

LAGG:    That's about it.

LC:      (UI) but…I just…I wasn't in for that…I just wanted for cruise.

LAGG:    Okay, so you remember telling her that you were wanting to be in a
         relationship with her?

LC:      No.

LAGG:    And you were going to treat her to whatever she wants?

LC:      Yes.

LAGG:    Bring her to…

LC:      (UI.)

LAGG:    Mm-hmm. (Affirmative.) You remember that conversation?

LC:      Yes.

LAGG:    Okay. Um…also you remember…uh…asking her…um…wanting to
         sh'…telling her that you would…you would shower her with money?

LC:      She wanted me to shower her with money, she said.

LAGG:    Okay. And you said you was going to bring down some money…for her,
         in the conversation you guys…text conversation you guys had?

LC:      I said, I would have money with me.

LAGG:    You said you would have money with you. Did you bring money with
         you…

LC:      (Shrugs his shoulders.)

LAGG:    …to give to her?

LC:      No, I guess…well, what I carry with me.

LAGG:    What you usually carry with you?

LC:      I have a few hundred.

**M. ACOSTA**

CUMMINGS_000770

**SUSPECT: LYLE RIKIO CUMMINGS**
**DATE: March 15, 2020**                    **Case Number: HL07QS20HL0007**

LAGG:       A few hundred.  What is a "…few…" like…?

LC:          Three hundred.

LAGG:       Three hundred.  That's all you…you have?

LC:          Uh…uh…I had…uh…I just got paid so I had…(UI) had my paycheck with me.

LAGG:       How much you usually get paid?

LC:          I had eleven hundred.

LAGG:       Okay.  So you had eleven hundred i'…on you?

LC:          No.  (Negatively shakes his head.)  I did not.

LAGG:       You just had three hundred from the eleven hundred?

LC:          I had…I had a little more…I had more than three hundred.  I not sure exactly.

LAGG:       Okay.  So you have around three hundred?  A little bit more or a little bit less?

LC:          Maybe five…five…five hundred or something.

LAGG:       Um…do you do this often?

LC:          I…I go on the website for…but I never did go to (UI).

LAGG:       Okay, you ever go…um…on any other sites…besides *Skout*?

LC:          I have like *MeetMe* but I never do…I don't go on that.

LAGG:       Okay.  So you have a *MeetMe* account?

LC:          I…uh…it's same as…it's same as *Skout*, I believe.

LAGG:       Same as *Skout*?  Okay.  So you have a *Skout* accout, *MeetMe* account.  Any others?

LC:          *Snapchat*.

LAGG:       *Snapchat*.

**M. ACOSTA**

2-SER-438

CUMMINGS_000771

**SUSPECT: LYLE RIKIO CUMMINGS**
**DATE: March 15, 2020**                    **Case Number: HL07QS20HL0007**

LC:     *Instagram.*

LAGG:   Okay.

LC:     *Facebook.*

LAGG:   Okay.

LC:     I don't know if *TikTok* is one of those whatever.

LAGG:   Okay. Have you ever…um…been involved in any other…um…in other relationships with any of the other people you chat with?

LC:     Oh, I usually before (UI) Vegas (UI).

LAGG:   And what is this…through just text messaging or you…

LC:     Hmmm. (Ponders.)

LAGG:   'Cause certain parts of Vegas is legal, right, for…outside of Vegas…um…actually in Nevada…

LC:     Yeah.

LAGG:   …right? Okay, so…

LC:     (UI) for meet people.

LAGG:   "…for meet people." Okay…um…let me…this ques'…let me read…read this question and…: Anybody under the age of sixteen?

LC:     (Negatively shakes his head.)

LAGG:   You ever been involved with…any…

LC:     No.

LAGG:   …female under the age of sixteen?

LC:     No.

LAGG:   Okay. So you saying that this is your first time?

LC:     I wasn't involved with her?

LAGG:   Involved with who?

**M. ACOSTA**

**Page 9 of 21**

CUMMINGS_000772

**SUSPECT: LYLE RIKIO CUMMINGS**
**DATE: March 15, 2020**                    **Case Number: HL07QS20HL0007**

LC:      This girl.

LAGG:    Okay. No but (UI) are you…were you involved with anybody else under
         the age of sixteen…

LC:      No. (Negatively shakes his head.)

LAGG:    …besides today?

LC:      No. (Negatively shakes his head.)

LAGG:    And d'…do you take medication for anything?

LC:      Yeah.

LAGG:    What you take medication for?

LC:      High blood pressure, diabetes…

LAGG:    Mm-hmm. (Affirmative.)

LC:      …all kind.

LAGG:    Okay. And you took your medication already tonight?

LC:      I take it every morning.

LAGG:    (UI) every morning. Where is that medication now?

LC:      At home.

LAGG:    So the medication that you going need?

LC:      (IA.)

LAGG:    You take it every morning: your blood pressure and diabetes.

LC:      (UI.)

LAGG:    Okay. Um…other than that, you…you do any other type of drugs or
         you…you took any other type of drugs?

LC:      Marijuana.

**Page 10 of 21**                           **M. ACOSTA**

**SUSPECT: LYLE RIKIO CUMMINGS**
**DATE: March 15, 2020**  Case Number: **HL07QS20HL0007**

LAGG:  Marijuana.  Guess when…how long ago was it?

LC:  Hmm.  (Ponders.)  Like six o'clock this evening…

LAGG:  Okay.

LC:  …after dinner.

LAGG:  Okay.  But it's not going to prevent you from like…speaking with us or…you know, making sound decisions right?

LC:  It shouldn't.  (Negatively shakes his head.)

LAGG:  Okay.  Are you willing to do…um…polygraph exam, if we are able to do it today?

LC:  Uh…

LAGG:  A lie detector test?

LC:  …(UI) I like talk to my lawyer.

LAGG:  You like talk to your attorney?  Okay.  Alright.  And you like talk to your lawyer because of the polygraph?

LC:  Yeah.

LAGG:  You fine talking with us still or you…you want to talk to your attorney already?

LC:  Depends on the questions.

LAGG:  Okay.  So you're still willing for speak with us?

LC:  Yeah.

LAGG:  Okay.

LD:  Okay.

LAGG:  So y'…y'…you're telling us, this is the first time you've been involved with…conversation with an underage?

LC:  Yes.

LAGG:  Okay, you've never done this before?

M. ACOSTA

**Page 11 of 21**

CUMMINGS_000774

**SUSPECT: LYLE RIKIO CUMMINGS**
**DATE: March 15, 2020**                    **Case Number: HL07QS20HL0007**

LC:       No.

LAGG:    Um…

LC:       (Turns away and coughs.)

LAGG:    …so if we looked at your…your *Skout* account, would we be…would we
         find information where you're chatting with somebody under the
         age…would it show that…any other people besides who you spoke with
         today?

LC:       (UI) if it's (UI) I just put in…I just…I put anything on *Skout*.

LAGG:    Okay.  (UI).

LC:       (UI).

LAGG:    (UI.)  And so…the person that you speaking with tonight…before you got
         here, what was her name?

LC:       Uh…Kiana (phonetic) I believe.

LAGG:    Kiana.

LC:       (UI) on top there.

LAGG:    That's what said on the…on the account.

LC:       Yes.

LAGG:    Okay.

(Brief pause.)

(To LD.)  (IA.)

LD:       Um…I do have some questions regarding…um…your chat with Kiana,
         earlier.  Um…if you can refresh your memory.  At one point, earlier, you
         said that…um…you were going to…she asked you to shower her with
         money.

LC:       Mm-hmm.  (Affirmative.)

LD:       How did that conversation came about?

**Page 12 of 21**

**M. ACOSTA**

2-SER-442

**SUSPECT:  LYLE RIKIO CUMMINGS**
**DATE:  March 15, 2020**                    **Case Number:  HL07QS20HL0007**

| | |
|---|---|
| LC: | She asked me…she said, oh, if I'm hustling 'cause I…I show a lot of money…oh, my pictures I get money. |
| LD: | Mm-hmm.  (Affirmative.) |
| LC: | 'Cause I put pictures of money. |
| LD: | Okay, what else? |
| LC: | What you mean, "What else?" |
| LD: | Um…like, you were going to take her shopping and stuff.  Wha'…tell me about that? |
| LC: | I just told her, "If you like go hang out," I…I go take her shopping. |
| LD: | Mm-hmm.  Mm-hmm.  (Affirmative.)  What was your intent to take her to shopping? |
| LC: | Make her feel good. |
| LD: | Mm-hmm.  (Affirmative.)  Were you planning to buy her stuff? |
| LC: | Umm…I'm not sure. |
| LD: | Or was it just like…talking about it? |
| LC: | (UI) talk. |
| LD: | Mm.  (Affirmative.)  Did you have plan to take her to Wailea or anywhere to shop…and buy her stuff? |
| LC: | No. |
| LD: | Mmm, okay. |
| LAGG: | 'Cause in your text conversation I believe it says that you will shower her with gifts. |
| LC: | Not, I said I would (UI) her go. |
| LAGG: | (UI.) |
| LD: | Mm-hmm.  Mm-hmm.  (Affirmative.) |

**M. ACOSTA**

**Page 13 of 21**

**SUSPECT: LYLE RIKIO CUMMINGS**
**DATE: March 15, 2020**          **Case Number: HL07QS20HL0007**

LAGG:     (UI) but…I'm saying that "…if you want to be my girlfriend…" and then she's saying, "What do you want? What do you want?" and you ask her what she wanted?

LC:       Right.

LAGG:     Yeah, so you're trying to initiate a relationship with Ki'…Kiana?

LC:       No.

LAGG:     No? Just (UI) to hook up?

LC:       Just hang out. She said like she needed…she was in trouble…like she…she…I don't know. Nowadays, kids they get in trouble sometimes they need somebody just for talk to.

LD:       Mm-hmm. (Affirmative.)

LC:       It seems like she kind of in that situation?

LD:       Mm-hmm. (Affirmative.) Are you in any relationship with anyone that…right now?

LC:       Yes, I am.

LD:       Okay, are you married?

LC:       No.

LD:       Okay, you have a girlfriend?

LC:       Yes.

LD:       Okay, you mind sharing her name?

LC:       Vienna. (Phonetic.)

LD:       Vien'…how old is Vienna?

LC:       She's thirty-seven.

LD:       Mm-hmm. (Affirmative.) Does she know that you…

LC:       (Negatively shakes his head.)

LD:       …came out? Okay. Are you living with…with her…right now?

**M. ACOSTA**

2-SER-444

CUMMINGS_000777

**SUSPECT: LYLE RIKIO CUMMINGS**
**DATE: March 15, 2020**                    **Case Number: HL07QS20HL0007**

LC:     I kind of stay with her.

LD:     Okay, where does she live?

LC:     On ▮▮▮▮▮▮▮▮

LD:     ▮▮▮▮▮▮▮▮ Oh, okay. You said she's about thirty-six years old?

LC:     Thirty-six. Thirty-seven. Ten...

LD:     Thirty-six...

LC:     ...years younger.

LD:     ...thirty-seven. What's Vienna's last name?

LC:     Ki'... Kihana... Kihana... Kihana

LD:     Kihana.

LC:     (UI.)

LD:     Okay. Does she work?

LC:     Yes.

LD:     Where does she work?

LC:     ▮▮▮▮▮▮▮▮

LAGG:   ▮▮▮▮▮▮▮▮

LD:     Oh, okay.

LAGG:   ▮▮▮▮▮▮▮▮

LD:     Okay, sorry I'm not familiar with...

LAGG:   No. No. No, I'm familiar with the area.

LD:     You have any children?

LC:     No.

LD:     No. Anyone else you have a relationship with besides your girlfriend?

**Page 15 of 21**

M. ACOSTA

2-SER-445

CUMMINGS_000778

**SUSPECT: LYLE RIKIO CUMMINGS**
**DATE: March 15, 2020**                    **Case Number: HL07QS20HL0007**

LC:        No.

LD:        Hmm. (Ponders.) How long have you been with Vienna?

LC:        Umm…maybe two…three years?

LD:        Two to three years. Um…tell me something about her. What do you guys normally do?

LC:        Oh, she works late hours so…I usually just sleep over and then go work and then we go have dinner (UI).

LD:        Mm-hmm. Mm-hmm. (Affirmative.) Okay. I'm trying to take you back to when you were talking to Kiana. You mentioned that she asked you to shower her with money, right?

LC:        She asked me, yeah.

LD:        Yeah, she asked you. How do you respond to that?

LC:        See I don't remember?

LD:        Mm…okay, what I'm trying to…to have you…when you met up with Vienna, is she the type that also wanted you to shower with…with money as well or…?

LC:        No.

LD:        No.

LC:        She don't ask me for that.

LD:        Okay. Any'…anybody else that…ask you…or you attempt to offer any kind of money to them for any kind of sexual relationship?

LC:        No.

LD:        No. Okay. (To LAGG.) Alright.

LAGG:      Hey, Lyle, just a few…um…information. "Lyle," yeah, is your…Lyle Cummings?

LC:        Yes.

LAGG:      Yeah. Your birthdate, Lyle?

**M. ACOSTA**

2-SER-446

CUMMINGS_000779

**SUSPECT: LYLE RIKIO CUMMINGS**
**DATE: March 15, 2020**                    Case Number: HL07QS20HL0007

LC:        8-9-73.

LAGG:      And your Social Security Number.

LC:        ███████

LAGG:      And your home address?  Where you live?

LC:        24 Nena.

LAGG:      Elena?

LC:        Nena.

LAGG:      Nena.

LC:        N-e-n-a.

LAGG:      Okay.  Uh…Haliimaile?

LC:        Yes.

LAGG:      Okay.  Um…where do you work at?

LC:        Um…(UI) in Kihei.

LAGG:      Um…what do you do for them?

LC:        T.M.O.

LAGG:      What is that?

LC:        Tractor Motor Operator.

LAGG:      Tractor Motor Operator.

LC:        Parts Department.

LAGG:      Okay.  You have any other number you can be reached at?

LC:        No.  Well, my home number but that phone not that good.

LAGG:      Okay, what is…what is the home phone number 'cause we…what
           happens is…um…you never get consent to search for your truck so we're
           going to apply for a search warrant and your phone is in there, as well.

M. ACOSTA

CUMMINGS_000780

**SUSPECT: LYLE RIKIO CUMMINGS**
**DATE: March 15, 2020**　　　　　　　　**Case Number: HL07QS20HL0007**

LC:　　　　Mm-hmm. (Affirmative.)

LAGG:　　　There is also an application for a search warrant on the phone. Okay. Um…what is the phone number for home?

LC:　　　　8-0-8-5-7-2-7-5-8-3.

LAGG:　　　Okay. And this is the…another way to get a hold of you?

LC:　　　　(IA.)

LAGG:　　　You have another number we can get a hold of you?

LC:　　　　(IA.)

LAGG:　　　No? Okay.

LD:　　　　What about your girlfriend?

LC:　　　　It's…

LD:　　　　You have her number?

LC:　　　　…(UI) I don't have her number…on me (UI).

LAGG:　　　(UI) your phone.

LD:　　　　It's on your phone?

LAGG:　　　Okay.

LD:　　　　Okay. The phone that you were using, what number was it?

LC:　　　　8-0-8-3-5-7-3-7-1-1

LD:　　　　Okay, who is this phone subscribed to? Are you the subscriber of this phone?

LC:　　　　Yes.

LD:　　　　Which services you have?

LC:　　　　Verizon.

**Page 18 of 21**

**M. ACOSTA**

2-SER-448

CUMMINGS_000781

**SUSPECT: LYLE RIKIO CUMMINGS**
**DATE: March 15, 2020**          **Case Number: HL07QS20HL0007**

LD:      Verizon. How long have you been using this particular number in…with Verizon?

LC:      Oh, long time.

LD:      Like…more than five years?

LC:      Oh, yeah. (UI.)

LD:      Less than five? One year?

LC:      Maybe twenty years.

LD:      Maybe five years.

LAGG:    Twenty years.

LD:      Twenty. Oh, okay.

LAGG:    Okay.

LD:      Anybody else have access to your phone? Are you the only person using it?

LC:      Yeah.

LD:      Okay. Is it password protected?

LC:      With a number?

LD:      Yeah, so a number.

LC:      Mm-hmm. (Affirmative.)

LD:      So it has a…a number (UI) iPhone…

LC:      Mm-hmm. (Affirmative.)

LD:      …or…or…something like that. Okay.

LAGG:    Yeah, what kind of phone do you have?

LC:      iPhone.

LAGG:    What brand? iPhone 7?

**M. ACOSTA**

**Page 19 of 21**

2-SER-449

CUMMINGS_000782

**SUSPECT: LYLE RIKIO CUMMINGS**
**DATE: March 15, 2020**                    **Case Number: HL07QS20HL0007**

LC:     (Affirmatively raises his eyebrows.)

LD:     Okay.  Have you given your password to anybody?

LC:     The Detective.

LD:     The Detective, okay.  So…you've been using this iPhone – today is what?
        Sunday – what about the last five days?

LC:     That's the only phone I got.

LD:     Okay, so the phone have always been in your possession?

LC:     Yes.

LD:     Okay.  Alright.

LAGG:   Yeah.

LD:     You have any question for me?

LAGG:   Or for us?

LD:     For us?

LC:     (Negatively shakes his head.)

LAGG:   Okay.  Like…um…what I explained earlier, when I was reading you your
        rights, the charges, Electronic Enticement of a Child in the First
        Degree…okay…um…the investigation is still ongoing so…um…we're
        going to check if there are more charges and so it's a pending
        investigation; therefore…um…I know you trying to make a phone call right
        now because it's still pending – the investigation – but once
        we're…um…clear with the investigation, the detective will come see you
        to let you know you can make your phone call and/or give you the…your
        bail amount.  Okay.

LC:     (Affirmatively nods his head.)

LAGG:   You have…

LC:     (Negatively shakes his head.)

LAGG:   …any other questions for us?  No?

LC:     No.  (Negatively shakes his head.)

**M. ACOSTA**

**Page 20 of 21**

**SUSPECT: LYLE RIKIO CUMMINGS**
**DATE: March 15, 2020**                    **Case Number:  HL07QS20HL0007**

LAGG:       Okay.

LD:         Well, thank you for being cooperative with us.  I appreciate you being
            honest and talking to us.

LC:         (Affirmatively nods his head.)

LAGG:       Okay, thank you, Lyle.  End of interview at 2057 [hours].

LD:         (UI.)

        (LAGG and LD exit the interview room.  LC remains in the interview room.)

                    (Video recorder is deactivated.)

**M. ACOSTA**

**Page 21 of 21**

2-SER-451



CUMMINGS_000098



2-SER-453

CUMMINGS_000099



3

2-SER-454
CUMMINGS_000102



2-SER-455

CUMMINGS_000104



2-SER-456 CUMMINGS_000105



6

CUMMINGS_000109



2-SER-458

CUMMINGS_000110



CUMMINGS_000111



**State of Hawaii 329 Medical Cannabis**

Registration Number: 2019032769

Start Date: 02/01/2020   Expiration Date: 01/31/2022

Patient Last Name: Cummings

First, Middle, Suffix: Lyle R

Date of Birth: 08/09/1973

Caregiver Last Name:

First, Middle, Suffix:

Date of Birth:

Physician/APRN Name: /s/ Robert Mastroianni, MD



2-SER-461    CUMMINGS_000114



2-SER-462
CUMMINGS_000115



2-SER-463

12



13



2-SER-465
CUMMINGS_000129



CUMMINGS_000130



2-SER-467
CUMMINGS_000131



2-SER-468

CUMMINGS_000124



18

CUMMINGS_000125



2-SER-470

CUMMINGS_000118



20

CUMMINGS_000119



2-SER-472

CUMMINGS_000122



22



2-SER-474
CUMMINGS_000123



2-SER-475

CUMMINGS_000120



25



2-SER-477
CUMMINGS_000133



2-SER-478
CUMMINGS_000134



2-SER-479

CUMMINGS_000135



2-SER-480
CUMMINGS_000136



2-SER-481

CUMMINGS_000137



CUMMINGS_000141



CERTIFICATE OF MOTOR VEHICLE REGISTRATION
COUNTY OF MAUI, HAWAII

| LICENSE NUMBER | MAKE | TYPE | YEAR MODEL | AFTER PAYMENT OF FEES, REGISTRATION EXPIRES ON THE LAST DAY OF: |
|---|---|---|---|---|
| LAJ777 | TOYT | PKUP | 08 | MAY 2020 |

| VEHICLE IDENTIFICATION NUMBER | DATE FIRST SOLD | TCI NUMBER |
|---|---|---|
| 5TETX22N28Z529314 | 06/16/08 | LAJ777-15 |

| WEIGHT | CLASS | SP PLATE | EXEMPT | STATE FEE | COUNTY FEE |
|---|---|---|---|---|---|
| 3720 | 1 | | | 45.00 | 45.50 |

| COUNTY WEIGHT TAX | COUNTY PENALTY | STATE WEIGHT TAX | STATE PENALTY |
|---|---|---|---|
| 130.20 | | 65.10 | |

SUBMIT CURRENT VEHICLE INSPECTION CERTIFICATE IF RENEWING AFTER: MAY 2019

AVOID PENALTY RENEW ON OR BEFORE

VALIDATED CERTIFICATE MUST BE IN DRIVER'S COMPARTMENT.

VALIDATION EMBLEM NUMBER
LAJ777

INSTRUCTIONS FOR APPLYING LI...
EMBLEM
HAWAII
ABC 222
ALOHA STATE

1. CLEAN SURFACE THORO... (EMBLEM WILL NOT STICK... WET OR DIRTY).
2. BEND EMBLEM AND PEEL ... SLOWLY.
3. PLACE EMBLEM IN UPPER ... HAND CORNER OF REAR LICENSE PLATE.

REGISTERED OWNER AND ADDRESS (PLEASE ENTER ANY ADDRESS CHANGE):

CUMMINGS LYLE
24 NENA ST
MAKAWAO HI 96768

Any change of Registration Owner or Lienholder must be recorded with the department within 30 days by presenting ... OF TITLE properly endorsed, last issued CERTIFICATE OF REGISTRATION and current CERTIFICATE OF VEHICLE INSPECTION. AFTER 30 DAYS, PENALTY F... OWNERSHIP WILL BE $50.00.

2-SER-483
CUMMINGS_000142



2-SER-484

CUMMINGS_000106

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

| UNITED STATES OF AMERICA, | CRIMINAL NO. 22-00023 DKW |
|---|---|
| Plaintiff, | **FINAL JURY INSTRUCTIONS** |
| vs. | |
| LYLE RIKIO CUMMINGS, | |
| Defendant. | |

INSTRUCTION NO. 18

In Count 1 of the Indictment, the defendant, Lyle Rikio Cummings, is charged with Coercion and Enticement of a Minor in violation of Section 2422(b) of Title 18 of the United States Code.  For the defendant to be found guilty of that charge, the government must prove beyond a reasonable doubt:

First, that between March 13-15, 2020, the defendant knowingly attempted to persuade, induce, entice, or coerce a minor, that is, an individual under the age of 18, to engage in unlawful sexual activity, for which the defendant could be charged with an offense under Hawai'i Revised Statutes, Section 707-730(1)(b), Sexual Assault in the First Degree;

Second, the defendant used a means or facility of interstate or foreign commerce to do so;

Third, the defendant believed that the individual he attempted to persuade, induce, entice, or coerce was under the age of 18; and

Fourth, the defendant did something that was a substantial step toward committing the crime and that strongly corroborated the defendant's intent to commit the crime.

Mere preparation is not a substantial step toward committing the crime.  To constitute a substantial step, a defendant's act or actions must unequivocally

18

demonstrate that the charged crime, that is, coercion or enticement of a minor, will take place unless interrupted by independent circumstances.

Jurors do not need to agree unanimously as to which particular act or actions constituted a substantial step toward the commission of a crime.

As a matter of law, Sexual Assault in the First Degree in violation of Hawai'i Revised Statutes, Section 707-730(1)(b), a felony, provides that: A person commits the offense of sexual assault in the first degree if the person knowingly engages in sexual penetration with another person who is less than fourteen years old.

"Sexual penetration" means: (1) Vaginal intercourse, anal intercourse, fellatio, deviate sexual intercourse, or any intrusion of any part of a person's body or of any object into the genital or anal opening of another person's body; it occurs upon any penetration, however slight, but emission is not required; or (2) oral sex, including cunnilingus or anilingus, whether or not actual penetration has occurred.

An actual minor victim is not required for an attempt conviction under Section 2422(b) of Title 18 of the United States Code.

The internet and a cellular phone are facilities of interstate commerce.

2-SER-487

INSTRUCTION NO. 20

A minor's willingness to engage in sexual activity, or stated consent to sexual activity, is irrelevant to the elements of 18 U.S.C. § 2422(b) (Coercion and Enticement of a Minor) and Hawaiʻi Revised Statutes Section 707-730(1)(b).  The relevant inquiry is the conduct of the defendant, not of the minor.

2-SER-488